UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KEYSE G. JAMA,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

Civil File No. 01-1172 (JRT/AJB)

**REPORT AND RECOMMENDATION**

Jeffrey J. Keyes and Kevin M. Magnuson, Briggs and Morgan, 2400 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, 55402, for Petitioner.

Lonnie F. Bryan, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Respondent.

ARTHUR J. BOYLAN, United States Magistrate Judge

Petitioner commenced this action by filing an application for habeas corpus relief pursuant to 28 U.S.C. § 2241. He is asking the Court to enter an order that would bar Respondent, the United States Immigration and Naturalization Service, ("INS"), from removing him to Somalia. He claims that Respondent cannot legally deport him to Somalia, because that country has not agreed to accept him.

Respondent has filed an answer, contending that this action should be dismissed for lack of jurisdiction. Respondent further contends that, in any event, Petitioner can legally be removed to Somalia, even though there has been no indication that he will be accepted there.

The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, I

FILED FEB 0 1 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

conclude that (a) Petitioner's habeas corpus petition can properly be entertained here, and (b) Petitioner cannot legally be removed to Somalia until that country agrees to accept him. It will therefore be recommended that habeas corpus relief be granted to Petitioner in the form of an order that bars Respondent from removing him from the United States until Somalia, or some other country, has agreed to accept him.

## I. BACKGROUND

Petitioner was born in Somalia in 1979. In 1991, he and his family went to Kenya to escape inter-tribal warfare in their homeland. After living in Kenya for several years, Petitioner and his family applied for admission to the United States as refugees. Their application was granted, and Petitioner arrived in the United States on or about February 27, 1996. He came to Minnesota shortly thereafter. Petitioner settled in the Twin Cities area, where he worked and went to school. He never became a citizen or permanent resident alien, but simply retained his refugee status.

In June of 1999, Petitioner got into a fight with another man. The man suffered a substantial injury, and Petitioner was charged with assault. In September 1999, he pleaded guilty to third degree assault – a felony under Minnesota law – and was sentenced to one year and one day in prison. His prison sentence was stayed and he was placed on probation for three years. He violated the conditions of his probation, so he ended up serving time in state prison.

Because of Petitioner's felony conviction, the INS initiated removal proceedings against him in late 1999. When he completed his state prison term in 2000, he was taken into INS custody. Petitioner attempted to avoid removal by filing an application for asylum, claiming that he would be persecuted if he returned to Somalia. He raised the same

argument in a separate application for relief under the "Convention Against Torture." He also filed an application seeking permanent resident alien status.

In August 2000, an immigration judge conducted a hearing to determine whether Petitioner should be removed from the United States. The immigration judge later issued a decision, in which he held that Petitioner was removable because he had been convicted of a "crime of moral turpitude." The immigration judge also rejected Petitioner's various applications for asylum and permanent resident alien status.[1] Petitioner did not request that he be sent to any particular country, so the immigration judge directed the INS to remove him to his homeland -- Somalia.

Petitioner appealed the immigration judge's decision to the Board of Immigration Appeals, but his removal order was affirmed. He never sought judicial review of the INS removal order, and he concedes, (at least implicitly), that the removal order has become final. On May 25, 2001, the INS formally notified Petitioner that the removal order would be executed.

As far as the Court can tell, Petitioner has been held by the INS at all times since he completed his state prison sentence in June 2000. The INS detained him for several months at the Minnesota Correctional Facility in Rush City, Minnesota, but when he filed

---

[1] The immigration judge noted that Petitioner had been arrested numerous times before his assault conviction, and that he had compiled an extensive disciplinary record while serving his state prison sentence. According to the immigration judge, Petitioner "was subjected to numerous violation reports, which ultimately resulted in him losing all his good time in prison, and being required to serve the entirety of his sentence. [Petitioner] was transferred from lower security institutions up to Oak Park Heights Prison, which is the highest security classification prison in the Minnesota System." (Government Exhibits, [Docket No. 8], p. 177.) Respondent has submitted various prison records that tend to corroborate the immigration judge's suggestion that Petitioner was a very hostile inmate. (Government Exhibits, pp. 115-39.)

his current habeas corpus petition, on June 28, 2001, he was being detained at the Sherburne County Jail in Elk River, Minnesota. It is unclear whether Petitioner is still in custody in Sherburne County, or whether he has been transferred to some other detention facility.

It is important to note that Petitioner is not presently challenging the validity of his removal order; nor is he challenging his current INS detention per se. Instead, Petitioner is challenging the manner in which the INS is planning to execute the removal order. More specifically, Petitioner is claiming that the INS should not be allowed to physically transport him to Somalia, and drop him off there, unless and until some proper governmental authority in Somalia has agreed that he can be left there.

According to Petitioner, there is no proper governmental authority in Somalia that can approve his return to that country at this time, because Somalia presently has no government. Respondent acknowledges that "Somalia has been without a functioning central government since 1991." (Respondent's Return, [Docket Nos. 5, 6 & 7], p. 6.) Moreover, neither party suggests that Somalia is likely to have a functioning central government any time soon.[2]

---

[2] According to Respondent:

> "On June 15, 2000 in Arta, Djibouti more than 900 delegates, representing various clans and a wide spectrum of Somali society, beg[a]n establishing a central and unified government of Somalia. In July 2000, the delegates adopted a charter establishing a transitional government including an elected assembly and president. Although this Transitional Government continues to pursue unification, Somaliland and Puntland [two major provinces] do not currently recognize the transitional government."

(Respondent's Return, p. 7.)

Respondent claims that there is no need to obtain anyone's consent before sending Petitioner back to Somalia, and that it has a plan to repatriate Petitioner, which can be executed without the acquiescence of anyone in Somalia. That plan, as explained in Respondent's Return, is as follows:

The INS intends to give Petitioner a choice of four cities in Somalia where he can be dropped off. After Petitioner has selected a city to land in, the INS intends to prepare, and issue to him, a "Form I-269 (Certificate of Identity) which is used when a passport travel document is unavailable." (Respondent's Return, p. 8.) The INS would then prepare a travel itinerary to return Petitioner to Somalia. If the INS follows its past practice, (and there is no indication that it will not), Petitioner probably would be put on a plane with two INS deportation officers and sent to Sweden. From there, Petitioner and the two deportation officers would fly to the City of Dubai, in the United Arab Emirates. The deportation officers would then put Petitioner on another flight bound for the Somali city of his choice, and Petitioner would travel that final leg of the journey alone. The deportation officers apparently would stay in Dubai long enough to satisfy themselves that Petitioner was not returned to Dubai on a flight back from Somalia. (Respondent's Exhibits, [Docket No. 8], pp. 243-44.) They would then return to the United States, presumably without any knowledge of Petitioner's fate upon his arrival in Somalia.

Respondent represents that the foregoing plan has been used to return at least 14 Somalis to their homeland during the past few years, and that the plan can be used to successfully remove Petitioner. Moreover, Respondent apparently is confident that Petitioner will be relatively safe and secure upon returning to Somalia -- assuming he chooses to return to a city controlled by members of his own clan. (Respondent's Return,

p. 6.)

Petitioner contends that the INS has grossly underestimated (or else understated) the danger that he would face if he were returned to Somalia. He cites news reports of people being killed recently "at the very airport where the INS seeks to drop [him]." (Petitioner's Memorandum, [Docket No. 11], p. 3.) However, Petitioner readily acknowledges that the outcome of this case should not be determined by weighing and deciding how much danger might await him in Somalia. Instead, Petitioner contends that the issue to be resolved here is whether it is legal for the INS to drop him off (quite literally) in Somalia, without first obtaining some type of consent, approval or acceptance from some Somali governmental authority. This appears to be an accurate description of the dispositive issue in this case; and the Court finds that the issue should be resolved in Petitioner's favor.

## II. JURISDICTION

Before reaching the legal issue raised by Petitioner, it is first necessary to determine whether this case can properly be entertained in a federal district court. Respondent contends that this action should be summarily dismissed for lack of jurisdiction, and that contention must be resolved before Petitioner's substantive claim can be addressed on the merits.

Respondent's jurisdictional argument is based on 8 U.S.C. § 1252(g), which reads as follows:

"(g) Exclusive Jurisdiction.

Except as provided in this section and notwithstanding any other

> provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act."

Respondent contends that this statute forbids federal district courts from exercising jurisdiction in any type of action -- including a habeas corpus action -- brought by an alien who is attempting to challenge the execution of a removal order. The instant Petitioner is challenging the INS's execution of the removal order entered against him, and therefore, Respondent argues, § 1252(g) deprives the Court of jurisdiction in this matter.

In Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999) ["AADC"], the Supreme Court concluded that § 1252(g) does indeed deprive federal courts of jurisdiction over actions challenging INS discretionary decisions in the three areas listed in the statute – (1) decisions involving the commencement of removal proceedings, (2) decisions made during the adjudication of removal cases, and (3) decisions pertaining to the execution of removal orders. According to Respondent, AADC clearly confirms that § 1252(g) bars Petitioner's current challenge to the INS's execution of his removal order.

Petitioner disagrees. He points out that AADC was not a habeas corpus case. Therefore, he argues, it is not controlling here.

At least the premise of Petitioner's argument is certainly correct -- AADC was not a habeas case. It was a civil lawsuit brought by a group of aliens who claimed that the INS was using selective enforcement tactics to harass them and deport them based on their nationality. The plaintiffs in AADC wanted the federal district court to enter an injunction and declaratory judgment that would end the INS's allegedly discriminatory practices. AADC, 525 U.S. at 473-75. Thus, Petitioner is correct when he contends that AADC did

not directly address the specific jurisdictional issue presented here – namely, whether § 1252(g) eliminates habeas corpus review of INS actions pertaining to the execution of removal orders. The resolution of this issue, Petitioner contends, is governed by the Supreme Court's more recent decision in I.N.S. v. St. Cyr, 121 S.Ct. 2271 (2001). The Court agrees.

In St. Cyr, a resident alien wanted the INS to waive a removal order that had been entered against him because he had been convicted of a crime. The INS contended that two laws enacted in 1996, the Anti-terrorism and Effective Death Penalty Act ("AEDPA") and the Illegal Immigration Reform and Immigrant Responsibility Act, ("IIRIRA"), took away the Attorney General's authority to waive removal orders. The alien, St. Cyr, filed a habeas corpus action claiming that the Attorney General still retained such authority, (and, presumably, that such authority should be exercised in his favor).

Before reaching the merits of St. Cyr's claims, the Supreme Court had to decide whether those claims could properly be raised in a habeas corpus proceeding. The Attorney General argued that habeas review was barred by four sections of the new 1996 laws – section 401(e) of AEDPA, and three sections of IIRIRA – 8 U.S.C. §§ 1252(a)(1), 1252(a)(2)(C) and 1252(b)(9). St. Cyr, 121 S.Ct. at 2278.[3] Even though all four of these

---

[3] The first of these new laws (AEDPA § 401(e)) repealed 8 U.S.C. § 1105a(a)(10), which had provided that "any alien held in custody pursuant to an order of deportation may obtain review thereof by habeas corpus proceedings." See id. at 2284. The second new law, 8 U.S.C. § 1252(a)(2)(C), provides that "[j]udicial review of a final order of removal" is available only in a federal circuit court of appeals. See id. at 2285. The third new law, 8 U.S.C. § 1252(b)(9), similarly indicates that "[j]udicial review of all questions of law and fact, including interpretations and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section" – i.e., only in the court of appeals. Finally, 8 U.S.C. § 1252(a)(2)(C) provides that

laws broadly bar "judicial review" of INS removal orders, the Supreme Court concluded that St. Cyr could still raise his legal arguments pertaining to his removal order in a habeas corpus petition filed in a federal district court.

In reaching that conclusion, the Supreme Court was guided by the "strong presumption in favor of judicial review of administrative action and the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." 121 S.Ct. 2278. The Court also noted "'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien.'" Id. at 2290, quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421 (1987). Finally, the Court emphasized that "some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.'" St. Cyr, 121 S.Ct. at 2279, quoting Heikkila v. Barber, 345 U.S. 229, 235 (1953). Because habeas corpus appeared to be the only means by which St. Cyr could secure "judicial intervention" in his case, the Court found that a serious constitutional problem would exist if the various new laws cited by the INS actually did bar St. Cyr from seeking habeas corpus relief. St. Cyr, 121 S.Ct. at 2282. In the words of the Court, "a serious Suspension Clause[4] issue would be presented if we were to accept the INS's submission that the 1996 statutes have withdrawn... the power [to issue the writ of habeas corpus] from federal judges and provided no substitute for its exercise." Id.

---

"[n]otwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain crimes specified by law. See St. Cyr, 121 S.Ct. at 2284-85.

[4] The "Suspension Clause" is Article I, Section 9, Clause 2 of the Constitution, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Applying these same principles here, this Court finds that § 1252(g) does not bar the instant Petitioner from seeking habeas corpus relief under 28 U.S.C. § 2241. In this case, as in St. Cyr, the statute at issue does not expressly purport to divest the federal district courts of habeas corpus jurisdiction. Section 1252(g) does not specifically mention habeas corpus review, and it should not be understood to eliminate such review merely by implication. See Shah v. Reno, 184 F.3d 719, 723-24 (8th Cir. 1999); Gavilan-Cuate v. Yetter, 94 F.Supp.2d 1039, 1040-42 (D.Minn. 2000) (emphasizing that AEDPA and IIRIRA could not repeal federal habeas corpus jurisdiction "by mere implication"), rev'd on other grounds, 276 F.3d 418 (8th Cir. 2002).

Although the jurisdiction limiting language used in § 1252(g) is certainly broad, ("no court shall have jurisdiction to hear any cause or claim"), it does not necessarily encompass habeas corpus jurisdiction. As the Supreme Court pointed out in St. Cyr, "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings." 121 S.Ct. at 2285. Here, as in St. Cyr, the statute at issue appears to be aimed only at "full, nonhabeas review," and does not "explicitly mention[ ] habeas, or 28 U.S.C. § 2241." Id. at 2286. The Court finds that § 1252(g), like the statutes examined in St. Cyr, is not worded with the clarity and specificity needed to take away the constitutionally-protected, and presumptively-favored, right to habeas corpus review.

Moreover, if Respondent's interpretation of § 1252(g) were adopted, and the remedy provided by the federal habeas statutes were therefore unavailable to Petitioner, it appears that he would have no opportunity to seek judicial review of his current claim. Respondent has not suggested that Petitioner might have some other non-habeas means of bringing his current claim before a federal judge, and the Court is not aware of any other option.

The absence of any non-habeas remedy for Petitioner's present legal argument further undermines Respondent's interpretation of § 1252(g). See St. Cyr, 121 S.Ct. at 2279 ("[a] construction of the [statutes] at issue that would entirely preclude review of a pure question of law by any court would give rise to serious constitutional questions").

Depriving Petitioner of any federal judicial remedy would be especially objectionable in this particular case, because Petitioner is not challenging any factual or discretionary determination made by the INS. Instead, he is attempting to raise a purely legal issue -- i.e., whether federal law allows the INS to send a removable alien to a country that has not agreed to accept him. As a general rule, such purely legal issues may properly be raised and decided in habeas proceedings. St. Cyr, 121 S.Ct. at 2283 ("[i]n case after case, courts [have] answered questions of law in habeas proceedings brought by aliens challenging Executive interpretations of immigration laws").[5]

Even before St. Cyr, some circuit courts had determined that recent amendments to the federal immigration laws could not be interpreted to eliminate federal habeas review for aliens facing removal. See Goncalves v. Reno, 144 F.3d 110, 122 (1st Cir. 1998), cert. denied, 526 U.S. 1004 (1999); Henderson v. I.N.S., 157 F.3d 106, 117-22 (2nd Cir. 1998), cert. denied, 526 U.S. 1004 (1999).[6] After St. Cyr, there can be little doubt that the new laws, including § 1252(g), do not eliminate federal habeas review of the legal claims of

---

[5] Because the key substantive issue raised by Petitioner is a legal issue, this case is distinguishable from other alien habeas cases that have been dismissed for lack of jurisdiction. See e.g., Sol v. I.N.S., 274 F.3d 648, 651 (2nd Cir. 2001) ("fact-intensive review is vastly different from what the habeas statute plainly provides: review for statutory or constitutional errors").

[6] The Supreme Court noted these decisions, without voicing any disapproval of them, in AADC. See AADC, 525 U.S. at 480, n. 7.

removable aliens. As the First Circuit Court of Appeals recently put it: "In light of St. Cyr, INS's principal argument – that section 1252(g) forecloses the exercise of habeas jurisdiction over cases in which an alien challenges his imminent deportation – is a dead letter." Carranza v. Immigration and Naturalization Service, No. 00-2365 (1st Cir. Jan. 17, 2002), 2002 WL 47139 at *6. The court agrees with this assessment of Respondent's jurisdictional argument based on § 1252(g), and adopts it here. I further agree with the First Circuit's conclusion that "[f]ederal courts... retain subject matter jurisdiction over habeas petitions brought by aliens facing removal to the extent that those petitions are based on colorable claims of legal error, that is, colorable claims that an alien's statutory or constitutional rights have been violated." Id. at *5.

In sum, while § 1252(g) generally eliminates judicial review of removal orders against aliens, it does not bar federal courts from entertaining habeas corpus petitions brought by criminal aliens who are attempting to challenge removal proceedings on legal or constitutional grounds. It follows that Petitioner's current claims, challenging the legality of the INS's plan to remove him, can properly be entertained in a habeas corpus petition brought under 28 U.S.C. § 2241.

## III. THE MERITS OF PETITIONER'S HABEAS CLAIM

8 U.S.C. § 1231(b)(2) establishes a three-step selection process for determining where a removable alien should be sent after a final removal order has been entered against him. First, the alien may designate a country to which he wants to be sent; and if he does so, the Attorney General will send him there -- subject to certain limitations and restrictions. 8 U.S.C. § 1231(b)(2)(A), (B) and (C). If the alien does not designate a country to which he wants to be sent, or if he designates a country that is statutorily

unacceptable, (see 8 U.S.C. § 1231(b)(2)(B) and (C)), the selection process proceeds to the next step. At step two, the INS is directed to send the alien back to the country where he is a citizen -- if that country indicates that it will accept him. The step two statute, § 1231(b)(2)(D), says that –

> "The Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country –
>
> > (i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or
> >
> > (ii) is not willing to accept the alien into the country.

Step three of the removal process is set forth at 8 U.S.C. § 1231(b)(2)(E), which provides as follows:

> (E) Additional removal countries
>
> If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:
>
> > (i) The country from which the alien was admitted to the United States.
> >
> > (ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.
> >
> > (iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.
> >
> > (iv) The country in which the alien was born.
> >
> > (v) The country that had sovereignty over the alien's birthplace when the alien was born.

> (vi) The country in which the alien's birthplace is located when the alien is ordered removed.
>
> (vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

In this case, the INS contends (and Petitioner apparently agrees) that Petitioner's removal destination is not determinable at step one of the selection process, because Petitioner did not designate a removal destination in a proper and timely manner. It is also apparent that a removal destination cannot be determined at step two of the selection process, because the "government of the country" of which Petitioner is a "subject, national, or citizen," (namely Somalia), has not informed the INS that it "will accept [Petitioner] into the country." 8 U.S.C. § 1231(b)(2)(D)(i). Indeed, the parties agree that the "country of Somalia" has no functioning government that could accept Petitioner.[7]

Thus, the Court finds that Petitioner's removal destination must be determined at

---

[7] The parties strongly disagree about whether Somalia is in fact a "country" at all. Respondent says it is; while Petitioner says it is not. The Court does not find it necessary to resolve that semantical debate in order to decide whether Petitioner is entitled to relief. For present purposes, the Court will accept Respondent's assertion that Somalia is a country. The fact remains, however, that Somalia has no functioning government, so the "government of the country" to which the INS wants to send Petitioner has not expressed, (and cannot express), a willingness to accept him.

In a footnote in its initial Return, Respondent suggests that perhaps Petitioner could be removed to Somalia at step two, (i.e., pursuant to § 1231(b)(2)(D)), even though no government in Somalia has expressed a willingness to accept him. (Return, p. 28, n. 16.) Respondent seems to believe that if a country has no government, then the government acceptance requirement is simply "not relevant." (Id.) As Petitioner has aptly noted, this is an "extraordinary interpretation" of the statute. (Petitioner's Memorandum, p. 10.) Respondent has offered no logic or authority to support its proposition that the governmental acceptance requirement in § 1231(b)(2)(D) can simply be ignored where a country has no government. The Court rejects that proposition.

step three of the selection process, which means that § 1231(b)(2)(E) is controlling. Respondent contends that Petitioner can be removed to Somalia pursuant to § 1231(b)(2)(E)(iv), which allows the INS to remove an alien to "[t]he country in which the alien is born." Petitioner argues that the INS cannot send him to Somalia pursuant to § 1231(b)(2)(E)(iv), (or otherwise), unless the government of Somalia first agrees to accept him back into that country. Again, the Court agrees with Petitioner.[8]

The acceptance requirement included at step two of the selection process, (§ 1231(b)(2)(D)), would be rendered all but meaningless if the INS could send an alien back to the country in which he was born without obtaining that country's consent. As Petitioner points out, (and Respondent does not deny), an alien will almost always be a "subject, national or citizen" of the country in which he is born. Therefore, under Respondent's interpretation of § 1231(b)(2)(E)(iv), the acceptance requirement at step two of the selection process, (§ 1231(b)(2)(D)), could be easily circumvented in just about every case. If an alien could not be returned to the country of which he is a "subject, national or citizen" because that country had not agreed to accept him, then, under Respondent's interpretation of § 1231(b)(2)(E)(iv), the INS could still return the alien to that country, (even without that country's acceptance), if that were the country where he had been born. Under Respondent's reading of the statute, the acceptance requirements of §

---

[8] The Court rejects Respondent's suggestion that Petitioner is somehow attempting to "create a private cause of action" for himself out of § 1231(b)(2)(E). (See "Reply of Respondent," [Docket No. 15], pp. 7-9.) It is Respondent who contends that § 1231(b)(2)(E) is controlling here, and that it provides the legal authority for its plan to remove Petitioner to Somalia. Petitioner is merely opposing Respondent's contention, arguing that § 1231(b)(2)(E) does not authorize Respondent to send him to Somalia without acceptance by a Somali government.

1231(b)(2)(D) could be evaded whenever an alien was born in a country of which he is a subject, national or citizen -- which is almost always the case. Congress could not have intended for § 1231(b)(2)(E)(iv) to essentially eliminate the acceptance requirement of § 1231(b)(2)(D), by allowing the INS to avoid that requirement in virtually every case.

Furthermore, all of the relevant case law suggests that an alien cannot be removed to another country, including the country of his birth, unless that country has agreed to accept him. The case law uniformly indicates that the acceptance requirement set forth in § 1231(b)(2)(E)(vii), (allowing removal to "another country whose government will accept the alien into that country"), was meant to apply to all of the clauses of § 1231(b)(2)(E), including § 1231(b)(2)(E)(iv).

The leading case on this issue appears to be United States ex rel. Tom Man v. Murff, 264 F.2d 926 (2nd Cir. 1959) ("Tom Man"). In that case, the INS was attempting to deport an alien to China. At the time, the United States did not have diplomatic relations with the country known as "Mainland China" or "Communist China," but the INS contended that the alien could properly be sent there, even though there was no indication that he would be accepted when he arrived there. The court in Tom Man considered whether the alien could be returned to Mainland China pursuant to 8 U.S.C. § 1253(a)(3), which was the statutory predecessor of § 1231(b)(2)(E)(iv). Section 1253(a)(3) allowed the INS to deport an alien "to the country in which he was born," if the country of which he was a "subject, national or citizen" did not agree to accept him. Section 1253(a)(3) did not expressly include an acceptance requirement, just as the current § 1231(b)(2)(E)(iv) does not expressly include such a requirement. However, § 1253(a)(7), the last subdivision of § 1253(a), did include an acceptance requirement, just as § 1231(b)(2)(E)(vii) does now.

In Tom Man, the court concluded that deportation under any of the subdivisions of § 1253(a) "is subject to the condition expressed in the seventh subdivision; i.e., that the 'country' shall be 'willing to accept' him 'into its territory.'" 264 F.2d at 928. Thus, the court held that the alien could not be deported to Mainland China, pursuant to § 1253(a)(3) or otherwise, unless there was a "mutual agreement between that 'country' and ourselves." Id.

Tom Man is not an anomaly; other courts have also concluded that the INS cannot deport an alien to a country that has not agreed to accept him. In Lu v. Rogers, 164 F.Supp. 320, 321 (D.D.C. 1958), aff'd 262 F.2d 471 (D.C.Cir. 1958), the court concluded that 8 U.S.C. § 1253(a) "require[d] a determination that the country to which the alien is to be sent is willing to accept him" and that such determination "must be made prior to the time of the deportation." The Court ordered that the Attorney General would be "restrained from apprehending and deporting the plaintiff unless prior expression of willingness to accept him has been received from communist China to which it is proposed to deport him." Id. at 322. Similar decisions can be found in United States ex rel. Wong Kan Wong v. Esperdy, 197 F.Supp. 914, 917 (S.D.N.Y. 1961) ("unless and until the respondent (the government) makes preliminary inquiry and... receives an expression of 'willingness to accept,' the relator [alien] may not be deported to the mainland of China"), and Hom Sin v. Esperdy, 209 F.Supp. 3, 4 (S.D.N.Y. 1962) (recognizing that "deportation may not be effected unless the [removal destination] country is willing to accept [the deportable alien] into its territory").

It must be acknowledged that all of the relevant cases are quite old, and that all of them interpreted an earlier and somewhat different version of the statute that is now §

1231(b)(2). Furthermore, those cases are factually different because they involved aliens who were slated to be deported to a country whose government was not formally recognized by the United States, (China), while in this case we have a country that has no government at all, (Somalia). Nevertheless, the various Chinese deportation cases cited above are directly relevant to the issue presented here, i.e., whether an alien can be removed to a country that has not yet agreed to accept him. Those cases clearly indicate that an alien cannot be sent to a country that has not agreed, in advance, to take him. Moreover, Respondent, in 50 pages of briefing, has not cited a single case in which a federal court has sanctioned the removal of a legally-admitted alien to a country that has not agreed to accept him. Thus, the Court finds that § 1231(b)(2) does not authorize the INS to remove Petitioner to any country that has not agreed to accept him.

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that (a) Petitioner's current claim for relief can properly be raised and adjudicated in a habeas corpus proceeding, notwithstanding the jurisdictional restrictions of 8 U.S.C. § 1252(g); and (b) Petitioner cannot be removed to a country unless some governmental authority in that country agrees to accept him. The conclusion reached on the jurisdictional issue is based primarily on the Supreme Court's recent decision in St. Cyr. The conclusion reached on Petitioner's substantive claim for relief is based on a construction of 8 U.S.C. § 1231(b)(2) that is consistent with the case law interpreting that statute's predecessor, 8 U.S.C. § 1253(a).[9]

[9] Petitioner has presented additional arguments in support of his substantive claim for relief that are based on INS administrative regulations and the Constitution's Due Process Clause. (Petitioner's Memorandum, pp. 18-23.) The Court has not found those arguments to be persuasive, and does not adopt them here.

It bears repeating that the Court has not been asked to review the legality or validity of the removal order entered against Petitioner. That order remains in full force and effect. Nor has the Court been asked to review the legality or validity of Petitioner's current and/or future detention by the INS.[10] That issue has not been presented here and will not be addressed here.

It also bears repeating that the Court is not second-guessing any factual determination made by the INS, including the type of danger that Petitioner might face if he were returned to Somolia. Nor is the Court second-guessing any discretionary determination that the INS has made in this matter. The issue presented and resolved in this case is purely a legal one: Do the federal immigration laws permit the INS to deposit a removable alien in a country that has not agreed to accept him? The INS has not convinced this Court that the law, specifically 8 U.S.C. § 1231(b)(2)(D)-(E), authorizes the INS to do what it intends to do. Only that legal issue has been decided here.

Finally, we must consider the exact nature of the relief that should be granted in this case. Customarily, of course, a writ of habeas corpus directs the named respondent to release the petitioner from custody. Such relief, however, would not be appropriate here. Petitioner has not asked to be released from custody, and he has not shown that he is entitled to be released. Instead, Petitioner has asked only that the INS be ordered not to remove him without first obtaining confirmation from a government that he will be accepted. The Court has concluded that Petitioner should be granted the relief he has requested, and

---

[10] See Petitioner's Memorandum, p. 29 ("Petitioner does not challenge the 90 day detention [period for effecting removal] but challenges the physical removal in violation of the statute").

the remedy available under the federal habeas corpus laws is broad enough and flexible enough to provide such relief.[11] It will therefore be recommended that Respondent be ordered not to remove Petitioner to another country, unless the government of that country first agrees to accept him.

**V. RECOMMENDATION**

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's application for a writ of habeas corpus, (Docket No. 1), should be GRANTED; and

2. Respondent should be ordered not to remove Petitioner from the United States until the government of the country to which he is to be removed has agreed to accept him.

DATED: February 1, 2002

ARTHUR J. BOYLAN
United States Magistrate Judge

---

[11] In St. Cyr, for example, the habeas petitioner was not seeking release from custody per se; he was only seeking an order that would compel the INS to consider whether he should be granted a discretionary waiver of removal. By granting St. Cyr's habeas petition, the courts presumably did not set him free, but merely directed the INS to consider whether he should be granted a waiver. See also Martin v. Gerlinski, 133 F.3d 1076, 1081 (8th Cir. 1998) (granting habeas relief in the form of an order directing the federal Bureau of Prisons to consider whether petitioner should be allowed early release pursuant to 18 U.S.C. § 3621(e)(2)(B).)

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.