# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 02-2324

| | | |
|---|---|---|
| Keyse G. Jama, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| | * | of Minnesota. |
| Immigration and Naturalization Service, | * | |
| | * | |
| | * | |
| Appellant. | * | |

Submitted: February 12, 2003

Filed: May 27, 2003

Before BOWMAN, MORRIS SHEPPARD ARNOLD, and BYE, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

More than three years after he entered the United States, Somalian refugee Keyse Jama pleaded guilty to third degree assault in Minnesota state court. As a result of this felony conviction, the Immigration and Naturalization Service (INS)[1]

[1]On March 1, 2003, after the parties argued this case but before this opinion was filed, the INS ceased to exist as an independent agency within the United States

FILED ____
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ____
DEPUTY CLERK ____

initiated removal proceedings against Mr. Jama as an alien who had been convicted of "a crime involving moral turpitude." *See* 8 U.S.C. § 1182(a)(2)(A)(i)(I). Mr. Jama conceded his removability, and the immigration judge rejected his applications for humanitarian relief. The Board of Immigration Appeals (BIA) affirmed the immigration judge's decision. After the INS issued a warrant of removal to Mr. Jama, *see* 8 C.F.R. § 241.32, he filed a petition for a writ of habeas corpus to prevent the execution of his removal order, *see* 28 U.S.C. § 2241. In that petition, Mr. Jama argued that under 8 U.S.C. § 1231(b)(2), the INS could not remove him to Somalia without first establishing that Somalia would accept his return.

The district court granted habeas relief in favor of Mr. Jama, and the INS appeals that decision. We believe that the district court correctly concluded that it had jurisdiction to consider Mr. Jama's habeas petition, but we reverse the district court's order granting the writ.

I.

The INS seeks review of the district court's conclusion that it had jurisdiction under 28 U.S.C. § 2241 to consider Mr. Jama's habeas petition. Relying on general principles of procedural default and waiver, the INS first argues that Mr. Jama should have challenged the INS's decision to remove him to Somalia by bringing a timely petition for review in this court following the administrative proceedings that resulted in his final order of removal to Somalia. *See* 8 U.S.C. § 1252(a)(1), (b)(1), (b)(2), (b)(9); 28 U.S.C. §§ 2341-2349. But as both parties recognize, Congress has directed that "no court shall have jurisdiction to review any final order of removal against an

---

Department of Justice, and its functions were transferred to the newly formed Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 79 Interpreter Releases 1777, 1777 (2002). For ease of reference and because of the status of the agency at the time this case was submitted, this opinion will refer to the agency as the INS.

alien who is removable by reason of having committed" a crime of moral turpitude. *See* 8 U.S.C. §§ 1252(a)(2)(C), 1182(a)(2)(A)(i)(I).

Although it is true that we retain "direct review" jurisdiction to determine whether an alien's criminal conviction is indeed the type of offense that subjects him to removal, as well as to consider substantial constitutional challenges to the Immigration and Nationality Act (INA), neither of these exceptions applies in Mr. Jama's case. *See, e.g., Vasquez-Velezmoro v. INS*, 281 F.3d 693, 695-96 (8th Cir. 2002). Mr. Jama has long since conceded that his criminal conviction renders him removable. Mr. Jama does not, as the INS suggests, raise a substantial constitutional challenge to the INA. Mr. Jama's challenge is one of statutory construction, notwithstanding his fleeting (and we think unavailing) references to the procedural and substantive due process implications of removing him to a country that has not agreed to accept him.

The INS also contends that the district court lacked jurisdiction over Mr. Jama's habeas petition because it constitutes a challenge to the execution of a removal order prohibited by 8 U.S.C. § 1252(g). That statute provides in relevant part that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to ... execute removal orders." 8 U.S.C. § 1252(g). Mr. Jama, however, is not objecting to an unfavorable discretionary decision or action to execute the removal order. *Cf. Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482-85, 487 (1999). He challenges, rather, the Attorney General's construction of a statute; specifically, the Attorney General's legal conclusion that 8 U.S.C. § 1231(b)(2)(E)(iv) authorizes the INS to remove Mr. Jama to Somalia without first establishing that Somalia will accept his return. Our role here (and the role of the district court below) is not to second-guess the Attorney General's exercise of his discretion; it is to address a purely legal question of statutory construction. *Cf. Demore v. Kim*, No. 01-1491, 2003 WL 1960607, at *5 (U.S. April 29, 2003). We believe, therefore, that

Mr. Jama's question is simply outside the scope of the jurisdiction-stripping provision of § 1252(g).

We note, moreover, that permitting Mr. Jama to proceed with his habeas petition is entirely consistent with the principles set forth in *INS v. St. Cyr*, 533 U.S. 289, 314 (2001), *Calcano-Martinez v. INS*, 533 U.S. 348, 351 (2001), and *Demore*, 2003 WL 1960607, at *5. Although those cases did not address § 1252(g), we believe that they are pertinent to the jurisdictional issue at hand. Absent a "clear, unambiguous, and express statement of congressional intent" to the contrary, we have no reason to assume that Congress intended to preclude the district court's habeas review of a pure question of law such as the one presented by Mr. Jama. *See St. Cyr*, 533 U.S. at 298-99, 314. We note further that construing § 1252(g) to eliminate "review of a pure question of law by any court would give rise to substantial constitutional questions." *See id.* at 300, 305; U.S. Const. Art. I, § 9, cl. 2.

II.

The INS also asserts that the district court misconstrued 8 U.S.C. § 1231(b)(2) when it concluded that that statute requires the INS to establish that Somalia will accept Mr. Jama's return prior to removing him to that country. We agree. Before we turn to the merits of the INS's argument, we review briefly the statute at issue here.

Section 1231(b)(2) sets forth a progressive, three-step process for determining a removable alien's destination country. The statute first permits the alien to select a country of removal, subject to certain limitations if the country designated is one that is contiguous or adjacent to the United States. 8 U.S.C. § 1231(b)(2)(A)-(B). The Attorney General may disregard the alien's designation under four specified circumstances; for example, if the designated country is unwilling to accept the alien. 8 U.S.C. § 1231(b)(2)(C), (b)(2)(C)(iii). In the second step, assuming the alien has failed to select a country or cannot be removed to his designated country under step one, the Attorney General is directed to "remove the alien to a country of which the

alien is a subject, national, or citizen" unless the country is unwilling to accept the alien or fails to indicate (upon an inquiry by the Attorney General) that it will accept the alien. 8 U.S.C. § 1231(b)(2)(D).

If the alien is not removed to a country where he is a subject, national, or citizen, then the Attorney General must proceed to the third step of the process. That step entails selecting a destination country from a list of statutory "[a]dditional removal countries", as follows:

> (i) The country from which the alien was admitted to the United States.
> (ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.
> (iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.
> (iv) The country in which the alien was born.
> (v) The country that had sovereignty over the alien's birthplace when the alien was born.
> (vi) The country in which the alien's birthplace is located when the alien is ordered removed.
> (vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

8 U.S.C. § 1231(b)(2)(E)(i)-(vii). In this case, the parties agree that Mr. Jama's removal destination must be determined at the third step of the process, and it is to this step that we now turn.

The INS seeks to remove Mr. Jama to Somalia because it is "[t]he country in which [Mr. Jama] was born." 8 U.S.C. § 1231(b)(2)(E)(iv). The parties disagree, however, on whether the statute requires the INS to establish that Somalia will accept

Mr. Jama's return prior to effecting his removal. This disagreement is significant; if prior acceptance is required, the INS will be unable to return Mr. Jama to Somalia. This is because Somalia lacks a functioning central government, rendering it impossible for the INS to obtain Somalia's prior acceptance.

Mr. Jama cites *United States ex rel. Tom Man v. Murff*, 264 F.2d 926, 928 (2d Cir. 1959), and its unquestioning progeny for the proposition that the acceptance requirement of clause (vii) applies to clauses (i) through (vi). We are not bound by these decisions; indeed, we are not persuaded by them because they disregard the plain language of the statute itself, which is the "starting point in any question of statutory interpretation." *United States v. Milk*, 281 F.3d 762, 766 (8th Cir. 2002). Our careful review of the statute reveals that, as matter of simple statutory syntax and geometry, the acceptance requirement is confined to clause (vii), and does not apply to clauses (i) through (vi).

This statute well illustrates the maxim "*expressio unius est exclusio alterius*," or "expression of the one is the exclusion of the other." Congress inserted an acceptance requirement into steps one and two, and into the self-contained provisions that appear in clause (vii) of step three. Congress did not insert an acceptance requirement into the self-contained provisions that appear in clauses (i) through (vi). "Courts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit." *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000). In other words, we believe that the "short answer" to Mr. Jama's assertion (that the INS must obtain prior acceptance before returning him to the country of his birth) is that "Congress did not write the statute that way." *See United States v. Naftilin*, 441 U.S. 768, 773 (1979). Whether it is politically wise, efficient, or considerate of the United States to remove an alien without the prior acceptance of the alien's destination country is, quite simply, a question that lies outside our province.

Mr. Jama contends that this interpretation of step three nullifies the preceding provisions of the statute. We disagree. We reject, for example, Mr. Jama's suggestion that our plain reading of the statute, which permits the INS to return an alien to his country of birth without prior acceptance, wholly eviscerates the need to obtain a destination country's acceptance before returning its "subject, national or citizen." *See* 8 U.S.C. § 1231(b)(2)(D), (2)(E)(iv). An alien is not always a subject, national or citizen of the country in which he was born. We note, moreover, that between countries, it is not uncommon behavior to attempt to accomplish a task by asking politely first, and then to act anyway if the request is refused.

We also reject Mr. Jama's suggestion that, in the absence of any material difference between § 1231(b)(2) and its predecessor statute, 8 U.S.C. § 1253(a) (1994), this court must presume that Congress meant to incorporate and adopt the (as Mr. Jama sees it) "settled judicial construction" that reads the prior acceptance requirement into all clauses of the statute. *See, e.g., Cannon v. University of Chicago*, 441 U.S. 677, 696-99 (1979). Whether or not this presumption applies only to decisions by the United States Supreme Court or includes all judicial and administrative constructions of the statute is immaterial. *See Keene Corp v. United States*, 508 U.S. 200, 212 (1993); *Shapiro v. United States*, 335 U.S. 1, 16 (1947); *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978). Under either standard, there exists no settled judicial construction of the provision in question. *See United States v. Powell*, 379 U.S. 48, 55 n.13 (1964); *Compare Tom Man*, 264 F.2d at 928 (prior acceptance required), *with In re Niesel*, 10 I.&N. Dec. 57, 59, 1962 WL 12904 (BIA 1962) (no prior acceptance required).

The dissenting opinion takes the view that *Niesel* addresses only the issue of an initial inquiry into whether a country will accept an alien, and thus does not bear on a country's final agreement to accept an alien. Our reading of *Niesel*, however, convinces us that no such distinction exists in that case or under the statute. *Niesel* recognizes that certain portions of the statute (steps one and two, and clause (vii) of

step three) require the INS's "preliminary inquiry" as to whether a country is willing to accept an alien prior to ordering the alien deported to that country, and that under the remaining portions of the statute, no such preliminary inquiry is required. *Niesel*, 10 I.&N. at 59. It does not follow from this that there exists some sort of statutorily-required "final inquiry" that applies to the deportation of every alien under every portion of the statute.

We note, moreover, that contrary to what the dissenting opinion suggests, the BIA did not abandon *Niesel*'s holding in *In re Linnas*, 19 I.&N. Dec. 302, 1985 WL 56051 (BIA 1985). That case arose in New York, and the BIA, citing *Tom Man*, noted that "the language of [the statute] expressly requires, or has been *construed* to require, that the 'government' of a country selected under any of the three steps must indicate it is willing to accept a deported alien into its 'territory.' " *Linnas*, 19 I.&N. at 307 (emphasis added).

Finally, we note the dissenting opinion's reluctance to apply the words of the statute because to do so would not "accord with [the dissenting judge's] sense of liberty and justice." But it was Learned Hand himself who noted that it would be "most irksome to be ruled by a bevy of Platonic Guardians," even if he knew "how to choose them," which, he said, he assuredly did not. Learned Hand, *The Bill of Rights*, 73 (1958). Congress is free to fix the statute if it needs fixing, and Congress knows how to do so if it wishes.

III.

Having reviewed Mr. Jama's remaining arguments, we conclude that they are without merit. Accordingly, for the reasons stated, we reverse the district court's order granting the writ, and remand the case to the district court for the entry of an order denying Mr. Jama's habeas petition under 28 U.S.C. § 2241.

BYE, Circuit Judge, dissenting.

I agree the district court and this court have jurisdiction to consider Mr. Jama's habeas petition. I disagree, however, that 8 U.S.C. § 1231(b)(2) allows our government to remove Mr. Jama to Somalia before a functioning central government has indicated it will accept him. Because I would affirm the district court's order granting the writ, I respectfully dissent.

For nearly a half century, the courts have held the United States cannot deport an alien unless the receiving country advises us it is willing to accept the alien. Rogers v. Lu, 262 F.2d 471, 471 (D.C. Cir. 1958); United States ex rel. Lee Ming Hon v. Shaughnessy, 142 F. Supp. 468, 468 (S.D. N.Y. 1956).

Forty-four years ago, Judge Learned Hand interpreted the statutory provisions at issue here and concluded there were no circumstances under which the statute allowed the United States to deport an alien unless the receiving country was "willing to accept" him. United States ex rel. Tom Man v. Murff, 264 F.2d 926, 928 (2d Cir. 1959) (quoting 8 U.S.C. § 1253(a), the precursor to 8 U.S.C. § 1231(b)(2)). Judge Hand's interpretation of the statute subsequently became well-settled. See Chi Sheng Liu v. Holton, 297 F.2d 740, 743-44 (9th Cir. 1961); Chan Chuen v. Esperdy, 285 F.2d 353, 354 (2d Cir. 1960); Matter of Linnas, 19 I. & N. Dec. 302, 307, 1985 WL 56051 (BIA 1985) ("[A] country selected under any of the three steps [set forth in § 1253(a)] *must* indicate it is willing to accept a deported alien into its 'territory'") (emphasis added); see also Amanullah & Wahidullah v. Cobb, 862 F.2d 362, 365-66 (1st Cir. 1988) (interpreting § 8 U.S.C. § 1227(a)(2), a "parallel" provision to § 1231(b)(2) which applies to excludable rather than removable aliens, and holding the statute requires a country to accept an alien prior to deportation).

The long-standing policy and, until recently, practice of the INS have been consistent with Judge Hand's interpretation. See 8 C.F.R. § 241.4(k)(1)(i) ("[T]he

INS] shall conduct a custody review for an alien . . . where the alien's removal, while proper, cannot be accomplished during the period because no country currently will accept the alien."); INS Operating Instruction 243.1(c)(1) ("Except for a limited class of aliens deported to contiguous territory, deportation cannot be effected until travel documentation has been obtained" and further providing for travel documents to be obtained from the country willing to accept an alien) (App. 103); see also 2 Immigration Law Serv. § 17.433 ("[D]eportation under Step Three is dependent upon the country in question being willing to accept the deportee into its territory.").

Each time Congress amended the INA or re-enacted the statutory provisions which now appear at § 1231(b)(2) without making any material changes to the precursor statute, it adopted the well-settled construction given the precursor by the courts and the INS. See Bragdon v. Abbott, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well"). The majority cites In re Niesel, 10 I. & N. Dec. 57, 59, 1962 WL 12904 (BIA 1962) for the proposition there was no settled judicial construction of the disputed provisions. I disagree. "Niesel simply held that the government appropriately disregarded a petitioner's designation and lawfully chose another country without *first inquiring* whether that country would accept the petitioner. Thus, Matter of Niesel addressed only the issue of an *initial* inquiry, not final acceptance of the country to which a person would be returned." Ali v. Ashcroft, 213 F.R.D. 390, 403 (W.D. Wash. 2003) (internal citations omitted) (emphasis in original). Even if Niesel had held no final acceptance was required, the Board of Immigration Appeals clearly abandoned that position in Linnas.

We are not to interpret statutory text in a manner which leads to absurd results. Rowley v. Yarnall, 22 F.3d 190, 192 (8th Cir. 1994). The majority explains its interpretation of the statute in part by noting "between countries, it is not uncommon

behavior to attempt to accomplish a task by asking politely first, and then to act anyway if the request is refused." Ante at 7. That is easier said than done. A government not willing to accept an alien will simply refuse his admittance into its country. Thousands of deportees from China, Viet Nam, Cambodia, Cuba and other countries continue to be detained in the United States because those countries are unwilling to accept them. See Donald M. Kerwin, Throwing Away the Key: Lifers in INS Custody, 75 Interpreter Release 649, 650-52 (1998). Those deportees can attest to the practical difficulty, if not impossibility, of acting anyway when a request is refused.

As a practical matter, then, the task of removing an alien to a country which has not accepted him will only be accomplished and the majority's construction of the statute will only be implicated when there is no functioning government to refuse the alien's acceptance, currently the case in Somalia. The absurdity of such a construction lies in the fact we require a functioning central government as an "essential aspect" of a "country " to which an alien can be deported. Linnas, 19 I. & N. Dec. at 307, 1985 WL 56051; see also Ademi v. INS, 31 F.3d 517, 521 (7th Cir. 1994) (recognizing it is impossible to seek acceptance from a country which has ceased to exist); Chan Chuen v. Esperdy, 285 F.2d 353, 354 (2d Cir. 1960) ("[A]ny place possessing a government with authority to accept an alien deported from the United States can qualify as a 'country' . . . to which a deportable alien may be sent"); Rogers v. Cheng Fu Sheng, 280 F.2d 663, 664-65 (D.C. Cir. 1960) (suggesting a "country" with the meaning of the statute requires a functioning government with undisputed control over a well-defined geographical area).

"Learned Hand warned that, absent order, liberty becomes license, ultimately leading to the denial of liberty. In a world of unbridled license, the strong do what they will and the weak suffer what they must." Remarks of Attorney General John Ashcroft, Eighth Circuit Judges Conference (Aug. 7, 2002). I fear if we "act anyway" by deporting Mr. Jama to Somalia, we abuse our great strength at the expense of the

weak. With this change in policy, we abandon a stateless person without a passport or traveling documents in a war-torn country victimized by battling warlords, and without a central government. By doing so, I fear we abandon order and risk the doom of liberty.

Because the government's recent disregard of a well-settled and accepted construction of § 1231(b)(2) does not accord with my sense of liberty or justice, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.