**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

JAMA, Keyse G. (A71 689 585)

Petitioner,

vs.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondents.

**AFFIDAVIT OF**
**KEVIN M. MAGNUSON**

**Civil No. 01-1172 (JRT/AJB)**

---

STATE OF MINNESOTA )
) ss.
COUNTY OF HENNEPIN )

I, Kevin M. Magnuson, being first duly sworn under oath, states and alleges as follows:

1. I am an attorney with the law firm of Briggs and Morgan P.A. in Minneapolis, Minnesota, representing the Petitioner Keyse G. Jama in the above-captioned matter and have personal knowledge of the facts contained herein.

**ICE's Request to Get a Passport "Acceptable to Daallo Airlines"**

2. The United States Supreme Court issued its decision on January 12, 2005, holding that 8 U.S.C. 1231(b)(2) authorizes the removal of Mr. Jama to Somalia despite the lack of acceptance from a central government in Somalia.

3. Shortly after learning of the Court's decision, I called Greg Mack, the Department of Justice lawyer who has represented the immigration service throughout this case, to congratulate him and to state my client's desire to be removed to Boosaaso in Somalia as quickly as possible now that the deportation to Somalia was inevitable. In the alternative, I requested that my client be released from detention if removal would not occur promptly. Mr. Mr. Mack

stated that he would communicate my request to his client, the Bureau of Immigration Customs Enforcement ("ICE") and call me back with information regarding how long it would take to remove Mr. Jama to Boosaaso. Mr. Mack and I had several subsequent conversations in the next weeks in which I communicated my requests for information and Mr. Mack stated that he was waiting for his client to respond.

4. The government has represented to this Court, to the Eighth Circuit Court of Appeals and to the United States Supreme Court in the July 17, 2001 Declaration of Detention Enforcement Officer Eric O'Denius that "[a] Somali national may select from the cities of Boosaso, Berbera, Hargeysa, or Mogadishu for their removal." (Exhibits by Resp't to Mot. to Dismiss, dkt. # 8, Ex. S, attached hereto as **Exhibit A**.) The declaration further describes the removal process, which involves issuing a Form I-269 (Certificate of Identity) created by the immigration service in lieu of internationally accepted travel documents and which O'Denius represents is accepted as valid documentation by transit countries. (*Id.*) The government in Respondent's Memorandum in Support of Motion to Dismiss notes that Mr. Jama would be given "an opportunity to select Boosaaso, a city controlled by Jama's clan." (Dkt. #7 at 8, attached hereto as **Exhibit B**.) The Magistrate Judge noted the removal method described in the Declaration in his Report and Recommendation. (*See* Dkt. #18 at 5.) Writing for the Supreme Court majority, Justice Scalia cited the O'Denius declaration and also noted: "(Removing an alien to Somalia apparently involves no more than putting the alien on one of the regularly scheduled flights from Dubai or Nairobi, and has been accomplished a number of times since petitioner's removal proceeding began. App. 36-40 (declaration of detention enforcement officer Eric O'Denius).) *Jama v. I.C.E.*, 125 S.Ct. 694, 702 (2005).

5. On February 2, 2005, Mr. Mack telephoned me and stated that he had engaged in detailed conversations with his client, ICE, regarding Mr. Jama's removal. Mr. Mack stated that his client had informed him that although ICE believed that Mr. Jama would be able to travel through transit countries in the company of ICE agents with a Form I-269 (Certificate of Identity), ICE would not be able to fly him into Somalia without a passport. He stated that his client told him that Mr. Jama could not board a Daallo Airlines flight from Nairobi to cities in Somalia without a passport. He stated that the airline had been fined $10,000 for allowing Somali nationals to board the plane without a passport. Mr. Mack stated that his contacts at ICE told him that the "solution" to this problem was for me to "get a passport that was acceptable to Daallo Airlines." I responded, "You want me to get a false passport?" Mr. Mack replied, "The passport does not need to be valid for purposes of the State Department. It just needs to be able to get Jama on the Daallo Airlines airplane in Nairobi." Mr. Mack stated that if we wanted to get Mr. Jama removed expeditiously, and thus out of jail, we need to get such a passport for Mr. Jama.

6. I expressed serious ethical concern about my involvement in obtaining an "unofficial" passport for my client. I stated that any Somali passport Mr. Jama would obtain would mean nothing as anyone can obtain a black market passport under any name.

7. I further stated that even if Mr. Jama were able to get such a document, traveling under it would be untenable. I pointed out that if anything were to go wrong in transit, Mr. Jama could become stateless. For example, I said, if Mr. Jama were to get on the plane in Nairobi with a false passport but not be able to disembark and returned to Nairobi, he may be detained in Nairobi for traveling with a false passport. Furthermore, he may be prevented from reentering the United States because any such "unofficial" passport would not be recognized by the U.S.

and an attempt to use it to enter the U.S. would likely be a crime and become stateless. I also pointed out that an even greater concern was that he may be detained, harmed or killed when he got off the plane in whatever Somali city he wound up in because of his false passport. Mr. Mack acknowledged these concerns but stated that he was instructed by his client to inform me that we needed to get Mr. Jama a passport if we wanted him removed to Somalia in the near future.

8. Mr. Mack further stated that ICE had given him some contact information that might assist me in getting started in tracking down a passport that was acceptable to Daallo Airlines. Although he said that these organizations could not provide a passport, someone there may be able to tell me how to find one. That email is attached hereto as **Exhibit C.**

9. I stated that I would talk to Mr. Jama to see if he or a family member had a passport for him that the former government of Somalia had issued before the fall of the Somali government in 1991 and that I would contact the organizations Mr. Mack would send me to confirm my understanding that there was no way of obtaining lawful, internationally recognized travel documents for Somalis. I also stated that I would attempt to contact Daallo Airlines to confirm that a passport was necessary.

10. The following day, February 3, 2005, I spoke with Mr. Jama, who stated that no one from his immediate family ever had a passport. He said that when he was a small boy the family fled Somalia after the collapse of the government and that his family was resettled by the American government in the United States from a Kenyan refuge camp.

11. I also contacted Daallo Airlines. I spoke with a woman named Odile in the Paris office. She stated that Daallo Airline's primary route is from Paris to Djibouti for tourists interested in scuba diving but that they also have regular flights to Nairobi, Dubai and Saudi

Arabia. She stated that flights into Somalia are much more sporadic and consist primarily of cargo flights to Hargeysa from Djibouti and Nairobi on Antonov airplanes, which are propeller driven Russian aircraft. There are some "connecting flights" to other cities in Somalia, but she laughed as she described travel in Somalia, saying that she had worked previously at TWA and that such terms with respect to flights to Somalia do not carry their normal meanings. She declined to elaborate. She said the airline has had a problem with the safety of refugees of a disfavored clan affiliation flying into Hargeysa but also declined to elaborate. She stated that Daallo does fly irregularly into Mogadishu but that conditions were very dangerous there. (The airport in Mogadishu is described by one journalist as a "fiasco" with five makeshift airstrips, one for each of the warring clans that control the capital. The control tower is the second story of a tiny office building…." (*"There are no laws. We are in a country where no one can control anyone else"*, http://news.telegraph.co.uk/news/main.jhtml;sessionid=JVJXNLOC3DXOHQFIQMGSNAGAVCBQWJVC?xml=/news/2005/02/13/wsoma13.xml&secureRefresh+true&_requestid+4370, attached hereto as **Exhibit D**.)) She further stated that Kenyan officials and Daallo airline officials would not allow anyone to board the aircraft without a valid passport. She stated that it was at times difficult for officials to tell the real passports from the fake passports but reiterated that a requirement for travel on Daallo Airline into Somalia was a valid, internationally recognized passport.

12. I also spoke with Kazim, a manager at the Daallo Airlines office in Chicago. He stated that he did not know the answers to the questions I posed and declined to state the passport policy of the airline.

13. I also attempted to contact the individuals and organizations Mr. Mack had emailed me as potential resources in learning how to obtain a passport. Most of the numbers did

not work. However, I did have a brief conversation with Mohamed Abdi at the office of the Permanent Representative of the Somali Republic to the United Nations, which apparently is the remnants of the Somali delegation to the UN at the time of the Somali government's collapse. Mohamed informed me that some Arab and African governments recognize legitimate Somali passports that the last government of Somalia had issued prior to fall of that government in 1991. He stated that his office will renew those passports if the holders can prove their identity. Also, he claimed that the transitional government issued legitimate passports from 2000-2003 in Dubai, as he was then a member of the transitional government there. That office was shut down after the transitional government fell. He was very clear that the governments that do recognize Somali passports only recognize legitimate passports. He stated that there is a tremendous problem of black market passports, which are easily available in Nairobi and which often are dated to appear issued by the pre-1990 Somali government. He stated that the fake passports often look more real than the legitimate ones and that the issue was one of serious concern because the widespread use of fake passports reduces the credibility of lawfully issued passports.

14. Apparently, black market passports are easy to obtain quickly and cheaply and thus a number of countries now decline to recognize any Somali passports. The United Nations High Commissioner for Human Rights on June 1, 2004 stated that the governments of Kenya and the United Arab Emirates (UAE) stopped issuing visas to holders of Somali passports. (*See United Nations Right Expert Concerned about Recent Visa Bans on Somali Passport Holders*, www.unhchr.ch/html/menu2/7/a/msom.htm, attached as **Exhibit E**; *see also Somali Passports for Sale*, http://www.hamarey.com/index.php/article/view/1874/1/4, attached hereto as **Exhibit F**; *Kenya Has All But Closed Border to Somalia After US Pressure*, Mathaba.net News, http://www.unhchr.ch/huricane/huricane.nsf/0/A4869ED45AA12608C1256EA6003EEFAE?ope

ndocument, attached hereto as **Exhibit G**.) The stated reason of these governments is that Somali passports are "widely forged raising security and illegal migration concerns." (*See* Ex. E.) A white reporter for News.Telegraph described the process by which he obtained a Somali passport in 10 minutes. (*See* Ex. D.) According to one news service, buying a passport in Nairobi is "as buying bread." (Ex. F; *see also "Stolen Kenyan Documents Find Huge Market in Somalia,"* attached hereto as **Exhibit H.**)

15. I responded to Mr. Mack's request that I find a Somali passport for Mr. Jama in an email dated February 3, 2005, (attached hereto as **Exhibit I**), reiterating my refusal to obtain a false passport. In light of ICE's inability remove Mr. Jama in the near term, the appropriate course of action was for ICE to release him under any reasonable conditions of supervision. I stated that Mr. Jama was one of the last Somalis still in detention and that in light of the ICE's recent release of other petitioners, both members of the class action and petitioners who had filed their own habeas petitions, Mr. Jama should be released until the government was able to put together a removal to Boosaaso. Finally, I informed Mr. Mack that I learned from my research that there are no direct flights into any cities other than Mogadishu and Hargeysa and that other cities we had discussed as possible destinations for Jama were only reachable via "connecting flights." I stated that "changing planes" in Mogadishu or Hargeysa posses too great a danger and would not be acceptable.

16. Mr. Mack replied to my email the same day. (*See* Ex. I.) In that email he stated that with respect to false passports, "'false' is an undefined term here, as the State Department does not recognize passports that purportedly come from Somalia, but other countries do, and an entity in Somalia may be issuing passports, but neither of us can confirm their validity." He stated in this email that he did not want us to be "embarking upon something that violated the

applicable law." He then stated that "[g]iven your response, ICE will have to assess what their options are…."

17. In subsequent telephone conversations with Mr. Mack, I pointed out that the admission that ICE could not remove Mr. Jama to Somalia without a passport was an admission that Mr. Jama was not removable in the reasonably foreseeable future. I stated that ICE made this inability startlingly clear by the fact that it went to the length of requesting that we somehow obtain a passport that was not acceptable to the United States government itself but might get him on a Daallo flight in order to get him into Somalia. I repeatedly urged his client to release Mr. Jama under any reasonable conditions of supervision, even bail, which is not a condition of supervision, until a deportation was truly imminent. I pointed out that Mr. Jama is the only Somali who has been detained from the moment his removal order became final until the present—all others are detained for a brief period and then release. (*See* Transcript of Oct. 7, 2004 Hearing, *Yusuf Ali Ali et al. v. Ashcroft*, No. C02-2304P, attached hereto as **Exhibit J** at 23:20-24, ("…there seems to be roughly 30-35 individuals in detention, and that it seemed to be sort of a revolving detention class.").) He said that he had checked with his client and release was not a possibility. Mr. Mack stated his client expressed concerns of administrative inconvenience of securing Mr. Jama's physical presence at the time of removal and the fear that he would abscond.

18. As an alternative to release, I raised the possibility of a written stipulation in which ICE agreed to remove Mr. Jama to Boosaaso, or another mutually agreeable destination, lawfully within 30 days of the date of the agreement or be released. If operational difficulties arose as the 30-day period ended, ICE would be able to present evidence that a small amount of additional time was necessary to accomplish the removal. Because we believed that ICE had

proposed removing Mr. Jama unlawfully by using a passport that by necessity would have to have been fake and which no country would have recognized, I also proposed that we file this agreement with the Court and that ICE agree to disclose prior to removal the date, method, and destination of removal. Mr. Mack stated that some of that information would be sensitive and I stated that we would be willing to allow ICE to present that information to the Court *ex parte* and let the Court decide which information would be communicated to Mr. Jama or Mr. Jama's counsel.

19. Mr. Mack discussed my proposal with his client, who refused, countering with a proposal that the stipulation memorialize ICE's intent to remove Mr. Jama to Boosaaso in 90 days but that the stipulation would be in no way binding. ICE would agree to inform me 15 days before the expiration of that period if they could not remove Mr. Jama to Boosaaso. Mr. Mack also told me that if we agreed to the stipulation, his client opposed filing it with the Court because it did not want to submit to the Court's supervisory jurisdiction. The draft stipulation is attached as **Exhibit K**.

20. I responded to Mr. Mack that the draft stipulation was not acceptable because it was not an agreement but a statement of intention which did not bind ICE to any action. I also stated that we objected to the last paragraph of the letter which erroneously stated that "Jama's removal is also dependent upon the Eighth Circuit issuing the mandate in this case." (Ex. J.) Mr. Jama has been removable since the Supreme Court's ruling in this case and ICE has not been prevented from arranging and carrying out Mr. Jama's removal because the mandate had not yet returned to the District Court. The mandate returned to this Court on March 1, 2005.

21. I responded that we would agree to the 90-day window for removal to Boosaaso if ICE would agree that if ICE could not remove Mr. Jama to Boosaaso during that period, it would

agree to present to the Court its reasons for not doing so and let the Court decide whether or not removal would take place in the reasonably foreseeable future. If the Court determined that removal was not reasonably foreseeable, ICE would release Mr. Jama under reasonable terms of supervision. If ICE could not agree to these terms, I stated that we would have no choice but to return to Court and seek its supervision over the removal process in order to ensure that Mr. Jama was lawfully and expeditiously removed to Boosaaso or another mutually acceptable destination, or be released form detention per *Zadvydas*. Mr. Mack had not responded at the time of filing this Affidavit.

**The District Court in Seattle Instructed ICE to Prevent False Passports from Getting into the Hands of Somalis Awaiting Deportation.**

22. The United States District Court for the Western District of Washington previously has addressed the issue of ICE using false passports to carry out removals to Somalia. According to the transcript of a September 20, 2004 hearing before Judge Marsha Pechman in *Garad v.* Ashcroft, No. C02-3404P, attached hereto as **Exhibit L**, Awad Garad, a member of the nationwide class in *Ali v. Ashcroft*, had moved to be excluded from the class and requested to be removed to Somalia as his requests for release had been repeatedly denied. Garad's decision was based in large measure on the government's representation to him that it could remove him safely to Hargeysa, the city in which he chose to reside, and that it had obtained a passport with which to travel. (*See* Ex. L at 5:19-23.)

23. The Court explored in depth how ICE had obtained for Garad a Somali passport, which was newly issued in May, 2004. (*See id.* at 6:1-3; *see* ¶ B *infra* discussing properly issued passports.) According to Garrad's attorney, local deportation at ICE "presented the document to him. They obtained it from U.S. government representatives in Nairobi, Kenya, and then

presented it to the district court [the U.S. District Court in Oregon] as his ticket home." (*Id*. at 6:12-14.) A copy of that document was submitted to the Court. (*See id.* at *7:2-10.*)

24. Judge Pechman asked Mr. Mack directly where the passports that ICE was giving to Somalis as transportation documents came from. (*Id*. at 8:10-12.) The Court expressed concern because she had received similar reports from detainees in Alabama. (*Id*. at 8:21-24; 18:3-8.) Mr. Mack, who argued on behalf of the government, stated: "I don't know where [the passports] are coming from. I know that the ICE official in Kenya obtained these passports, but I don't know whom or what in Somalia is issuing these documents." (*Id*. 18:11-14; *see* 8:17-18.) Mr. Mack further stated the he had language stricken from a letter to a class member that stated that there was a government in Somalia and that the person had a travel document because "I knew that the United States government doesn't recognize for the moment a government in Somalia…." (*Id*. at 18:17-24.) Mr. Mack stated that it is Daallo Airlines that "is interested in a travel document or a passport so that's why passports are being obtained. But, they're not to be used, as far as I know, with any government official, government entity in Somalia for the purpose of transit into Somalia. But it's Daallo Airlines interest that wants this sort of travel document." (*Id*. at 19:5-12.) Mr. Mack stated that his client was reviewing the nature of these passports and whether they should be recognized. (*See id*. at 20:11-14.)

25. The Court responded that ICE could not allow passports that "have been made up for the purpose of some airline's request. I mean you just can't start issuing things that look like governmental documents because somebody wants a ticket to get on a plane. That makes no sense to me whatsoever." (*Id*. at 21:13-17.) She ordered that Mr. Mack's client, Michael Garcia, apparently at the general counsel's office of ICE, submit to her an affidavit describing how ICE is dealing with the fact that false passports are circulating to Somalis who are subject to removal

orders. (*See id*. 24:13, 22-24.) She stated, "don't you think it's time that you issue a directive to everybody in terms of it you've got individual people that are continuing to manufacture these documents and present them to people in custody as something that's legitimate – shouldn't that to out to everybody, that that is not the case?" (*Id*. at 20:5-10.) She went on to say, "I expect that you're going to get back to me in very short order and tell me what it is that you've done in order to make sure that you don't have these rogue officers in various detention centers advising people of things that aren't true." (*Id*. at 21:23-22:2.) "I'd be looking in 30 days to see his affidavit to tell me how he's dealing with the fact that there's documents are circulating to the people who are in his charge." (*Id*. at 24:22-24.)

26. On October 12, 2004, Leonard Kovensky, the Deputy Assistant Director, Removal Management Division, Immigration and Customs Enforcement, submitted a declaration to the Court, attached hereto as **Exhibit M**. In that declaration, Kovensky stated that it could remove an individual to Somalia in 30-45 days using Daallo Airlines to fly into Somalia. (*See* Kovensky Decl. at ¶4-6.) Kovensky cited the removal of Mahad Omar, who was put on a Daallo Airlines flight into Somalia on March 13, 2004, as evidence of this removal ability. Omar was a client of undersigned counsel and one of the petitioners in the writ of habeas corpus captioned *Omar et al. v. I.N.S.*, No. 02-1387. Judge Davis had released the other petitioners citing the *Jama* case but found that six months had not passed since Omar's appeal of his BIA decision that resulted in his final order of removal. Omar was eligible to be released on May 17, 2003 under the Court's order. The Eighth Circuit reversed *Jama* on May 27, 2003. The hearing to determine whether removal was reasonably foreseeable occurred the next day and Judge Davis in a June 5, 2003 Order found that as a result of the Eighth Circuit's decision, Omar was immediately removable and thus remained in detention. As in the case presently before the

Court, I repeatedly pressed Mr. Mack to get his client to remove Omar as quickly as possible over the next six months. On February 12, 2004, Mr. Mack agreed in writing to remove Omar within 30 days in exchange for our decision not to seek an order releasing Omar. That letter and attaching email is attached hereto as **Exhibit N**. A day or so before Omar's removal, Mr. Mack informed me that ICE intended to remove him to Hargeysa, attached hereto as **Exhibit O**. I strenuously objected, reminding him that I had repeatedly stated in the past that Hargeysa was the most dangerous place ICE could possibly send him and that we would petition the Court to prevent Omar's removal there. Mr. Mack consulted with his client and then told me that the flight from Nairobi into Somalia stopped at several cities and that he could get off the plane in Galkacyo, a city that was acceptable to Omar. Omar did not have a passport but traveled from the United States to Kenya with a Form 269 (Certificate of Identity) in the company of ICE agents.

27. Kovensky's declaration states that Omar was put on a Daallo Airlines flight on March 13, 2004 from Nairobi, Kenya to Mogadishu with an onward connection to Galkacyo. (*See* Kovensky Decl., Ex. M at ¶ 6.)

28. Kovensky states that following Omar's flight on Daallo Airlines into Somalia, Daallo Airlines informed ICE "that it will no longer board individuals without a passport and that certificates of identity will no longer suffice." (*Id.* at ¶ 10.) The declaration also states that "the Department of State has recently requested that ICE utilize the certificate of identity up to the final transit point prior to Somalia, but not to present it for admission into Somalia." (*Id.*)

29. Kovensky admits that a passport is necessary to remove individuals to Somalia if no other means besides Daallo Airlines exists for transportation into Somalia:

> ICE recognizes that if Daallo Airlines is the only feasible way that ICE can presently complete the removal process and the Department of State has now requested that ICE should no longer use the certificate of identity for admission to Somalia (although ICE believes that a certificate of identity could be used to seek admission into any country), individuals must generally obtain a passport to enter Somalia.

(*Id*. at ¶ 11.)

30. The declaration stated that with respect to Garad's removal, "[i]n the event that the Daallo flight does not prove feasible, we have also sought and received three bids for charter flights that would fly Mr. Garad from Nairobi nonstop to Hargeysa." (*Id*. at 18.)

31. Kovensky's declaration states that "[i]n Mr. Garad's case, a Somali passport was obtained with the assistance of an ICE official at the U.S. Embassy official in Nairobi after an ICE official in Portland, Oregon, requested assistance in obtaining a passport around April 2004" (*Id*. at ¶ 13.) It states that "[t]he passport was issued in Mogadishu on May 22, 2004. (*Id*.) The declaration goes on to state that "[t]he Department of State has advised us that while they would not recognize the passport in question, some countries may recognize these passports." (*Id*. at ¶14.)

32. The declaration does not address the question presented to Mr. Mack in the September 20, 2004 before Judge Pechman of how the government secured a passport in Mogadishu and whether ICE had determined if it was issued by the requisite governmental authority for it to be legitimate. Kovensky merely stated that the passport was obtained by an unnamed ICE official at the U.S. Embassy in Nairobi. By virtue of the issuing date and location, it could not have been a legitimate passport, a fact that most likely was known to ICE at the time it obtained the false passport and certainly at the time of the hearing and declaration. Despite these very troubling actions by ICE officials, counsel for Garrad and for the class did not pursue

the matter because Garrad withdrew his request to be removed and ICE released him from detention.

33. The declaration also states that ICE does not believe it must send individuals to specific locations within a country of removal "absent a court order" but "the agency realizes the unique circumstances surrounding removals to Somalia and will make efforts to accommodate the requests." (*Id*. at ¶ 17.)

34. At no time did the government supplement the record before the U.S. Supreme Court to reflect the change in deportation possibilities. At the time of the Supreme Court's decision, it accepted the O'Denius declaration at face value.

35. A map of Somalia is attached hereto as **Exhibit P**.

**FURTHER AFFIANT SAYETH NOT.**

s/ Kevin M. Magnuson
Kevin M. Magnuson

Subscribed and sworn to before me
this 4th day of March, 2005.

s/ Erin M. Hartman 1/31/08
Notary Public