**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Civil No. 01-11720 JRT/AJB**

| | | |
|---|---|---|
| KEYSE G. JAMA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DECLARATION OF DETENTION** |
| | ) | **ENFORCEMENT OFFICER** |
| | ) | **ERIC O'DENIUS** |
| Immigration and Naturalization Service, | ) | |
| | ) | |
| Respondent. | ) | |

I, Eric O'Denius, a Detention Enforcement Officer from the Office of Detention and Deportation in the St. Paul District of the United States Immigration and Naturalization Service ("INS"), hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information and belief:

1. In performing my duties as a detention enforcement officer, I am assigned the primary responsibility of organizing and scheduling all alien removals originating from the St. Paul District Office. In that capacity, I regularly make flight arrangements and oversee the acquisition of all Department of Justice, Department of State, and foreign clearances.

2. I have been involved in making final arrangements for the removal of 14 Somali nationals originating from the St. Paul District Office. (See Attachment). The selection of the destination city within Somalia is largely left to the alien's discretion. A Somali national may select from the cities of Bossaso, Berbera, Hargeysa, or Mogadishu for their removal. The fare from Minnesota to any of these cities is about the same, which is paid for at Government expense. Of the 14 Somali nationals removed from the St. Paul District Office since 1999, all were removed to the city of their choice: one (1) to Mogadishu (via Berbera); three (3) to Berbera; and the remaining ten (10) to Hargeysa.

3. Sample schedules for removal to Bossaso, Berbera, Hargeysa, or Mogadishu, Somalia are as follows:

For Berbera, Bossaso, Hargeysa, or Mogadishu:
- Sat 1630 Depart Chicago (alien & INS)

EXHIBIT 5

**EXHIBIT A**

- Sun 0830 Arrive Stockholm (alien & INS)
- Sun 1050 Depart Stockholm (alien & INS)
- Sun 2030 Arrive Dubai (alien & INS)
- Mon 0400 Depart Dubai (alien)
- Mon 0600 Arrive Berbera (alien)
- Mon 0700 Connecting flights depart (alien)
- Mon 1000 Last connecting flight arrives (alien)

For Mogadishu: (no stop in Berbera):
- Thu 2100 Depart New York (alien & INS)
- Fri 1530 Arrive Jeddah (alien & INS)
- Fri 2350 Leave Jeddah (alien & INS)
- Sat 0340 Arrive Nairobi (alien & INS)
- Sat 0700 Leave Nairobi (alien)
- Sat 0900 Arrive Mogadishu (alien)

4. When preparing for the removal of a Somali national, the INS issues the alien a Form I-269, Certificate of Identity. (See Attachment). This document is issued for aliens of any nationality where a national passport or other form of travel document cannot be obtained for travel. Form I-269 is also used by INS Inspectors when an alien is to be removed or excluded at airline carrier expense and the alien has no documentation of his own. All of the foreign governments whose territories are listed as transit sites in the previously discussed sample schedules for removal to Bossaso, Berbera, Hargeysa, or Mogadishu, Somalia, have accepted these documents as valid, with our guarantee of onward travel.

5. After a Somali national is notified of the INS intent to execute a warrant of removal to Somalia, and after the alien selects a destination city, flight arrangements are made accordingly. When a travel itinerary has been drafted, the INS then issues a Request for Country Clearance through INS Headquarters, International Affairs Office. This Request for Country Clearance is issued to the Secretary of State – Office of Diplomatic Security, all U.S. Embassies which would be involved in the proposed removal (including those in any countries through which the alien will transit), and INS Headquarters – Detention and Deportation Section. Attached is a copy of a Request for Country Clearance issued in connection to an unrelated Somali National who was removed to Somalia in March of 2001 as well as a detailed explanation of abbreviations and acronyms used. (See Attachment).

6. Removal of an alien is not actually commenced until the St. Paul District Office receives country clearance approval through the Department of State. Upon receipt of the Request for Country Clearance, the State Department prepares a cable that is sent to U.S. Embassies in all countries through which the alien and INS officers will transit. All U.S. Embassies must approve. Attached is an example of a country clearance approval issued in connection to the case of an unrelated Nigerian National. (See Attachment).

7. At the time of removal, INS officers carry U.S. passports and any visas required for transit. All country clearance cables and Form I-269 Certificate of Identity are presented

on behalf of the alien. A minimum of 2 officers are required for all overseas escorts. At least one officer must be of the same gender as the alien. If more than two aliens depart, a third officer must be present.

8. Of the 14 Somali nationals removed from the St. Paul District Office since 1999, the local government has accepted every Somali national we have sent back. The State Department, the INS Office of International Affairs, and Headquarters/INS, any of whom may veto a proposed removal, have not denied our requests for removal of Somali Nationals.

17 July 2001

Date

INS-DEO #1441

ERIC O'DENIUS
Detention Enforcement Officer
U.S. Immigration and Naturalization Service
Office of Detention and Deportation
2901 Metro Drive, Room 100
Bloomington, MN 55425

| DATE OUT | A-NUMBER | NOTES |
|---|---|---|
| | | |
| 8/28/99 | A74 621 108 | |
| 8/28/99 | A75 592 879 | |
| 9/25/99 | A76 802 710 | |
| 12/18/99 | A74 674 014 | FEMALE |
| 12/18/99 | A40 446 831 | |
| 3/18/00 | A70 397 177 | |
| 3/18/00 | A75 328 133 | |
| 4/8/00 | A70 376 614 | |
| 4/29/00 | A74 816 136 | |
| 4/29/00 | A70 377 302 | |
| 7/29/00 | A70 366 834 | |
| 7/29/00 | A75 016 797 | |
| 1/14/01 | A70 396 123 | DENVER ASSIST |
| 3/10/01 | A70 367 180 | |

UNIT[illegible] STATES DEPARTMENT [illegible] JUSTICE
IMMIGRATION AND NATURALIZATION SERIVE

File No.: A

Date: April 9, 1998

# CERTIFICATE OF IDENTITY

To facilitate transportation to
of applicant whose photograph appears below.

NAME:

DATE & PLACE OF BIRTH:

NATIONALITY: SEX:

OCCUPATION OR PROFESSION: MARITAL STATUS:

PRESENT ADDRESS:

PURPOSE OF JOURNEY: For travel to ___
A national passport or any form of travel document cannot be obtained for travel to that country.

PERSONAL DESCRIPTION

Attach Photograph

Height:

Weight:

Color of hair:

Color of eyes:

Identification marks:

For the U.S. Immigration and
Naturalization Service

Form I-269
(6-16-58)

FROM: INS/HQIAO >2.

TO: AMEMBASSY MOGADISHU >.3
USINS/OIC NAIROBI
USINS/DD ROME

INFO: SEC STATE WASHDC/ROBHC 0624/CA/OSC/CCS/AF ROOM 4811HQ >4.
JINS/DDP WASHINGTON, DC

UNCLASS

SUBJECT: REQUEST FOR COUNTRY CLEARANCE

1. INS REQUESTS COUNTRY CLEARANCE FOR AN ESCORT DETAIL TO BERBERA, SOMALIA.

A. THE INS POINT OF CONTACT FOR THIS REMOVAL IS ERIC ODENIUS EXT 270; INS ST. PAUL; TEL#: 612-313-9060; FAX#: 612-313-9064. ADDITIONAL CONTACT IS BOB SHANNON; TEL#: 202-616-7800; FAX#: 202-514-0122.

B. ALIEN NAME/(SEX)/A#: [redacted] /(MALE)/ A70 367 180.
ALIEN DPOB/TVL DOC: 10/1/1965 ; SOMALIA/ US CERT. D'IDENTITE A70367180 >5.
DEPORT GROUNDS (D/P CONVICTION): [redacted]
6.> [redacted]

C. ESCORTING AGENTS: (NAME; TITLE; PASSPORT #; EXPIRY DATE)
LYLE BRABAZON; DETENTION; 801114809; 3/24/2003

PATRICK KENNEY; DETENTION; 801008415; 1/8/2002

D. TRAVEL ITINERARY: (AIRLINE, #; DEP CITY, DDATE(MDY), DTIME; ARR CITY, ADATE(MDY), ATIME)
AA-AMER, 80; ORD-CHICAGO, 3/10/2001, 4:55:00 PM; ARN-STOCKHOLM, 3/11/2001, 8:25:00 AM.

EK-EMIRATES, 6152; ARN, 3/11/2001, 10:50:00 AM; DXB-DUBAI, 3/11/2001, 8:15:00 PM. <7.

ESCORTS WITNESS DEPARTURE OF ALIEN FROM DUBAI ON NON-STOP FLIGHT AS FOLLOWS: <8.

D3-DAALLO, 189; DXB, 3/12/2001, 4:00:00 AM; BBO-BERBERA, 3/12/2001, 3:10:00 PM.

ESCORTS DEPART AS FOLLOWS: <9.

KL-KLM, 428; DXB, 3/14/2001, 9:30:00 AM; AMS-AMSTERDAM, 3/14/2001, 2:00:00 PM.

KL-KLM, 6055; AMS, 3/14/2001, 4:35:00 PM; MSP-MPLS/ST PAUL, 3/14/2001, 6:35:00 PM.

E. ESCORT DEPARTURE INFO: ESCORTS TO DEPART AS INDICATED ABOVE. UAE TRANSIT VISAS APPLIED FOR. SWEDISH TRANSIT PERMISSION ALSO APPLIED FOR. NOTE: THIS IS A RESCHEDULE OF PREVIOUS CLEARANCE. MECHANICAL DIFFICULTIES ON FLIGHT 80 FROM CHICAGO PREVENTED COMPLETION OF DETAIL on 03/03/2001. <10.

2. NO EMBASSY ASSISTANCE REQUIRED. <11.

3. COUNTRY CLEARANCE IS REQUESTED FOR THE INS ESCORTS. THE ABOVE INFORMATION IS PROVIDED TO POST FOR APPROPRIATE LOCAL NOTIFICATIONS. FAX NOTICE OF THIS COUNTRY CLEARANCE TO INS CONTACT SHOWN ABOVE. SHOULD POST HAVE ANY QUESTIONS PERTAINING TO THE REMOVAL, PLEASE CONTACT INS POC DIRECTLY. RSO ASSISTANCE IS GREATLY APPRECIATED. <12.

DIRECTOR, HQIAO

# EXPLANATION OF COUNTRY CLEARANCE DOCUMENT

DRAFT

1. REFERENCE: A unique locater number with the overseas offices listed. RIT is for Rome District and NBO is the Nairobi sub-office.

2. FROM: INS, Headquaters, International Affairs Office.

3. TO: All embassies involved. The US Embassy in Mogadishu is temporarily closed, so the nearest embassy -- Nairobi -- makes the arrangements.

4. INFO: Secretary of State, Diplomatic Security. Also, Headquarters, DDP.

5. ALIEN DPOB/TVL DOC: With few exceptions, all international travellers must have a document verifying identity.

6. DEPORT GROUNDS: A courtesy to the receving country.

7. ITINERARY: The airlines code deportees in the following manner:

   DEPA: Escorted Deportee
   DEPU: Unescorted Deportee
   INAD: Inadmissible Alien (Carrier Responsibility)

Some airlines charge extra for DEPU aliens, because the carrier becomes responsible for ensuring that the alien arrives at his ultimate destination. The IATA (International Air Transport Association) has developed uniform rules which cover the transport of deportees. It is the responsibility of INS to notify carriers that they will be booked deportees. The carrier knows the entry requirements for the countries they fly to as well and will not accept persons without approval from the receiving and transit countries.

8. WITNESS DEPARTURE: If the officers cannot go to the country of ultimate destination, they must witness the departure of the alien on a non-stop flight to the receiving country.

9. RETURN FLIGHT: As you can see, the officers are in Dubai long enough to be notified in case the alien is bounced back.

10. OTHER INFO: This is to let all parties know that we have carried out our responsibilites. These include: 1) US citizens must have a visa to enter the UAE. 2) Somali citizens must have an airside transit visa or consular approval to transit Sweden.

11. ASSISTANCE: Medical, psychiatric, afflicted, insane, or dangerous aliens. Also includes aliens where there might be media interest.

12. RSO: Regional Security Officer: attached to every US embassy or consulate worldwide.

FILE NAME: COUNTRY CLEARANCE GRAFF AND KENNEY
DRAFTED BY: LFE
CLEARED BY: CPJ
APPROVED BY: CDW
CLASSIFICATION: UNCLASSIFIED
PRECEDENCE: P

ACTION ADDRESSEES: SECSTATE WASHDC

INFO: AMEMBASSY THE HAGUE
AMEMBASSY ROME
AMCONSUL FRANKFURT
AMEMBASSY ABUJA
AMCONSUL LAGOS

CAPTION LINE: ROME FOR INS
FRANKFURT FOR INS

TAGS: ASEC, CVIS, AMGT, CMGT

SUBJECT: COUNTRY CLEARANCE (GRAFF AND KENNEY)

REF: STATE 015084

1. Post welcomes the visit of Tim Graff and Patrick Kenney on April 09 and 10, pursuant to the deportation of alien [redacted].

2. Notice of the deportation has been provided to the Amsterdam Schiphol Airport office of the Dutch Royal Border Police (Marechaussee) (fax 31-20-603-8690).

3. Post Fraud Prevention Manager Chris Jester (tel 31-20-575-5336, fax 31-20-575-5310) is available should any assistance be required with this visit.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1172 JRT/AJB

| | | |
|---|---|---|
| KEYSE G. JAMA,<br><br>Petitioner,<br><br>v.<br><br>Immigration and Naturalization Service,<br><br>Respondent. | ) | INS No. A71 689 585 |

RESPONDENT'S RETURN, MOTION TO DISMISS,
AND MEMORANDUM IN SUPPORT

Jama Keyes (Jama), a refugee, admitted and was convicted of third degree assault and served more than one year in prison. After an evidentiary hearing, the Immigration and Naturalization Service (INS) found this crime was a crime of moral turpitude, 8 U.S.C. § 1182, and ordered Jama removed. Because Jama failed to select a country for his removal, INS selected Somalia where Jama is a citizen and native and will likely be accepted. Jama appealed to the Board of Immigration Appeals (BIA), which affirmed. He also requested a discretionary waiver of removal, which was denied. The order of removal became final less than ninety days ago, the statutory period for removal. 8 U.S.C. § 1231(a). After learning that the INS planned to execute the order of removal, Jama filed this petition for habeas corpus review, which lacks merit.

Jama filed this petition within ninety days of the final order of removal. Section 241(a) of the INA, 8 U.S.C. § 1231(a) (1999) requires his detention during this period. Moreover, Jama did not raise any due process claims. For these reasons, therefore, Zadvydas v. Davis, ___ U.S. ___, 121

**EXHIBIT B**

S.Ct. 2491 (2001) is not currently applicable. The INS, however, voluntarily stopped finalizing arrangements to return Jâma to Somalia when he filed this petition. As a result, the INS asks this court to deny quickly the instant petition to avoid creating a Zadvydas situation during the pendency of this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Jama's Departure From Somalia And Arrival In The United States.

Jama is a twenty-two (22) year-old native and citizen of Somalia. Exhibits (Exs. A, D, F). As a result of the tribal violence in Somalia in 1991, Jama and his family fled the country and entered a refugee camp in Kenya. (Exs. A, D).

While still in a Kenyan refugee camp in August 1995, Jama and his family applied for admission into the United States as refugees under Immigration and Nationality Act ("INA") § 207, 8 U.S.C. § 1157 (1997) (Admission of Emergency Situation Refugees). On August 9, 1995, the family's admission applications were approved, and the family was given authorization to enter the United States as refugees. (Ex. A). The family arrived in the United States on or about February 27, 1996 at New York, New York. (Exs. A, B). The Jamas eventually settled in the metropolitan area of Minneapolis, Minnesota.

### B. Jama's Criminal Conviction For Assault.

On September 8, 1999, Jama pled guilty and was convicted in the Waseca County District Court of Assault in the Third Degree. The complaint shows that the circumstances surrounding this crime involved Jama stabbing three separate individuals with a knife outside of their apartment building. (Ex. J). Jama was given a suspended sentence of one year and one day, ordered to serve 180 days in jail, and placed on probation for up to three years.(Exs. C, H, J). The Jama was found

to be intoxicated (in violation of his probation) on October 21, 1999, shortly after he was released from jail. On November 1, 1999, the Jama's probation was revoked and he was ordered to serve the original one year and one day prison sentence. (Ex. K). Jama was eventually released from prison and placed into the custody of the INS on June 22, 2000. (Exs. B,I).[1]

### C. Jama's Immigration Proceedings And Final Order Of Removal To Somalia.

On October 26, 1999, the INS commenced deportation proceedings against Jama by issuing a Notice to Appear charging Jama with removal from the United States under Section 212(a)(2)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(2)(A)(i)(I) (Supp. V. 1999), as an alien who committed a crime of moral turpitude based upon his conviction for "Assault in the Third Degree."[2]

---

[1] Jama would have been released earlier from state custody; however, the Jama was found to have committed numerous disciplinary infractions while in state prison. After each administrative/disciplinary hearing, the Jama was ordered to serve significant time in disciplinary detention as a result of various assaults and verbal threats directed at other inmates and prison staff. (Ex. I).

[2] 8 U.S.C. § 1182, applies to exlcudable or inadmissable aliens, like Jama, and provides, in pertinent part:

(a) Classes of aliens ineligible for visas or admission

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

* * *

(2) Criminal and related grounds

(A) Conviction of certain crimes

(i) In general

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(Exs. B).

Jama filed an asylum application with the Immigration Court alleging a fear of persecution if returned to Somalia on account of his membership in a particular social group. Specifically, Jama claimed that, since he was a member of the Darod tribal clan in Somalia, he would be subjected to persecution by other clans as a result of the ongoing civil war and violence in Somalia. (Exs. D). In addition to his requests for asylum, Jama applied for relief under Article 3 of the Convention Against Torture. 8 C.F.R. § 208.16(c) (Eligibility for withholding of removal under the Convention Against Torture). Jama also filed an application (Form I-485) to adjust his immigration status to that of lawful permanent resident pursuant to Section 209 of the INA, 8 U.S.C. § 1159 (1999).[3]

---

(II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

(ii) Exception

Clause (i)(I) shall not apply to an alien who committed only one crime if--

(I) the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

[3] This section permits any alien who was admitted to the United States as a refugee to adjust his or her status to that of permanent resident providing that certain requirements are met. INA § 209, 8 U.S.C. § 1159. One of the requirements is that the alien's admission has not been terminated by the Attorney General. INA § 209(a)(1)(A). Since Jama faced termination of his admission due to his conviction and

In order to determine Jama's removability and asylum request, an immigration hearing was held in Jama's case in August 2000. At his immigration hearing, Jama offered his own testimony and that of his uncle to support the claims made in his asylum application. (Exs. L).

On August 31, 2000, the Immigration Judge issued his decision finding Jama removable from the United States for conviction of a crime involving moral turpitude, as charged in the Notice to Appear. (Ex. L). In addition, based upon Jama's conviction for Assault in the Third Degree, the Immigration Judge found Jama ineligible for asylum, withholding of removal, and denied his applications for relief under the Torture Convention and for adjustment to permanent resident status. (Ex. L).[4] The Immigration Judge ordered Jama removed to Somalia. Jama filed a timely appeal of this decision to the Board of Immigration Appeals. (Exs. M, N).

On May 9, 2001, the Board of Immigration Appeals ("BIA") dismissed Jama's appeal and affirmed the Immigration Judge's order of removal to Somalia. (Exs. O). Jama never sought review of the BIA's decision in the court of appeals. See 8 U.S.C. § 1252. Accordingly, this decision

---

charge of removability, he needed to obtain a waiver of this criminal ground of removability in order to be eligible to adjust his status under INA § 209. To this end, Jama filed, with his adjustment application, an "Application by Refugee for Waiver of Grounds of Excludability" (Form I-602). (Exs. F); INA § 209(c)(provision permitting alien to waive ground of excludability in order to meet the requirements to adjust status).

[4] The Immigration Judge determined that Jama's conviction for "Assault in the Third Degree" constituted a conviction for a "particularly serious crime." Aliens convicted of a "particularly serious crime" are ineligible for asylum (see INA § 208(b)(2)(A)(ii), 8 U.S.C. § 1158(b)(2)(A)(ii)), or withholding of removal (see INA § 241(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii)). The Immigration Judge denied Jama's request for relief under the Convention Against Torture, finding he failed to establish that it was more likely than not that he would be subject to torture upon return to Somalia. The Immigration Judge also denied Jama's request for a discretionary waiver under INA § 209(c), finding that the seriousness of his conviction precluded him from this benefit. 8 U.S.C. § 1159 (waiver of some requirements for refugee's adjustment of status under § 209(a) "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.").

became Jama's final order of removal to Somalia. See 8 C.F.R. §3.1(d)(2) (Finality of BIA's Decision); INA § 242(b)(1), 8 U.S.C. § 1252(b)(1)(a petition for review of the BIA's decision must be filed in circuit court "not later than 30 days after the date of the final order of removal.").

On May 25, 2001, the INS issued a "Warrant of Removal" notifying Jama that the INS intended to execute his removal order to Somalia. (Exs. P). Jama filed the instant habeas petition on June 28, 2001, to prevent the execution of this warrant.

**D. Somalia - Political Background And Current Conditions.**

Somalia experienced a severe civil war during 1988-91, resulting in the collapse of the country's central government. As a result, the country was divided into various regions mainly along ethnic and tribal lines. Somalia has been without a functioning central government since 1991. (Exs. E, Q, R).

In 1991, the Northwestern part of Somalia declared its independence and was named the Republic of Somaliland. Somaliland maintains a functional regional government. However, this independence and government has not been recognized by the international community and thus, Somaliland is still considered a part of Somalia. (Exs. Q, R).

In 1998, the Northeastern section of Somalia named itself the Republic of Puntland. Unlike Somaliland, Puntland has no present intention of attempting to break away from the rest of Somalia. The Jama's own clan, the Darod, controls and maintains stability in the Puntland region, which has remained relatively peaceful since the civil war. Indeed, the United Nations has been successful in providing food and humanitarian assistance, and repatriating refugees to Puntland where Jama's clan dominates. (Exs. Q, R).

Jama claims that he is a member of the Darod clan, which is the dominant clan in the northeastern region of Sômalia. Although there are numerous clans in Somalia, only the following four clans are considered dominant: Issak (Northern Somalia), Darod (Northeast Somalia and along the Kenyan border), Hawiye (Central Somalia), and Rahanweyn (Inter-River Zone of Southern Somalia). (Exs. Q, R). Unlike the area controlled by Jama's clan, most of the violence in Somalia occurs in Southern Somalia where minority clans are attacked by one of the four dominant clans. The majority clans like the Darod view many of the minority groups as foreigners and have singled them out for harassment. (Exs. Q, R). INS does not intend to return Jama to southern Somalia.

On June 15, 2000 in Arta, Djibouti more than 900 delegates, representing various clans and a wide spectrum of Somali society, begin establishing a central and unified government of Somalia. In July 2000, the delegates adopted a charter establishing a transitional government including an elected assembly and president. Although this Transitional Government continues to pursue unification, Somaliland and Puntland do not currently recognize the transitional government. (Exs. Q, R). Punltand is the region controlled by Jama's clan. Jama is not a member of a minority clan.

**E. The INS's Method Of Removing Aliens, Such As Jama, To Somalia.**

Since 1999, the St. Paul District Office of the INS has made travel arrangements and successfully removed 14 Somali nationals to Somalia. Ex. S[5] INS utilizes a flight plan and removal system which permits the alien to select his or her destination city within Somalia. The alien is given a choice of landing in the following four cities: Hargeysa (Northwest Somalia); Berbera (Northwest

---

[5] The ability to deport aliens to Somalia has special concern in Minnesota as that state has the highest concentrations of Somalis (estimated at 50,000) in the United States. (Exs. T).



00_016

Somalia); Mogadishu (Southern Somalia); and Boosaaso in Northeast Somalia where Jama's clan maintains order. In each case, the alien has been accepted into Somalia. (Exs. S).

The INS procedures for deporting aliens with final orders of removal to Somalia are effective. Initially, the INS issues the alien a Form I-269 (Certificate of Identity) which is used when a passport or travel document is unavailable. Like a passport, this document contains information regarding the alien's name, place of birth, nationality, present address, purpose of journey, and a detailed physical description which includes a photograph of the alien. In the cases involving the 14 Somalis previously removed by the INS, the I-269 has been accepted by all foreign governments and territories enroute to Somalia. (Exs. S). The I-269 also gives the alien an opportunity to select his destination city which in this case includes Boosaaso, a city controlled by Jama's clan.

Once a travel itinerary is drafted, the INS requests "Country Clearance" from the State Department, INS Headquarters, and all embassies affected by the alien's removal. Removal cannot be effectuated until the St. Paul District Office receives clearance from all of these entities. Once clearances are received, the State Department sends a cable to U.S. embassies on the travel itenerary to Somalia. (Exs. S).

During actual removal, each alien is accompanied by at least two INS deportation officers who serve as escorts. Additionally, these officers carry the relevant documentation depicting the alien's identity, citizenship, nationality, and country of destination. These are the procedures that will be utilized to effectuate Jama's removal to Somalia. (Ex. S).

## II. ARGUMENTS FOR DISMISSING THE HABEAS PETITION.

### A. Applicable Law.

Jama's case is governed by the Immigration and Naturalization Act's (INA) "permanent" judicial review provisiofis for removal orders. These provisions arise out of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[6] which revised the procedures for the removal (deportation) of aliens from the United States. In addition, it repealed section 106 of the INA, 8 U.S.C. § 1105a (1994), which had controlled the judicial review of such matters. Congress replaced Section 106 (8 U.S.C. § 1105a) with INA § 242, 8 U.S.C. § 1252 (2000), and made it effective for Title III-A on "the first day of the first month beginning more than 180 days after the date of enactment of this Act," or April 1, 1997. Section 309(a) of IIRIRA. Because Jama's removal proceedings commenced after April 1, 1997, the "permanent" review provisions (as opposed to its transition rules) govern this habeas petition.[7]

In addition to applying the permanent rules, the instant petition concerns an excludable alien, unlike Zadvydas v. Davis, ___ U.S. ___, 121 S.Ct. 2491 (2001).[8] An excludable alien, like Jama, never converted his status as a refugee to permanent resident. Consequently, he has never "entered" the United States, and has the status of a foreign citizen. Indeed, Jama is a native and citizen of Somalia.

---

[6] Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), as amended by the Extension Of Stay In United States For Nurses Act of October 11, 1996, Pub. L. No. 104-302, § 2, 110 Stat. 3656 (Oct. 11, 1996).

[7] Thus, this case can be distinguished from the immigration case, Shah v. Reno, 184 F.3d 719, 722 (8th Cir. 1999), reh'g denied, (Aug. 31, 1999), which raised jurisdictional issues under the "transitional" rules and not under the "permanent" rules, which govern Jama's case. Shah 184 F.3d at 725 ("As to whether the new provisions of that Act. . .exclude all judicial review, including habeas corpus, in other cases, we express no view. Our opinion is limited to those who, like Mr. Shah, fall within IIRIRA's transitional rules.").

[8]The descriptive word "excludable" can be used interchangeable with "inadmissable."

**B. Detention For Ninety Days After Entry Of A Final Order Of Removal Is Authorized By 8 U.S.C. § 1231(a).**

The detention provisions of the INA, as amended by the IRRIRA are bifurcated. Section 236(a) of the INA, 8 U.S.C. § 1226(a) (1999), covers detention "pending a decision on whether the alien is to be removed from the United States." Jama is not such an alien because he already is subject to a final removal order. The relevant detention provision is section 241(a) of the INA, 8 U.S.C. § 1231(a) (1999), which covers detention following entry of a final removal order. That provision generally affords the Attorney General a ninety-day period to accomplish removal.

Pursuant to section 241(a)(1)(B) of the INA, the removal period begins on the latest of three events: (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed and the court stays removal, the date of the court's final order; or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement. 8 U.S.C. § 1231(a)(1)(B) (1999). Once initiated, the ninety-day removal period might be tolled by entry of a judicial stay of removal, which obviously would prevent the INS from executing the administratively final order of removal. Alternatively, the removal period might be tolled if the alien "fails or refuses to make timely application in good faith for travel or other documents necessary to [his] departure or conspires or acts to prevent [his] removal." INA § 241(a)(1)(C), 8 U.S.C. § 1231(a)(1)(C) (1999).

Congress has mandated detention of criminal aliens such as Jama during the ninety-day removal period: "During the removal period, the Attorney General *shall* detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found . . . deportable under section 1227(a)(2) [relating to criminal grounds of deportability] . . . of

this title." INA § 241(a) (2), 8 U.S.C. § 1231(a)(2) (1999) (emphasis added). In Jama's case, the ninety-day removal period commenced on May 9, 2001, when the order became administratively final for purposes of appeal to the Court of Appeals. Because Jama is lawfully detained pursuant to INA § 241(a) (2), 8 U.S.C. § 1231(a)(2) (1999), this court should deny habeas corpus relief.

**C. 28 U.S.C. § 2241 Does Not Grant Jurisdiction To Review An Order Of Removal In The District Court.**

Recently, the Supreme Court decided, INS v. St. Cyr, 531 U.S. 1107, 121 S.Ct. 2271 (2001) and its sister case Calcano-Martinez v. INS, ___ U.S. ___, 121 S.Ct. 2268 (2001) discussing habeas corpus jurisdiction over immigration matters. Both opinions concerned constitutional challenges to detention of immigrants after the statutory period for removal had expired. Moreover, neither case concerned an excludable alien, like Jama, who is subject to INA § 212(g); 8 U.S.C. § 1252(g). As a result, neither St. Cyr nor Calcano apply; rather, Reno v. American-Arab Anti-Discrimination Committee, 119 S. Ct. 936, 943 (1999)("AADC") applies and Jama's petition is barred because it arises from the execution of an order of removal during the statutory period for removal.

**1. This court lacks jurisdiction to review the attorney general's execution of the order removing Jama to Somalia.**

The IIRIRA extensively amended the INA, particularly with respect to the judicial review provisions. Included among the new provisions is INA § 242(g), 8 U.S.C. § 1252(g) which states:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.[9] (emphasis added).

---

[9] This section was added to the INA by IIRIRA § 306. Most of IIRIRA's provisions were made applicable only to removal proceedings commenced on or after April 1, 1997. See IIRIRA § 309(c)(1).

In AADC, the Supreme Court declared that INA § 242(g) applies to "three discrete actions that the Attorney General may take: [his] 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" AADC, 525 U.S. at 482. The Court clarified part of the scope of INA § 242(g) by stating that this provision "performs the function of categorically excluding from non-final-order judicial review. . .certain specified decisions and actions of the INS. AADC, 525 U.S. at 483 (emphasis added). See also Shah, 184 F.3d at 722 ("The words 'commence proceedings, adjudicate cases, or execute removal orders' refer to separate and discrete actions in the deportation process. The Section has nothing to do with petitions for review of final orders of deportation, or indeed with any sort of review of such orders."). These "three discrete actions" pertain to matters left by Congress to the discretionary determination of the Attorney General. See AADC, 525 U.S. at 483-84. The Supreme Court explained that many of the IIRIRA changes, such as INA § 242(g), were "aimed at protecting the Executive's discretion from the courts - - indeed, that can fairly be said to be the theme of the legislation." Id. at 486. In further analyzing the rationale behind INA § 242(g), the Supreme Court stated that "[i]t is entirely understandable, however, why Congress would want only the discretion-protecting provision of § 1252(g) applied. . .because that provision is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." Id. at 487. Thus, the Court emphasized that INA § 242(g) was designed to afford "protection" from judicial review of certain discretionary decisions of the Attorney General which, if challenged, would simply prolong litigation and make execution of removal orders more difficult.

---

Congress made an exception, however, for Section 1252(g), which was made applicable "without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under [the INA]." IIRIRA § 306(c)(1); See Reno v. American-Arab Anti-Discrimination Committee, 119 S. Ct. 936, 943 (1999)("AADC").



00_021

Id. at 485.

While the Supreme Court did not attempt to explain the full scope and compass of INA § 242(g), it did provide the basic framework for understanding the types of cases for which INA § 242(g) works its preclusive effect. The Court mentioned several examples of cases for which INA § 242(g) was intended to preclude jurisdiction, including: Cheng Fan Kwok v. INS, 392 U.S. 206 (1968) (review of the refusal to stay deportation), and Ramallo v. Reno, Civ. No. 95-01851 (D.D.C., July 23, 1996) (review of execution of removal order), described in and rev'd on other grounds, 114 F.3d 1210 (D.C. Cir. 1997). AADC, 525 U.S. at 485.[10]

In Cheng Fan Kwok, the Supreme Court entertained a challenge to the denial of a stay of deportation by the district director after a special inquiry officer established the petitioner's deportability and granted him voluntary departure. Cheng Fan Kwok, 392 U.S. 206, 208 (1968). The Court noted that the petitioner's challenge to the district director's denial of his request for a stay of deportation pending the submission and disposition of an application for adjustment of status fell outside the scope of judicial review. Cheng Fan Kwok, 392 U.S. at 211. The key feature of the challenge in Cheng Fan Kwok was that the "petition did not 'attack the deportation order itself but instead (sought) relief not inconsistent with it.'" Id. at 213, quoting Mui v. Esperdy, 371 F.2d 772, 777 (2d Cir. 1966) (emphasis added). In other words, the petition did not contest his order of deportation but instead focused on the Attorney General's discretionary denial of a stay and execution of the final deportation order. According to the Supreme Court, such a challenge may not now be

[10] The Court mentioned two other cases not discussed in detail above: AADC I, 70 F.3d 1045 (9th Cir. 1995)(review of commencement of deportation proceedings); Lennon v. INS, 527 F.2d 187, 195 (2nd Cir. 1975)(same, dicta). See AADC, 525 U.S. at 485.

entertained by a district court in light of the jurisdictional bar at § 242(g). See also Mapov v. Carroll, 185 F.3d 224, 228 (4th Cir. 1999), cert. denied, 120 S. Ct. 1417 (2000)(concluding that 1252(g) divested the district court of jurisdiction to review an alien's challenge to the INS's denial of an administrative stay of deportation pending resolution of a motion to reopen); Ferdorca v. Perryman, 197 F.3d 236, 240 (7th Cir. 1999)(same); Botezatu v. INS, 195 F.3d 311, 313 (7th Cir. 1999)(INS refusal to defer alien's deportation or reinstate voluntary departure was discretionary action within the scope of § 1252(g).

The Supreme Court also cited Ramallo as a case involving a challenge to the execution of a final order. AADC, 525 U.S. at 485. Specifically, the alien in Ramallo raised claims of breach of contract, promissory and equitable estoppel, and violations of the Fifth Amendment. Ramallo, 114 F.3d 1210, 1212 (D.C. Cir. 1997), cert. denied, 526 U.S. 1003 (1999). The district court concluded that it was not reviewing a final deportation order and maintained jurisdiction. Id. at 1213. The court of appeals, however, specifically found that the alien's claims arose from the "decision or action" of the Attorney General "to execute a removal order against Ramallo, and, thus, falls squarely within the express terms of the newly amended [INA § 242]." Id. at 1213. The court of appeals thereafter vacated the district court's decision and remanded with directions to dismiss. Id. at 1214. Thus, section 242(g) was intended to restrict judicial review of certain claims in order to preserve the Attorney General's discretion to proceed or not proceed at "various stages in the deportation process." AADC, 525 U.S. at 483.

Here, Jama's claims fall directly within the preclusive scope of § 242(g). The claims "aris[e] from" the INS's attempt to execute his removal order to Somalia. First, the content of his

challenges, "My country has no government,...." focus on execution of a removal order--return to Somalia. (Petition at 3). He does not challenge the merits of his removal by contesting alienage, citizenship, or the basis for removal--his criminal conviction for assault. Instead, he challenges the conditions of "clearance" for his return arguing that there is no government in Somalia to issue clearance. Second, the timing of Jama's petition evinces a challenge to the execution of the order returning him to Somalia. Jama filed his habeas petition soon after he was notified by the INS that he would be removed. Jama's sole challenge is limited to the discretionary actions of the Attorney General in employing certain procedures and methods to "execute" his removal order to Somalia.

It is within the discretion of the Attorney General to prescribe the manner in which a final order is executed by employing procedures which effectively repatriate the alien to the country designated for removal. By questioning these methods, Jama's challenge is more akin to those presented in Cheng Fan Kwok and Ramallo where the aliens did not contest the deportation orders themselves, but instead, presented a challenge directly affecting the Attorney General's discretionary determination and methods of "executing" the final removal order. According to the Supreme Court, such challenges to the Attorney General's discretion in "executing" a final order of removal may not be raised in this Court in light of the jurisdictional bar of § 242(g).[11] Therefore, the district court lacks subject matter jurisdiction. 8 U.S.C. § 1252(g).

---

[11] Moreover, this situation implicates issues of foreign policy especially when dealing with the status of governments and a government's issuance or non-issuance of travel documents and visas. These are Executive Branch decisions of foreign policy and not suited for judicial intervention. See, e.g., Hampton v. Mow Sun Wong, 426 U.S. 88, 101 n.21 (1976) ("the power over aliens is of a political character and therefore subject only to narrow judicial review"); Mathews v. Diaz, 426 U.S. 67, 79-82 (1976); Galvan v. Press, 347 U.S. 522, 531 (1954).

2. **Jurisdiction to review the merits of a removal order is barred by 8 U.S.C. § 1252.**

Even if this Court were to consider Jama's habeas petition to be a challenge to the "merits" of his final order of removal, this claim is also barred by the new permanent rules for judicial review. See INA § 242, 8 U.S.C. § 1252. Section 242(a)(1) provides that final orders of removal are subject to judicial review only on petition for review in the courts of appeals. See Max-George v. Reno, 205 F.3d 194, 198 (5th Cir. 2000), reh'g en banc denied (5th Cir. May 26, 2000) ("The clear language of IIRIRA's permanent rules force an alien to raise all potential issues regarding his deportation at one place and time: a petition for review filed in the court of appeals."); Richardson v. Reno, 180 F.3d 1311, 1315 (11th Cir. 1999), cert. denied, 120 S. Ct. 1529 (2000) (same).[12] Congress provided for only one narrow exception that permits a limited form of habeas corpus review for aliens arriving at the border without valid documentation who were placed in expedited-removal proceedings, a circumstance not at issue in Jama's case. See INA § 242(e)(2), 8 U.S.C. § 1252(e)(2).

Under the new permanent rules, Congress also specifically restricted judicial review of removal orders entered against criminal aliens by providing that, "[n]otwithstanding any other

---

[12] But see Gavilan-Cuate v. Yetter, 94 F.Supp.2d 1039, 1041 (D.Minn.2000), pending on appeal Ramon Gavilan-Cuate v. Yetter, et al., No. 00-2599 (8th Cir. 2000). Although Gavilan-Cuate, extended habeas corpus jurisdiction despite the restrictive language in the permanent rules, the case did not concern a refugee who, like Jama, never improved his immigration status to permanent residency. Id., at 1040. Moreover, the court in Anic v. Reno, 114 F.Supp.2d 871, 876 (E.D.Mo. 2000), another case concerning a lawful permanent resident, discussed the construction of the permanent rules remarking that "prior to 1996, habeas review of deportation orders was generally available only when the petitioner could not obtain review in the court of appeals. (citations omitted). Conversely, if [direct review by the Courts of Appeals] has no effect on habeas, any alien could presumably attack a removal order by filing a habeas petition in the district court, regardless of whether the alien had full access to direct review in the court of appeals. Under this construction, IIRIRA would have expanded, rather than curtailed, the avenues available for challenging removal orders." Id. at 876. Although Jama has the ability to seek review in the Court of Appeals, infra. at footnote 13, he did not pursue it or test the limitations in 8 U.S.C. § 1252(a)(2)(C).

provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" one of various criminal offenses, including Jama's crime of moral turpitude. See INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C). Additionally, Congress enacted a new, sweeping jurisdiction-limiting provision at INA § 242(b)(9), 8 U.S.C. § 1252(b)(9), which provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only injudicial review of a final order under this section [i.e., Section 1252].

Based upon these provisions, it is clear that an alien may seek judicial review of the "merits" of a final order of removal, but this review may only be brought in the circuit court of appeals. Moreover, if the alien happens to be a criminal (such as Jama who was found removable as an alien convicted of a crime of moral turpitude), then the jurisdictional bar to judicial review contained in the permanent rules would preclude a criminal alien's challenge to the merits of his final order even in circuit court. See INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C).[13] Thus, Jama's habeas petition

---

[13] In Flores-Miramontes, 212 F.3d at 1137, the Ninth Circuit interpreted 8 U.S.C. § 1252 as permitting habeas review in district court in the cases of criminal aliens otherwise barred from review in circuit court by § 1252(a)(2)(C). However, unlike Jama's challenge to the discretionary decision of the Attorney General in "executing" a removal order, the challenge in Flores-Miramontes concerned a constitutional attack on the BIA's filing deadline for Notices of Appeal of an Immigration Judge's decision to the BIA. Id. at 1134-35. Moreover, the Government disagrees with Flores-Miramontes, but decided against further review since similar issues are pending before the Supreme Court in Liang, supra, at 21 n. 12. The Government still contends that all review of removal orders is channeled to the circuit courts by INA § 242(b)(9), 8 U.S.C. § 1252(b)(9). See AADC, 525 U.S. at 483 (describing § 1252(b)(9) as an "unmistakable 'zipper clause'" directing challenges to the circuit courts). For criminal aliens, otherwise subject to the jurisdictional bar of INA § 242(a)(2)(C), review in circuit court may still be obtained concerning threshold jurisdictional issues such as alienage and deportability. See, e.g., Flores-Miramontes, 212 F.3d at 1135 (recognizing that a court of appeals has jurisdiction to determine whether an alien is removable by reason of having been convicted of one of the enumerated offenses in INA § 242(a)(2)(C)); Nguyen v. INS, 208 F.3d 528, 531 (5th Cir. 2000) ("it is a threshold question in the determination of our jurisdiction for this court to determine whether

should be dismissed for lack of jurisdiction since any attack on the "execution" of his removal order is barred by INA § 242(g) and any challenge to the removal order itself is precluded by INA §§ 242(a)(2)(C), 242(b)(9).

**D. Even If Jurisdiction Exists Pursuant To 28 U.S.C. § 2241, Jama's Removal Is Justified On The Merits.**

In the event this court finds that jurisdiction exists, Jama's removal is justified.[14] In reviewing a removal order, the scope of review is very narrow, certainly, narrower than review pursuant to the Administrative Procedures Act. Heikkila v. Barber, 345 U.S. 229,236 (1953); St. Cyr, 2001 WL 703922, 7-8. The issue is "whether reasonable, substantial, and probative evidence in the record as a whole supports the BIA's conclusion . . . " Miranda v. INS, 138 F.3d 624, 626 (8th Cir. 1998); See Feleke v. INS, 118 F.3d 594, 598 (8th Cir.1997) ("The Board's decision that an alien is not eligible for asylum must be upheld if supported by reasonable, substantial and probative evidence on the record considered as a whole."). The court does not, however, re weigh the evidence. Id. Here, this court should deny the petition because reasonable, substantial and probative evidence supports the conclusions of the BIA.

**1. Jama's crime - assault in the third degree - is a crime of moral turpitude justifying his removal.**

---

Nguyen is a citizen"); Aragon-Ayon v. INS, 206 F.3d 847 (9th Cir. 2000) (Court has jurisdiction to decide whether application of aggravated felony definition is impermissibly retroactive). Under the permanent rules for judicial review, the only review permitted in district court by way of petition for writ of habeas corpus is that narrow review specifically provided for by Congress in INA § 242(e)(2), 8 U.S.C. § 1252(e)(2)(aliens arriving at the border without documentation) and possibly review of the constitutionality of an alien's detention. See Ho v. Greene, 204 F.3d 1045, 1052 (10th Cir. 2000)(district court has jurisdiction under the habeas corpus statute over constitutional challenges involving the detention of aliens); Parra v. Perryman, 172 F.3d 954, 955 (7th Cir. 1999)(same). None of these issues is raised here.

[14] Jama was precluded from seeking asylum by his conviction for third degree assault. (Exs. 178) See Section 208(b)(2)(B)(i).

Jama is a refugee with an immigration status similar to a citizen and native of a foreign country. He came here as a refugee and never improved his status to a resident alien. At the age of 22, he stabbed three people, pleaded guilty to assault and failed to obey the conditions of a suspended imposition of sentence. In addition, he served more than one year in prison even though with good prison behavior he could have been released earlier. While facing prison on state charges, Jama stated, "If you can put me on probation, that would be fine, otherwise, transfer me to Immigration Court and let them take me to Somalia." (Exs. at 174). Jama's age, crime and sentence justify removal pursuant to 8 U.S.C. § 1152.

A refugee, like Jama, is subject to removal when after reaching 18 years of age he is "convicted of, or . . . admits having committed, or . . . admits committing acts which constitute the essential elements of . . . (I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, . . ." 8 U.S.C. § 1152(a)(2)(A)(1)(I). In Lopez-Mendes v. Immigration and Naturalization Service, 187 F.3d 642 (8th Cir. 1999)(table)(unpublished), the Eighth Circuit found that an assault resulting in substantial injury qualified as a crime of moral turpitude, thus, upholding an alien's removal. The same result is merited in the instant case after a review of Minnesota law concerning Jama's conviction for assault in the third degree resulting in substantial injury.

Whether a crime involves moral turpitude for deportation is a question of federal law. Franklin v. INS, 72 F.3d 571, 572 (8th Cir.1995). Although state law determines the elements of the crime, it does not "control the consequences given to the conviction in a federal deportation proceeding." Id. Moreover, courts do not examine the factual circumstances surrounding the

crime to determine whether the crime occurred as described. Id. The issue is whether the INS reasonably interpreted use of a knife to commit a third degree assault and cause substantial injury as a crime of moral turpitude. Id. "If the BIA's interpretation is reasonable, `[we] cannot replace the agency's judgment with [our] own.'"Id., 573, quoting, Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1440-41 (8th Cir.1993) (en banc).

The INS interprets moral turpitude to include crimes of reckless endangerment. "Having consistently adhered to its view about crimes of reckless endangerment for nearly twenty years, [this] interpretation is entitled to deference." Franklin, 72 F.3d at 573; See Arkansas AFL-CIO, 11 F.3d at 1441; Okoroha v. INS, 715 F.2d 380, 382 (8th Cir.1983). likewise, deference is appropriate because the application of "moral turpitude" in the context of the immigration laws entails "policy determinations [about removal] that fall within the ambit of [the BIA's] expertise." Akindemowo v. INS, 61 F.3d 282, 285 (4th Cir.1995).

Jama admitted to and was convicted of the crime - assault in the third degree. In Minnesota, assault in the third degree requires substantial injury, though not intent. Minn. Stat. § 609.233. It includes some seemingly minor injuries, but also includes the use of a deadly weapon to inflict serious or life threatening injury. Consequently, the element of substantial injury, required to convict a person of assault in the third degree, implies a conscious and reckless disregard for the life and safety, such as, stabbing three persons with a deadly weapon.

Moral turpitude is a nebulous concept with ample room for differing definitions of the term, Franklin, 73 F.3d at 573, the INS' interpretation of third degree assault as a crime of moral turpitude is reasonable. Indeed, in accordance with this court's deferential review and the Eighth

Circuit's unpublished decision in Lopez-Mendez, 187 F.3d 642, Jama's crime can be fairly characterized as, "an act of baseness, vileness, or depravity in the private and social duties which [persons] owe to [their] fellow [persons] or to society in general, [and is] contrary to the accepted and customary rule of right and duty between [persons]." Marciano v. INS, 450 F.2d 1022, 1025 (8th Cir.1971) (quoted cases omitted). The INS reasonably defined third degree assault as a crime of moral turpitude. This Court should deny the petition for habeas corpus.

**2. INS correctly denied adjustment of status and a waiver of removal.**

In the written order denying the waiver of removal, the immigration judge identified several crimes committed by Jama over a short period of time:

> 1) the applicant was convicted of theft on September 17, 1997, in Hennipen County District court . . . However, the conviction was later vacated because [Jama] was unaware of the immigration consequences of entering a guilty plea.
>
> 2) [Jama] was convicted in Hennipen County District Court, . . . on July 17, 1998 of theft - value more than $200 but less than $501.
>
> 3) [Jama] was convicted in Waseca County District Court, . . . , on September 8, 1998, of Assault 3rd degree - substantial injury.
>
> 4) On November 23, 1999, [Jama] was convicted in Hennepin County district Court, . . . of Theft.

(Exs. at 99). In his oral opinion, (Exs. 159-187) he described and analyzed all the testimony and documentary evidence.

The immigration judge had an opportunity to observe Jama's testimony and later commented on his credibility. (Exs. 178-179). The judge fairly noted that Jama's testimony about his criminal behavior was "vague" but attributed the vagueness to the influence of alcohol on Jama at the time of committing the offenses. The judge also noted that Jama's testimony at the

immigration hearing was inconsistent with his testimony to the Waseca County District Court and that Jama "advises this court that he lied to the criminal judge . . . to be released from custody." Id. In addition to this admission to a lack of credibility, Jama failed to accept responsibility blaming "probation officers, police officers, and prison guards . . . including the lawyers who previously represented him " for his disciplinary and criminal problems. After reciting these faults in Jama's credibility, the judge had "serious doubts" about Jama's credibility. (Exs. 179)

Despite the legitimate doubts about Jama's credibility, the immigration judge reviewed Jama's application for adjustment of status and concomitant waivers of removability. (Exs at 179) The judge individually addressed each consideration in favor of granting such relief - public interest, family unity and humanitarian purpose even if they were not raised by Jama. The judge found no public interest at issue. On the issue of family unity, he relied, in part, on the testimony of Jama's uncle that Jama "chose to leave the family home" where he could not abide household rules. (Exs at 180). Indeed, Jama's immediate family did not visibly support his requests to stay in the U.S.. Finally, the judge balanced the negative factors evidencing removal - Jama "has a significant disregard for the laws of this country"- against the fact that Jama came to the U.S. as a refugee and conditions in Somalia. The judged affirmed the INS decision not to adjust Jama's status or waive removal.

Jama appealed the judge's decision to the BIA asking for greater emphasis on humanitarian purposes and family unity. For humanitarian purposes, Jama referred to strife in Somalia. For family unity, he referred to the presence of his family in the U.S. even though he

had not lived with his immediate family since 1999, and none of them appeared on his behalf at the immigration hearing. (Exs. 188). After a complete review of the record, the BIA adopted the findings of the Immigration Judge (Exs at 200)

The INS weighed several factors, including family unity and strife in Somalia, in denying a discretionary waiver of removal. Similarly, based on current research by the U.S. State Department the conditions in Somalia have substantially improved, particularly for members of Jama's clan. Indeed, the St. Paul District itself, has successfully repatriated fourteen Somalis over the last two years. (Exs. at 246) In Jama's case the INS concluded, "Considering all the evidence of the record, it is concluded that on balance the unfavorable factors outweigh the favorable ones and approval of the application is not warranted as a matter of discretion." Such a facially legitimate reason, supported by reasonable, probative and substantial evidence, for denying a discretionary waiver of removal satisfies this court's review and this court should deny Jama's petition.

An INS decision not to waive removal is hard to reverse. In Kliendiest v. Mandel, 408 U.S. 753 (1972), the INS denied an excludable alien, like Jama, release into the United States on parole. Similarly, the INS denied Jama a discretionary waiver of removability from the U.S... (Exs. at 99). Kliendiest defined the scope of review in such cases as, "[W]hen the Executive exercises this power negatively [denying entry into the United States] on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification . . . " Id., at 770. Here, a facially legitimate reason justifies denial of a discretionary waiver of removal - after turning 18, Jama committed

several serious crimes, one of which resulted in a conviction for third degree assault, knowing that he placed himself in danger of removal from the U.S.. Moreover, even under a more extensive review for reasonable, substantial and probative evidence supporting the denial of relief, the instant petition lacks merit because Jama admitted the grounds for removal and did not present evidence to rebut the publications by the Department of State, (Exs 203-227 ). These exhibits contradicted Jama's argument concerning his membership in the Darod clan.

Jama argued that as a member of the Darod clan his return to Somalia will result in persecution. Persecution is an element of an application for asylum. To obtain asylum or a waiver of removal based on persecution, the alien must have a subjectively genuine and objectively reasonable fear of persecution. Brijmati Singh v. INS, 134 F.3d 962, 966 (9th Cir. 1998); Arriaga-Barrientos v. INS, 937 F.2d 411, 413 (9th Cir. 1991). An alien satisfies the subjective component by credibly testifying that he genuinely fears persecution. Brijmati Singh, 134 F.3d at 966; Cuadras v. INS, 910 F.2d 567, 570-71 (9th Cir. 1990). The objective component requires that an alien point to "credible, direct, and specific evidence in the record . . . that would support a reasonable fear of persecution." Brijmati Singh, 134 F.3d at 966. Here, Jama testified about his subjective fears, but did not produce credible evidence concerning the conditions for the Darod clan in Somalia at the current time.

Jama accurately claimed membership in the Darod clan, but referred to it as a minority clan without control over any region of Somalia. (Exs 193-94). The State Department, however found the Darod clan to be a majority clan exercising control in Northeastern Somalia. (Exs. 224-228). As a result, substantial, reasonable and probative evidence contradicted Jama, The INS

has expressed a facially legitimate reason, based on substantial, probative and reasonable evidence, to deny an adjustment of status and a discretionary waiver of removal, thereby, requiring this court to deny Jama's petition for habeas corpus relief.

### 3. The INS correctly denied withholding of removal because Jama committed a "particularly serious" crime.

Withholding of removal permits an alien to remain in the U.S. despite grounds to remove him from the U.S.. It is not, however, available where an individual has been convicted of a particularly serious crime. Section 241(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii).[15] Courts have authorized the BIA to consider the nature of the conviction, the type of sentence imposed, and the circumstances and facts underlying the conviction in determining whether or not the crime was "particularly serious." See Mahini v. INS, 779 F.2d 1419, 1421 (9th Cir.1986).

---

[15]Conviction of a "particularly serious" crime also prevents an alien from obtaining asylum. See 8 U.S.C. § 1158(b)(2)(A)(ii). 8 U.S.C. § 1231(b)(3)(B) provides an exception to preventing a removal to "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." The exception, which applies in the instant case, provides that an alien can be removed despite the threat where, the Attorney General finds that:

> (ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States; ...
>
> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 1227(a)(4)(B) of this title shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

8 U.S.C. § 1231(b)(B)(ii).

Here, Jama was convicted of stabbing three people. Although imposition of sentence was suspended, one of the victims stated, that "he lost a job as a result of the hand injury . . . Mr. Jama is going to kill someone some day, and he's really concerned with his safety and others' . . ." (Exs at 16) Moreover, despite the known threat to Jama's immigration status and the history of appearances in criminal courts, within one month, Jama violated the conditions of the suspended imposition of sentence. At the revocation hearing, the State judge commented, "It is obvious to this Court that you have no intention of following any probationary terms regardless of the conditions that may be imposed on you . . . This Court is further of the opinion that to not revoke your probation would undermine the seriousness of the conviction for which you are appearing today." (Exs at 16) The State court further emphasized the seriousness of the conviction by sentencing Jama to imprisonment for more than one year, knowing the sentence would create a "serious risk of deportation." (Exs. at 38). The evidence is reasonable, substantial and probative even if this Court would decide differently. This court should deny the petition for habeas corpus.

**4. The INS correctly denied a deferral of removal under Article 3 of the Convention Against Torture.**

An applicant for relief under the Convention on Torture has the burden of proof to show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(1) and (2) (2001). In making this assessment, evidence to be considered includes evidence of past torture inflicted upon the applicant, evidence of gross, flagrant or mass violations of human rights within the country of removal, and other relevant information regarding conditions in the country of removal." 8 C.F.R. §

208.16(c)(3)(i)-(iv) (2001). Here, INS determined that Jama should be removed to Somalia, his place of birth and citizenship, where none of his family had been tortured.

Although when an alien is convicted of a particularly serious crime, relief under the Convention against Torture is not available pursuant to 8 C.F.R. § 208.17, it may still be available pursuant to 8 C.F.R. § 208.16. Pursuant to this section, an alien has the burden of establishing a *prima facie* case that it is more likely than not that he or she will be tortured if removed to the proposed country of removal. See 8 C.F.R. § 208.18(b)(2)(ii) (2001). Although the administrative record contains evidence about the genital mutilation of young women in Somalia, it also contains evidence that young men of the Darod clan, like Jama, are not subjected to torture. Indeed, in northeastern Somalia the Darod, a majority clan, is in control of this relatively safe region. Indeed, "there is no evidence in the record that any of [the] governmental groups in Northern Somalia would be inclined to torture [Jama]." (Exs at 186). This court should deny the petition for habeas corpus because reasonable, substantial and probative evidence supports the denial of relief pursuant to the Convention against Torture.

### 5. Removal to Somalia is appropriate even if a recognized central government does not exist in that country.

Jama's attempt to delay execution of the removal order may rely on the misguided presumption that Somalia must have a functioning government for the INS to execute a removal order. Although a foreign government is the preferred course, and perhaps the course most commonly utilized, it is not required. Therefore, Jama's objections to removal lack merit as a matter of law.

Section 1231(b) is entitled "Countries To which Aliens May Be Removed." Since

Petitioner is not an arriving alien under § 1231(b)(1), his circumstances are governed by § 1231(b)(2) which applies to all other aliens including those like Petitioner who were initially admitted to the United States as refugees. For an alien in removal proceedings, this section initially permits the alien to designate his country of removal. See § 1231(b)(2)(A). However, in cases such as Petitioner's where the alien fails to make a designation, section 1231(b)(2)(D) directs the Attorney General to "remove the alien to a country of which the alien is a subject, national, or citizen." See Osmani v. INS, 14 F.3d 13, 15 (7th Cir. 1994)("The authority to designate the country to which an alien is to be deported is vested in the Attorney General rather than in the courts . . . "). Since there was no dispute that Petitioner was a national and citizen of Somalia, this country was designated by the Immigration Judge for removal. Exs. 1, 8, 144-54.[16]

Most importantly, these provisions do not mandate that a functioning government exist or that travel documents are necessary for removal. This statute is clear and unambiguous and only requires that Petitioner be removed to a "country" designated by the Attorney General. Whether or not this country has a functioning government with the ability to issue travel documents is of

---

[16] Section 1231(b)(2)(D) provides two exceptions where the Attorney General may not remove the alien to a country of which he is a subject, national, or citizen if the government of that country does not acknowledge acceptance of the alien within 30 days or if the government specifically states that it is unwilling to accept the alien. See 8 U.S.C. § 1231(b)(2)(D)(i) & (ii). Both of these exceptions are not relevant to Petitioner's case because there is no government in Somalia to make such declarations.

Even if removal cannot be executed under § 1231(b)(2)(D) because it references "government," the INA permits the Attorney General to remove aliens to any one of seven alternative countries under § 1231(b)(2)(E) which only references the term "country" and not "government." For example, § 1231(b)(2)(E)(iv) permits the Attorney General to remove Petitioner to "[t]he country in which the alien was born." Under this provision, the Attorney General could conceivably remove Petitioner to Somalia despite there not being a functioning government in that country since, again, "country" and not "government" is the focus of removing aliens under these provisions.

no consequence. Indeed, the general theme throughout § 1231(b)(2) stresses the importance of and considers removal only to certain "countries" designated in the statute. See, e.g., § 1231(b)(2)(A)("Selection of Country by Alien")(emphasis added); § 1231(b)(2)(D)("Alternative Country")(emphasis added); § 1231(b)(2)(E)("Additional Removal Countries")(emphasis added); § 1231(b)(2)(F)("Removal Country When United States Is At War") (emphasis added). Simply stated, nowhere is there mandated that a "government" must exist or that travel documents must be issued, nor may this Court read into the statute a requirement not intended or stated by Congress. See generally Carlson v. Landon, 342 U.S. 524 (1952) (the power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers with such opportunity for judicial review of their action as Congress may see fit to authorize or permit).

Moreover, the term "country" is not defined in the INA, but courts have construed the term to refer to the geographical area from which an alien came that has some sort of international recognition, and has not limited the meaning of "country" to a political entity or functioning government that can issue travel documents or formally accept an alien. See, e.g., Ademi v. INS, 31 F.3d 517, 520 n.7 (7th Cir. 1994)(rejecting the argument that alien could not be deported to Macedonia, which the U.S. did not recognize, because the term "country" in the INA is used "to refer to the geographical area from which the alien came rather than the political entity to which the alien was subject when he entered the United States."); Menon v. Esperdy, 413 F.2d 644 (2nd Cir. 1969); Bajaleih v. Beechie, 309 F.2d 386, 389 (9th Cir. 1962); Fook v. Esperdy, 320 F.2d 86 (2nd Cir. 1963); Wang v. Pilliod, 285 F.2d 517, 519 (Formosa held to be a

country to which alien may be deported even though the political status of Formosa had not been formalized).

Any other conclusion would severely hinder the United States' lawful removal of aliens to many war-torn countries and areas where the United State's diplomatic efforts have been temporarily abandoned. For many years, the INS has successfully removed aliens to countries or territories where governments have been fragile, nonexistent, or under siege and where diplomatic relations were minimal or severed completely. See, e.g., Wang, 285 F.2d at 519 (Formosa (Taiwan)); Ademi v. INS; 31 F.3d at 517 (Macedonia and the Former Yugoslavia); Palciauskas v. INS, 939 F.2d 963 (11th Cir. 1991)(former Lithuania under the control of the Soviet Union). Thus, it is the "country" of designation that is mandated under § 1231(b) - - not the existence of a functioning government that can issue travel documents and formally accept the alien.

**6. Jama has an alternative remedy for challenging Somalia as the pace of removal.**

Finally, if Jama's claim is interpreted as a challenge to the actual country of removal (i.e cannot be returned to Somalia because it has no functioning government), then the appropriate mechanism to raise this challenge is a motion to reopen before the BIA. See 8 C.F.R. § 3.2; Bevc v. INS, 47 F.3d 907, 911 (7th Cir. 1995)("Ordinarily, when an alien believes that the designated country of deportation is inappropriate, the proper course of action for the petitioner is to file a motion to reopen her case with the board.")(emphasis added). Here, to the extent Jama wishes to relitigate the counts of removal, the proper venue is to move to reopen before the BIA Because an adequate remedy exists. The Court should decline to exercise habeas jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this petition for writ of habeas corpus for lack of jurisdiction. Alternatively, dismissal is warranted on the merits because the INS's method of removal to Somalia fully comports with the Constitution, immigration statutes, and regulations.

Dated this 31 Day of July, 2001.

ROBERT M. SMALL
United States Attorney

BY: LONNIE F. BRYAN
Assistant U.S. Attorney
Attorney ID Number 206635
600 U.S. Courthouse
300 S. Fourth Street
Minneapolis, MN 55415
(612) 664-5600

C[illegible]IFICATE OF SERVICE BY [illegible]

| | | |
|---|---|---|
| KEYSE G. JAMA,<br><br>Petitioner,<br><br>v.<br><br>Immigration and Naturalization Service,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 01-1172 JRT/AJB |

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the State and District of Minnesota and is a person of such age and discretion as to be competent to serve papers.

That on July 30, 2001, she served a copy of the attached:

RESPONDENT'S RETURN, MOTION TO DISMISS, AND MEMORANDUM IN SUPPORT

by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and address(es) stated below, which is/are the last known address(es), and by depositing said envelope and contents in the United States Mail at Minneapolis, Minnesota.

Addressee(s):

Keyse G. Jama
0101803
Sherburne County Jail
13880 Hwy 10
Elk River, MN 55330

STACEY E. KULEVICH