**Magnuson, Kevin**

**From:** Greg.Mack@usdoj.gov
**Sent:** Thursday, February 03, 2005 5:08 PM
**To:** Magnuson, Kevin
**Subject:** RE: Passport Contacts

Kevin,

Thanks for your response. I note your concern about a false passport, and I also note that "false" is an undefined term here, as the State Department does not recognize passports that purportedly come from Somalia, but other countries do, and an entity in Somalia may be issuing passports, but neither of us can confirm their validity. So, we wanted to provide the options that we saw out there, but certainly would not want you or your client to embark upon, or perceive yourselves as embarking upon, something that violated the applicable law. In short, we wanted to inform you what the airline wanted, as that would facilitate removal.

I repeated your inquiry about Jama's release today, as I have the several previous days, and I will inquire again about that point. ICE is also aware of Jama's desire to go to Bossasso. Given your response, ICE will have to assess what their options are and whether that fits in with their options. I want to be clear with you about that. That is, to the extent that they can accomodate his return to Bossasso, ICE, I believe, will explore that.

GDM

-----Original Message-----
From: KMagnuson@Briggs.com [mailto:KMagnuson@Briggs.com]
Sent: Thursday, February 03, 2005 5:40 PM
To: Mack, Greg (CIV)
Subject: RE: Passport Contacts

Greg: Thanks for your call last night. I am out of the office this afternoon but I wanted to get back to you regarding my attempts to find a passport for Jama.

I talked with Jama himself this morning and he said that when they walked to Kenya (and he said they literally walked from Mogadishu to the camp in Kenya) they did not have any travel documents. When they were relocated in the United States they also did not have any such documents.

I then contacted Daallo Airlines and you are correct--they will not allow a passenger to board a plane bound for Somalia who does not have a passport. I also contacted some of the organizations you passed on from your client. There is no way of obtaining a legitimate passport from Somalia. As for your suggestion that I get a false passport for him, similar to the kind that some Somalis obtain for the purpose of entering the country illegally, I simply cannot do that nor can I advise him or his family that he get an false passport. As we discussed, that is wrong for a number of reasons. As a lawyer, I cannot have a part of obtaining an illegitimate passport or



**EXHIBIT I**

advising someone to agree to travel under such a document. The practical problems associated with doing so are obvious and enormous. I'm sorry that I'm repeating myself but, for example, if for some reason he gets stranded with a fake passport he could be stuck between countries and even worse, charged with a crime.

So, we have to go to Plan B. I believe that Jama is the last, or one of the last, Somalis held in detention pending his removal. I know that you are waiting to hear from your client as to whether my suggestion that he be released under reasonable conditions of supervision until his removal but I would strongly suggest that you encourage them to do that. It would mean everything to Jama and pose no hardship whatsoever to BICE. Jama is one of the most widely known Somalis in the country. Although risk of flight has never been a valid reason for detention, it is clear that he can't go anywhere without being recognized. Furthermore, he understands that the question of his removability has been settled and that it is inevitable. Because it is inevitable, he is eager to get on with that next step as he has been in the custody of the immigration service for so long. He wants a little time--how ever much the service can give him--to spend with his family before he leaves. He has not had physical contact with any of them for five or six year, only talking to them on a phone through a glass window. Although worries about "dangerousness" (which are unfounded) also has never been a valid legal basis for continuing to detain him, he has been a model prisoner this last year. If he is released, we will have no objection to the service getting together a collective deportation, as long as it minimizes the danger level to Jama (i.e. sends him to Bossasso).

While I'm on the topic, I would like to also point out that I learned from my Daallo research that the plane flies directly only to Mogadishu and Hargeisa and that to move on to other cities such as Galkacyo Jama would have to change planes in Mogadishu. As we've discussed, putting Jama into Mogadishu or Hargeisa, even for the purpose of "changing planes" however THAT works, is unacceptable. Mogadishu and Hargeise are simply too dangerous to dump him in either place.

Please let me know if we can work something out as quickly as possible. I am in and out of the office tomorrow but we should talk. Call me at the office or on my cell, or email me...I will be checking messages all day.

Thanks,
Kevin

-----Original Message-----
From: Greg.Mack@usdoj.gov [mailto:Greg.Mack@usdoj.gov]
Sent: Wednesday, February 02, 2005 5:16 PM
To: Magnuson, Kevin
Subject: Passport Contacts

Here are the contacts I was given:
Somali Democratic Republic
Address: 27 Somali Street (Iran), Dokki, Cairo

Telephone: 202-337-4038
202-337-4577

Office hours: 0800-1500
Non working day: Friday

H.E. MR. Abdullahi Hassan Mahmoud
Ambassador Extraordinary & Plenipontentiary & Permanent Representative to the Arab League Telephone 336-5386

Mrs. Halima Ahmed Nur
First Secretary
telephone: 344-4648 (home)

Mr Ismail Abdi Hussein
Counsellor
Telephone: 349-0930

This email has been scanned for all viruses by the MessageLabs SkyScan service. (http://www.messagelabs.com)

CONFIDENTIALITY NOTICE: The information contained in this e-mail communication and any attached documentation may be privileged, confidential or otherwise protected from disclosure and is intended only for the use of the designated recipient(s). It is not intended for transmission to, or receipt by, any unauthorized person. The use, distribution, transmittal or re-transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing or by e-mail. If you are not the intended recipient of this e-mail, please delete it from your system without copying it and notify the above sender so that our e-mail address may be corrected. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

This email has been scanned for all viruses by the MessageLabs SkyScan service. (http://www.messagelabs.com)

This email has been scanned for all viruses by the MessageLabs SkyScan service. (http://www.messagelabs.com)

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YUSUF ALI ALI, et al., Plaintiffs, v. JOHN ASHCROFT, Attorney General of the United States, et al., Defendants. | Case No. C02-2304P<br>Seattle, Washington<br>October 7, 2004 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

For Awad Garad: Christine S. Dahl (via telephone)
Federal Public Defender's Office
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

For the Defendants: Greg D. Mack (via telephone)
U.S. Department of Justice
Office of Immigration Litigation
1331 Pennsylvania Avenue NW
Washington, D.C. 20530-0878

Joseph F. Roth
Official Court Reporter
600 U.S. Courthouse
Seattle, Washington 98104
(206) 553-1899

**EXHIBIT J**

Proceedings recorded by computer-aided stenography.

(In-chambers.)

THE COURT: Good morning, counsel. This is Judge Pechman.

MS. DAHL: Good morning, Your Honor. This is Christine Dahl.

MR. MACK: Good morning, Your Honor. This is Greg Mack for respondents.

THE COURT: Okay. Are you both in Washington, D.C., this morning?

MS. DAHL: Yes, Your Honor.

MR. MACK: Yes, Your Honor.

THE COURT: Okay. I've had an opportunity to read the paperwork, Ms. Dahl's motion, the government's response and Ms. Dahl's reply, which I got last night. So, Ms. Dahl, do you want to elaborate for me on your position, please.

MS. DAHL: Well, first I want to correct a mistake in the reply. The government does object to the motion to transfer jurisdiction out of Oregon and there's -- it says the opposite in my reply.

But I think that the government's main concerns about the abuse of the writ doctrine have no application for this case. The Court has jurisdiction over all petitioners in the district. He is in the district. And the Successive Petition Doctrine does not bar this motion. There was no full and fair hearing before Judge Panner. And the incorrect representation that induced

Mr. Garad's action in the District of Oregon prevents the government from invoking any equitable doctrine to prevent his release.

Zadvydas requires release from indefinite detention. And the government's position that the Jama case somehow alters the legal landscape is simply an incorrect statement of the law in this circuit.

THE COURT: Ms. Dahl, you've made a request of Judge Panner to transfer the jurisdiction.

MS. DAHL: Yes.

THE COURT: Do you have any idea when he might consider that motion?

MS. DAHL: Well, the motion to vacate the judgment has been set for hearing November 5th, along with class counsel's motion to intervene. I have no reason to believe he would advance the hearing date on the motion to transfer jurisdiction before considering the motion to vacate and motion to intervene.

THE COURT: I see. So basically he's got two motions in front of him, one to transfer, one to vacate?

MS. DAHL: Correct.

THE COURT: Okay. And has the government responded in your motion to vacate?

MS. DAHL: No, it has not.

THE COURT: Okay. You argue that your client should not have been transferred under Rule 23 of appellate procedure. Do

you know why your client was transferred up here?

MS. DAHL: My belief is that the policy is to fill available bed space at the lowest possible price. In Oregon they contract with local county jails through different sheriffs' offices. And with the opening of the Northwest Detention Center, they have made indications publicly that that's where detained people will be.

THE COURT: Were you notified ahead of time that your client was going to be moved?

MS. DAHL: No.

THE COURT: How did you find him?

MS. DAHL: Mr. Garad called me to tell me that he had been moved. And several other of my detained clients called to let me know that everybody at the Norcor facility had been rolled up and transferred, and that they were all now in Tacoma.

THE COURT: Okay. And can you explain to me why you think that this falls under Rule 23? What is on appeal at this point that would block the transfer?

MS. DAHL: The circuit considers that rule to apply to District Court proceedings. And it's been our practice that before habeas respondents can move the petitioners they have sought permission from the district in which the petition was pending to move the petitioners. We would not have opposed the request.

I believe that the rules regarding the Court's jurisdiction

and transfer protect the plaintiff from having to repeatedly file new cases and prevent respondent jailers from defeating the Court's jurisdiction. I don't think, though, it blocks access to the Court by petitioners.

THE COURT: Okay. A couple of other questions. Zadvydas has a six-month presumptive line and your client will not meet it until when?

MS. DAHL: I believe October 21st. He is out of the mandatory 90-day detention period. And I think that the presumption evaporates in an instant like this one, where there is an injunction against removal to Somalia, and that allowing -- or requiring that he serve the full six months is simply punitive, because there's no likelihood of removal, and Zadvydas allows detention so long as there is some reasonable likelihood of removal, and that's not this case.

THE COURT: Okay. Neither of you have presented to me what would be appropriate restrictions on release. You've simply asked for me to release him. Can you tell me what you think would be reasonable restrictions? I'm assuming that -- your client is a sex offender. Does Oregon require that they register? Is he currently on a parole or probationary status in Oregon, where he has to report?

MS. DAHL: He has to register. He has certain supervision obligations. He has suitable housing where there are no minors. He would live with his cousin. And it's been my

experience that BICE fashions reasonable conditions upon being directed to do so by the District Judge.

I imagine that BICE would require advance notification and permission to travel beyond, you know, the -- Oregon or Vancouver, if he were released to Oregon, and, you know, would comply with his state supervision requirements, and, you know, the ordinary things that they impose.

THE COURT: Does Oregon have any methodology or rule that allows matters to come on expeditiously? In other words, you've had pretty rapid access to me. Would Judge Panner respond to a request to put this matter on before November 5th? Is there a mechanism for you to do that?

MS. DAHL: I believe the head of my office, Mr. Wax, has contacted the Court and has not been able to obtain that.

THE COURT: Okay. All right. Mr. Mack.

MR. MACK: Yes, Your Honor. The principle underlying our motion is that the Court that first exercises jurisdiction should proceed with the case to conclusion. The Court -- this Court, Your Honor, has the transcript from the Oregon Court from the September 17th hearing before the Oregon Court, at page 5, where Ms. Dahl points out that there's -- or refers to the nationwide injunction issued by this Court, and the Oregon District Court says, I don't really care.

While it can say that, I think I have an obligation -- the government overall has an obligation to care about the Court's

jurisdiction, not to seek any litigation advantage. But, again, the case commenced in Oregon District Court, and while it's true that Mr. Garad was now transferred to this Court's jurisdiction, if he didn't have a full and fair hearing or proceeding in Oregon, if there's a violation of Federal Rule of Appellate Procedure 23, the case in Oregon is still open before Judge Panner, and if there are those concerns, those concerns can be presented to Judge Panner.

It's not a case of as if a case had proceeded to conclusion, a Court had closed proceedings, and now the alien, or other person, was proceeding anew or seeking relief from that prior order, but those proceedings had -- those prior proceedings had closed down. We still have open proceedings before Judge Panner.

I think also the transcript before Judge Panner reflects that Mr. Bowman, the Assistant U.S. Attorney before Judge Panner, told Judge Panner that if the government can't get this done, this being the removal in 30 days, leave the case open and this all can come back to you, and Judge Panner said, sure, or responded affirmatively. So, again, the case in Oregon is still open.

I would also add that with respect to Federal Rule of Appellate Procedure 23, the rule at (a) talks about the person having custody of the prisoner must not transfer custody to another. Custody hasn't been transferred to another. ICE is still ICE in Washington or in Oregon. So in that regard the rule shouldn't apply here.

Again, our point would be if there is a FRAP 23 violation, that's a matter for Judge Panner to take up. And I would point out on the merits, though, that Rule 23(a) doesn't seem to apply here, because it's not -- ICE didn't transfer custody to another. It is still ICE. It may be a different component within ICE, but it is still ICE. And in this case I believe it's still the regional director for ICE.

But, in any event, it's still the same agency.

THE COURT: Well, counsel, does that mean that these jurisdictional lines don't matter at all in terms of -- he was in the custody of a county sheriff in Oregon and now he's moved to a different state and a different district.

So are you saying that anytime somebody is within ICE's purview that jurisdiction would apply?

MR. MACK: ICE is -- ICE has legal custody and control over the alien. ICE puts the individual at the local detention facility with the sheriff. And ICE is taking that individual and transferring them to another facility, but, again, still under ICE's legal control.

THE COURT: So under that theory, though, you'd be able to move prisoners anyplace in the country, because ICE would have control, but you could move them anywhere; is that your position?

MR. MACK: Well, it would be our position that ICE does have that authority, and that they can move prisoners for administrative reasons around the country, for detention costs,

for bed space concerns, for security concerns.

So -- but, again, if there is a Rule 23 violation here, it should be an issue for Judge Panner to have taken up before him and considered before him and not a new habeas Court to have to take up that issue, particularly, again, in this instance where proceedings are still open before Judge Panner.

After all, if there is a violation of Rule 23, it was a violation in front of Judge Panner's Court. And I'm not conceding that there was a violation. But if there was one, that issue should be taken up and resolved by Judge Panner.

THE COURT: Okay. Well, Mr. Mack, here's one of the things that's bothering me. You told me that you cannot carry through on Judge Panner's order, correct?

MR. MACK: What I've given -- when Ms. Dahl contacted me before the 30 September hearing before this Court, I gave Ms. Dahl the background that I had regarding removal to Somalia.

The decision to forgo class protection must be a daunting choice for any alien to confront. And I would have expected that this Court at the 30 September hearing, if the motion to exclude had not been withdrawn and Mr. Garad was at the hearing, that the Court and Ms. Dahl would have voir dired Mr. Garad about whether he was making a knowing, voluntary, intelligent waiver of his interests under the nationwide injunction.

So, again, I gave Ms. Dahl the background of my experience and knowledge with respect to removal to Somalia.

THE COURT: Well, Mr. Mack, you told me at the September 30 hearing that you cannot carry out Judge Panner's order, is that correct?

MR. MACK: I said I wouldn't use the word "expeditious" in front of Judge Panner, knowing what I know about the process of removal to Somalia.

THE COURT: And you cannot guarantee that any transportation for this petitioner would not go through Mogadishu?

MR. MACK: I could not guarantee that. As a matter of fact, as I told Ms. Dahl in our phone conversation, a plan to remove Mr. Garad is not in place and likely would not be in place until he was excluded from the class, and then ICE would then go about trying to figure out what would be the best mode of removing him to Somalia.

Now, he has -- now that he's had a concern about being removed to Mogadishu, certainly ICE would try to accommodate that, if they could. But no plan is currently in place with respect to that.

THE COURT: Okay. Well, Mr. Mack, if that's the case, where is your Oregon AUSA, or your obligation, in terms of being officers of the Court, to not go back to Judge Panner and tell him that what was represented to him cannot be carried out?

MR. MACK: Well, at this juncture, after the hearing before this Court on 30 September, I came back to my office and

shared with my office what transpired. What we're endeavoring to do now is have a declaration from ICE for both courts to see what ICE's position would be with respect to removing Mr. Garad with his condition that he didn't want to be removed to Mogadishu. And the agency is working on that right now.

Mr. Bowman in Oregon, I don't know what his current deadlines are for responding to that, but we are endeavoring to have that declaration for the Oregon Court, and then we would also file it before this Court, to lay out ICE's position on all of this, given Mr. Garad's concern about being removed to Mogadishu, and the fact that we're in this current state right now where what was told to Oregon about this being an expeditious removal and then my statements to Ms. Dahl about what I knew to be the case on the ground with respect to removals to Somalia certainly being in conflict.

And what I told Ms. Dahl is what I've told to other counsel about removal to Somalia based on my background and my experience with the ICE headquarters individuals. And that would be a record -- the ICE declaration would be a record before Judge Panner, and, again, we would file that as well before this Court.

THE COURT: When do you expect to have that done?

MR. MACK: They've been working on that since I got back, and I expect them to have that by next week.

THE COURT: Has your office taken any steps to expedite this matter in front of Judge Panner?

MR. MACK: My office has not as yet.

THE COURT: Okay. So is it your position or your understanding that Judge Panner is going to take up the two motions, one, to transfer jurisdiction and/or vacate his order on November the 5th?

MR. MACK: I haven't heard that. I don't know. He has both of those motions before him. I don't know if he's going to take it up by that date.

MS. DAHL: Your Honor, Judge Panner has not scheduled the motion to transfer for hearing. It's class counsel's motion to intervene and the motion to vacate that are scheduled for November 5th.

THE COURT: Okay. I misunderstood. All right. All right. Mr. Mack, what else did you want to tell me about -- Ms. Dahl argues that the successive petition rules don't apply, and even if they did apply, this circumstance would make a new petition something that would be appropriate.

MR. MACK: Well, Ms. Dahl is correct. I think the eight AEDPA provisions don't apply specifically to Section 2241 cases, but I think the Supreme Court has said that abuse of the writ doctrine has at times been murky and been evolving. But that the general principle that one should not file successive -- second or successive habeas petitions, that rule still pertains and applies in civil habeas contexts. And I think the rule of comity also applies in terms of the first jurisdiction to take -- or,

excuse me, the first tribunal to take jurisdiction over a case, particularly when we're talking about two concurrent federal district courts, the first federal district Court to take jurisdiction should proceed with the case to conclusion.

So it's both a successive habeas principle that we're asserting, as well as a comity principle that we're asserting. Particularly in this instance where proceedings before Judge Panner are still open before him, and whatever concerns that have been raised before you, they are still available for being raised to Judge Panner for his resolution to conclusion of the case.

The motion that was presented to this Court was a motion to exclude. That's how Mr. Garad got to this Court. He's withdrawn that -- that motion now, because of what has transpired. But, again, he still has proceedings and rights and options before Judge Panner to pursue, and Judge Panner should proceed with his jurisdiction to conclusion of the case. Judge Panner is the Court that had jurisdiction initially over this habeas petition.

If I could turn briefly to the merits of the issue in terms of whether Zadvydas should apply here. Mr. Garad is at the outer fringe of the presumptive six-month reasonable detention period, and I think since the Court has granted -- the Supreme Court has granted certiorari in Jama and the arguments are going to be held next week, and it's likely we're going to have a decision, I would say, probably January or February of 2005, I don't think we can say that detention regarding Mr. Garad is going to

indefinite.

The Supreme Court is going to resolve the acceptance to Somalia issue, and that decision, whichever way it breaks, will either affirm the Jama decision in the Eighth Circuit, and if it does, it should mean that the Ninth Circuit's affirmance of this Court's nationwide injunction would then be vitiated and the government would be in a position to begin removing individuals to Somalia.

If the Court doesn't uphold the Eighth Circuit's decision in Jama, then that means removal to Somalia cannot be pursued, and, therefore, at that juncture then certainly it's a foreclosed option for the government. And then you would have Zadvydas claims arising out of that.

But because Mr. Garad is at the outer fringes of the presumptive six months reasonable detention period, and the Supreme Court is taking the issue up right away, his detention cannot be said to be indefinite.

Of course, that's our argument in the alternative. Our first argument is that the Court should not entertain the habeas motion by Mr. Garad, and that matter should be left to the District Court in Oregon until it proceeds to conclusion of the case.

THE COURT: Okay. Mr. Mack, what do I do with the law in Ninth Circuit that basically says that until we otherwise know the Court follows the law of the Ninth Circuit, which at this point is you cannot deport to Somalia?

MR. MACK: Well, I mean that's correct, but what -- where that issue was presented first to was to Judge Panner, and that action is still open. So there's a Court to act upon that argument.

This Court -- the District Court of the Western District of Washington has a motion presented to it in the context of a motion to be excluded from the class, and now a motion to release after learning certain facts.

But the action in Oregon is still open for presentation of the claim that the Ninth Circuit's authority should be followed here and now. The merits arguments I made to this Court right now should, of course, be the merits argument that's presented to Judge Panner, and Judge Panner should then -- in the District Court of Oregon should then rule on the Ninth Circuit's authority that it applies its authority now. It doesn't wait for en banc, the petition to be resolved, or the Supreme Court to resolve the case. It applies its authority. Judge Panner should apply that authority, not this Court.

THE COURT: Mr. Mack, you seem to have changed your position as to where you want these matters to come up, because on September the 30th you seemed to express some frustration that you didn't want to be going from district to district arguing these matters, you would have preferred that they stayed in one spot.

Why the change of position at this point in your position

that the case should not be transferred here?

MR. MACK: I haven't opposed the motion to transfer. It's still before the U.S. Attorney's office in Oregon. And I have not seen their written position on the motion to transfer. My comments with respect to handling cases around the country, that goes more to, I think -- I think it's inevitable that I would be -- or other -- the United States Attorney's office would have to be dealing with Zadvydas cases around the country, simply because, I think, our view would be that habeas would obtain in the jurisdiction in which the individual was first detained, in which he or she brought his habeas petition. So I don't know that it's a change of position. I haven't seen the U.S. Attorney's position on the motion to transfer.

But I think when we first saw the Court's nationwide injunction in 2003, I think the government anticipated that removal issues would be within the Seattle District Court's, your Court's jurisdiction, but habeas claims would be filed in the various district courts around -- around the country.

THE COURT: How is it that the government can take two different positions on this? You're saying you don't oppose transfer, but the U.S. Attorney in Oregon does.

MR. MACK: I think -- I don't know what the U.S. Attorney's position on transfer has been. I'm now saying I don't oppose it. And since -- I am not responsible for responding to the motion to transfer. That has not been delegated to me.

MS. DAHL: Your Honor, may I interject? Mr. Bowman told me that he conferred immediately with Washington before taking a position, and so I'm incredulous at the inconsistent positions being taken now, because Mr. Bowman told me he did not have the authority to take a position before he had conferred with Mr. Mack's office.

MR. MACK: Well, Mr. -- I mean, Mr. Bowman did not confer with me --

THE COURT: Well --

MR. MACK: And I haven't seen the Oregon office's written answer, written response to the motion to transfer. My thing -- I don't oppose the motion to transfer. I didn't -- I haven't been assigned responsibility to respond to the motion to transfer. And I haven't seen the U.S. Attorney office's response to the motion to transfer. So I can't say what his position would be.

All I've seen is that his office would oppose the motion to transfer likely because the case started in Oregon. So it's not an inconsistent position from Washington's perspective. I haven't seen Oregon's final position that they're going to take on the opposition. All I know is that they have stated and told Ms. Dahl that they're going to oppose the motion to transfer.

THE COURT: Mr. Mack, turning to the merits, what sorts of restrictions, if Mr. Garad was to be released, would you be asking the Court to impose?

MR. MACK: At this juncture I would need to consult with my client about whatever restrictions or conditions on release that they would want to impose. Typically what I've seen in these sorts of habeas decisions is that the Court orders release with reasonable conditions on release. And then ICE issues its ordered supervision with whatever restrictions it would decide to impose, and if there was a dispute as to those conditions, then the parties would go back to the habeas Court that had jurisdiction over the matter.

And I don't have at this juncture what restrictions or conditions on release ICE would want. I certainly would want to confer with them, because this individual is a sex offender. There may be some state provisions that Oregon has that need to be accommodated in that regard.

So I don't have those at my disposal to give to the Court as to what would be reasonable release restrictions. I would ask an opportunity to consult with my client on that particular issue.

THE COURT: Okay. Well, that's what counsel has asked for, is release, so I would have thought that we would know that. When is it that you can tell me what you think reasonable release conditions are?

MR. MACK: I could tell the Court -- well, it's already -- Monday is a holiday. I could tell the Court, I would say, by the 13th of October.

THE COURT: All right. Ms. Dahl, any rebuttal that

you'd like to make?

MS. DAHL: Yes, Your Honor. Four points. On the transfer to another, the Court correctly points out that he was in the custody of Sheriff Eiseland in Wasco County. The import of the government's jurisdictional argument gives the Court jurisdiction to release the Somalians in Alabama. I think that your observation that their position that jurisdictional lines don't matter if there's a national agency that has authority to move detainees nationwide is correct.

The government's litigation objective in this case is delay and continued detention. They are using offensively the judgment they obtained from Judge Panner based on representations that were made without any factual investigation as to their accuracy.

If I had allowed the time to set aside that judgment to expire, I imagine I would be faced with something akin to a res judicata or collateral estoppel argument from the government. They have simply raised only procedural obstacles. They have done nothing to attempt to set aside the order that they induced Judge Panner to enter.

They have not appealed it, despite the fact that they represented to the Court -- to this Court that they were inclined to do so. And these changed circumstances distinguish these proceedings from the District of Oregon. This is a new petition. Although he seeks the same relief, it's not the same factual circumstances.

Mr. Garad went into the District of Oregon when he would stay there seeking conditional release, and the government told Judge Panner that they could safely and expeditiously get him to Somalialand and nowhere else. Those representations have proved not to be true. And I think the time has come to put the delay and obfuscation to an end.

The inconsistent positions even on the motion to transfer provide the perfect example of why this Court should exercise its jurisdiction over Mr. Garad and have one lawyer speaking from the government -- from the government that's fully informed and have, you know, one Court deciding it.

There's no reason to persist in the District of Oregon, but for Mr. Garad's concern that if he doesn't do something to set that aside that it will be used against him in further litigation.

And there's no need to go to the Ninth Circuit to reverse Judge Panner's order if the government is sincere in its statement that it would appeal the order as conflicting with the injunction. Then why haven't they joined me in the motion to set it aside?

I believe that Judge Panner, with the government's representations, would act more expeditiously. But right now Judge Panner is sitting with the material based on the government's opposition.

I don't expect -- you know, I went back to try to get it set

aside the first time, and even then, in the middle of September, the government persisted in its representation that it could achieve the representations it made to Judge Panner.

These are new circumstances and a new motion is properly before the Court, and there's no reason that the Immigration Service can't fashion reasonable conditions forthwith and release Mr. Garad.

MR. MACK: Your Honor, if I could be heard briefly.

THE COURT: Go ahead, Mr. Mack.

MR. MACK: Your Honor, with respect to the Etowah Alabama detainees or any detainees around the country, I think the law of the case in this case is that the Court has nationwide jurisdiction over the Attorney General and the Secretary of Department of Homeland Security, and that was sustained by the Ninth Circuit, relying on the Armentero decision out of the Ninth Circuit.

It's my belief -- it's my recollection that the Armentero decision, however, has been vacated and oral argument is going to be reheard on the Armentero decision, I believe, this week. But, nonetheless, still the law of the case in this case was that there was nationwide jurisdiction over the habeas respondents at the head of the agency.

My statements with respect to the transfer of Mr. Garad were not meant to state general policy or waive any opposition we would have to habeas petitions being filed in this Court, the

point was only to make the point that with respect to FRAP 23 it says custody to another, and that the legal custody is held by ICE here.

But more to the point, that the habeas jurisdiction here started where Mr. Garad was initially detained. And the Oregon Court exercised jurisdiction and the case is still open before -- before that Court.

And back to the representation before the Oregon Court. Again, ICE is going to work on this declaration to lay out for both courts the view on removal to Somalia. Again, my statements to Ms. Dahl and statements to the Court were based on I think this Court would have gone through a voir dire with Mr. Garad about what he understood to be the case about his removal to Somalia before he waived or forgo the protection of the class.

That's got to be a daunting choice for any alien to face. And so I gave Ms. Dahl the background -- or the benefit of my background and information on this matter, not for any advantage for the government to take.

As I noted before we had the hearing on the 30th of September, this issue is going to come to a head in both courts, as Judge Panner had initially started down the track that he wasn't a part of the class at all, and had made that ruling in this case -- in his case, but -- and that was going to put the government in a dilemma as to what to do with that case.

And at that time I said -- or at the last hearing I said it

would likely be the case that the government would have to appeal the case. Now, I certainly don't have appeal authority. The solicitor general has that explicit -- or that exclusive authority. But that was my thinking at the time, was how to deal with Judge Panner's ruling if Mr. Garad doesn't seek to be excluded from the class, is we can't comply. I don't know how we could comply with Judge Panner's order in the face of this Court's order.

And all that in the mix, I gave Ms. Dahl the benefit of my information that I had on this case, because I imagined that she was going to speak with her client to effectively represent her client, and that this Court was going to conduct a voir dire of Mr. Garad about what his understanding of removal to Somalia would entail.

So from this counsel's perspective it wasn't done for any advantage and there isn't any putative practice by ICE to detain people to have them give up their rights under the class. Mr. Garad is a sex offender, and he's had custody review decisions that have decided to detain him.

At one hearing that the Court had with Perkins Coie on the notice issue, Perkins Coie and this counsel discussed with the Court that there seemed to be roughly 30 to 35 individuals in detention, and that it seemed to be sort of a revolving detention class.

And out of that what's evident is that folks are -- detainees

are being released consistent with custody review decisions and what ICE believes in exercising its discretion on release. So detention isn't being used putatively in this regard.

And I think I'll stop right there.

THE COURT: All right. Counsel, I think that a couple of things should happen. I'm getting the distinct message that counsel in Oregon and Mr. Mack, in your office, are not on the same page with regard to either their position on transfer or what your obligations are in terms of forthwith letting Judge Panner know what the reality is about the ability to carry out his order. I think that you've got an officer of the Court obligation to get that straightened out and get it before Judge Panner immediately.

I would suggest that immediately after you get off the phone with me, you call the counsel in Oregon and, with Ms. Dahl on the line, see if you can't straighten that out. Then I'd ask that you would basically let me know what your position is on transfer. I'm going to wait to find out what that position is before I issue a written order.

Second, if I reach the merits of the case and decide that this individual should be released, I need to have some specifics as to what his obligations are, where he's going to live, what would be an appropriate restriction on his movement. And I really have only gotten the vaguest indication of what that might be.

So I think that, Mr. Mack, you've got to supply me with some information as to what it is you believe would be appropriate restrictions if in fact he is going to be released. I'm not saying he's going to be, but if I reach that decision, I've got to know what the alternatives are.

MR. MACK: Understood, Your Honor. And I'll call ICE immediately after this.

THE COURT: Okay. But you've got to get on the same page here. We've spent a whole lot of time and energy and human resources only to have the government's position change back and forth, or their arguments aren't consistent.

So I'd suggest you get on the phone with your counsel in Oregon and explain what the realities are, and you decide whether you want the transfer of jurisdiction, and you decide how you're going to quickly get before Judge Panner what the reality is of removing this individual and why your original statements were in error.

So, Ms. Dahl --

MS. DAHL: Yes, Your Honor.

THE COURT: -- I'll expect that you'll give me some response on -- keep me posted and apprised of when you believe that Judge Panner might otherwise put the motion to transfer on his agenda and whether or not you're going to be going to Judge Panner jointly to ask for transfer. I would expect that that would be -- you'd let me know by, say, Wednesday of next week.

MS. DAHL: Yes, Your Honor.

THE COURT: Any clarifications that's needed about what I'm asking you to do?

MR. MACK: Not from the government, Your Honor.

MS. DAHL: No, I understand fully.

THE COURT: All right. Thank you, counsel.

MS. DAHL: Thank you, Your Honor.

MR. MACK: Thank you, Your Honor.

(Proceedings concluded.)

CERTIFICATE

I, Joseph F. Roth, Official Court Reporter, do hereby certify that the foregoing transcript is correct.

S/Joseph F. Roth

Joseph F. Roth

U.S. Department of Justice

Civil Division

DJK:GDM:gdm
39-39-434

Telephone: (202) 616-4858

*February 28, 2005*

**VIA FACSIMILE AND REGULAR MAIL**

**CONFIDENTIAL FOR JAMA'S COUNSEL OF RECORD ONLY**

Kevin Magnuson, Esq.
Briggs & Morgan, P.A.
2400 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Re: Jama v. ICE, No. 02-2324 (8th Cir.)

Dear Mr. Magnuson:

Pursuant to our telephone conversation on February 23, 2005, I am writing to confirm that U.S. Immigration and Customs Enforcement ("ICE") is willing to state that ICE intends to remove Keyse Jama to Bossasso, Somalia within 90 days of the date you acknowledge, in writing, receipt of and agreement with this letter. ICE is also willing to state that if Jama cannot be removed to Bossasso, Somalia within that 90-day period, ICE will inform you of this development no later than 15 days before expiration of that period. The 90-day removal window is contingent upon operational developments that may arise as ICE works on effecting Jama's removal. This letter does not preclude the parties from agreeing to alter the terms of this letter.

Finally, Jama's removal is also dependent upon the Eighth Circuit issuing the mandate in this case. Accordingly, I have attached a draft joint motion to issue the mandate. Please advise if you have any comments or suggestions regarding the draft motion.

Sincerely,

GREG D. MACK
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

**EXHIBIT K**