UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AWAD GARAD,

Plaintiff,

v.

JOHN D. ASHCROFT, AG AND IMMIGRATION AND NATURALIZATION SERVICE,

Defendants.

No. C 02-3404 P

Seattle, Washington

BEFORE THE HONORABLE MARSHA J. PECHMAN, DISTRICT JUDGE

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

(MORNING SESSION)

SEPTEMBER 20, 2004

APPEARANCES:

For the Plaintiff: CHRISTINE DAHL

For named petitioners and class representatives: ROLF JOHNSON

For Respondents: GREG MACK

Court Reporter: Laurene Kelly, RDR, CRR
700 Stewart Ave. #17207
Seattle, WA 98101
206.370.8506
Laurene_Kelly@wawd.uscourts.gov

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

COPY

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

EXHIBIT L

SEATTLE, WASHINGTON THURSDAY, SEPTEMBER 30, 2004

HON. MARSHA J. PECHMAN, DISTRICT JUDGE 9:07 A.M.

**PROCEEDINGS**:

THE CLERK: C 02-3404 P, Awad Garad versus John Ashcroft, et al.

Counsel, please make your appearances.

MISS DAHL: Good morning, Your Honor. Christine Dahl on behalf of Mr. Garad.

MR. JOHNSON: Your Honor, Rolf Johnson on behalf of named petitioners and class representatives.

MR. MACK: Good morning, Your Honor. Greg Mack on behalf of the respondents.

THE COURT: Counsel, we are missing Mr. Garad this morning.

MISS DAHL: Yes, Your Honor. I understand that. I'm prepared to waive his appearance for this hearing because of the information I'd like to give the Court.

I spoke with Mr. Mack on Tuesday in preparation for this hearing and asked him some specific factual questions to determine whether the representations made by the government to the District of Oregon were in fact in the process of being fulfilled. Mr. Mack told me that he did not think that the government could safely and expeditiously remove Mr. Awad Garad to Hergeysa, Somaliland. I reviewed that new information with Mr. Garad at the detention facility yesterday.

Mr. Mack outlined the last removal of an individual to Somalia to me. That included a plane that touched down in Mogadishu before going to Hergeysa, and it did not include any government representative accompanying the detainee to his final destination.

Mr. Garad legitimately fears for his personal safety. He is the grandson of a tribal chief and fears that if he were to have occasion to touch down in Mogadishu that he could be shot on the Tarmac. He does not want to seek any longer relief from the classwide injunction.

I asked Mr. Mack to be prepared to advise the Court whether the government would persist in its refusal to release him under the terms of the injunction. We spoke again this morning, and he does not have his client's position on that.

At this point Mr. Garad authorized me to withdraw the motion to exclude him from the class. The factual predicates for the agreement to resolve the litigation in the District of Oregon cannot be fulfilled, and he wishes to be released from indefinite detention.

Serendipitously BICE transferred him out of the District of Oregon to the Northwest Detention Center in Tacoma, Washington, bringing him within the personal jurisdiction of this court under 28 USC 2241, and I have prepared a motion for release and needed to get Mr. Mack's position on it prior to filing it in this court. His physical custodian is already a

party to this proceeding, and there's no reason why he should not be released now.

THE COURT: Counsel, can you help me understand why we've had such a difficult time trying to find him? My marshals have been calling ICE, and they say -- they told my marshals that he had been released last January.

MISS DAHL: Were that that was true, Your Honor. My only explanation is that I enjoy the same degree of difficulty in finding my clients who are in INS custody. I have a very difficult time finding someone to tell me where someone is physically located, and I knew that Mr. Garad had been transferred because he told me, and I use my clients as a best source of information.

He is in fact there. I was there with him yesterday, and the deportation officer, whose name I gave to your deputy, was aware that there was a hearing today, and we expected that he would be able to be here.

THE COURT: I'm having a hard time understanding how -- I read the materials that were filed by the class representatives to intervene in Oregon. I read the transcripts of the hearings before Judge Panner.

I am hard-pressed to understand how one government official could promise one thing, and yet it's been my understanding since January of 2003 that the government cannot guarantee that they won't touch down in Mogadishu. There are

no people who are escorting these individuals. And indeed it appears to be not government flights that are taking people, which is -- which is part of the premise for why the injunction was -- was put in place.

So I have to say that Judge Panner did not appear to be cognizant of those particular facts. Who is it that you were dealing with in Oregon?

MISS DAHL: The Office of Immigration Litigation allows the local U.S. Attorneys to appear on their behalf.

We sued all the appropriate parties respondent. We presented the amended petition from this case, this court's injunction, as well as the Ninth Circuit's affirmance, to Judge Panner, and we disagreed with his ruling that Mr. Garad's wish to return to his family somehow made him more removable or more detainable than the class, and we sought to have him conditionally released, which I think is the import of the injunction, that there is a problem of indefinite detention and inability to remove.

Judge Panner, I think, relied on the representations of the government lawyer that Neil Clark, the district director, had given assurances that Mr. Garad could be safely and expeditiously removed to Hergeysa, where he would like to reside, and acted on those assurances.

After the ruling in August I went back to the government lawyers and said, how can this be true. There was a

document purporting to be a passport from the Democratic Republic of Somalia, which ceased to function in 1991, and this was a fresh document issued in May 2004, and I said to them, where did this come from.

And no one could answer that question. And I suggested that it was a fraudulent document, that it has no weight internationally as a legitimate tribal document.

THE COURT: Who is it that presented that to your client?

MISS DAHL: BICE. The local deportation officers in attempting to secure removal documents asked him to sign paperwork. They presented the document to him. They obtained it from U.S. government representatives in Nairobi, Kenya, and then presented it to the district court as his ticket home. That disturbed me.

THE COURT: Judge Panner doesn't seem in his order to make a distinction between Somalia and Somaliland.

MISS DAHL: I agree, Your Honor. I pointed out that distinction several times, that Somaliland, although it has declared itself an independent state, has not received widespread international recognition and that there is no functioning government and the State Department says so. I could not see why the government came into Judge Panner's courtroom and opposed release.

THE COURT: Do you have a copy of the document that

ICE presented to you?

MISS DAHL: I have the exhibits that the government filed on October -- August 23rd, and I'll present those to the Court.

What I presented to Judge Panner was the reports from the deportation officers regarding efforts to remove him, and I Bates stamped my copy. And at page 10 is a composite photocopy of the document, which includes the cover and the photographs.

It was a small, square, stapled document that looked official.

THE COURT: Mr. Mack, have you had an opportunity to review this document?

MR. MACK: No, I haven't, Your Honor.

THE COURT: Why don't you take a look at it.

MR. MACK: Thank you.

MISS DAHL: Tony Lamb, the local deportation officer, was present in court and brought Mr. Garad's immigration file with him, and contained therein was the original of that document.

THE COURT: Well, counsel, if your client is withdrawing his request to be severed from the class, I don't know that I have anything more to do today. But I don't know that that -- in other words, I don't know that I have any jurisdiction over his personal release without a petition before me.

MISS DAHL: Well, I will file one today. I wanted to hear from Mr. Mack whether that would be opposed or not, frankly. The rules require me to get the opposing party's position, and I had asked him on Tuesday to be prepared to tell me today. He's unable to give me a position. But I prepared last night and will file when we recess a motion for release.

THE COURT: Do the representatives of the class have anything that they'd like to add?

MR. JOHNSON: No, Your Honor.

THE COURT: Do you have any information as to where these documents that ICE is giving the Somalis as transportation documents are coming from?

MR. JOHNSON: I don't have any information beyond what's just been provided to the Court.

As Miss Dahl just mentioned, it includes some additional documents, including a case chronology which indicates dates when ICE apparently contacted somebody by the name of Michael Webster in Nairobi asking for his passport.

But beyond what's been provided to the Court, no, we don't have any further information.

THE COURT: Counsel, has your client been in Alabama? Because I'm getting similar things from the detainees in Alabama saying that they have been told that they have travel documents, and in fact, you know, that is not the case.

MISS DAHL: Mr. Garad has lived in Oregon for the

duration of his presence in the United States, and he was detained at a jail, contract facility in eastern Oregon, which is quite distant from most anything, pending his removal proceedings and then continuing there during the 90-day removal period and was transferred to Tacoma Friday.

THE COURT: I notice that Judge Panner's order -- does it contain an error that your client has not been in the United States since 1988 but would be '98?

MISS DAHL: I believe that would be correct, Your Honor.

THE COURT: Talk to me about the procedural issues. If Judge Panner has an order out there that's saying that your client is to be removed, how are you going to deal with the fact that that order is still outstanding?

Or maybe I should put that to Mr. Mack.

How is he going to deal with the order that the judge said to remove this individual?

Is your client intending to go ask the judge to withdraw his order?

MISS DAHL: I have three answers. The first is I would really like to hear from Mr. Mack also on that question.

The second is there is no jurisdictional impediment with Mr. Garad being transferred to the Western District of Washington for this court to exercise habeas jurisdiction. There are changed circumstances that render Judge Panner's

order of no continuing vitality. We could appeal that order and, if this court declines to exercise habeas jurisdiction on his person now that he is in this district and before this court, then we will endeavor to perfect an expedited appeal.

I believe that Judge Panner made a legal error and the recent Eighth Circuit decision, despite its decision in Jama, which sustained district court's grant of habeas based on this court's injunction, tells me that our appeal would be well-founded.

My concern, though, is that Mr. Garad languishes in detention. We had -- his petition in Oregon was filed at the end of July. We had a hearing near the end of August. As soon as that hearing took place, Mr. Mack began to tell me and tell the local U.S. Attorney that headquarters could not comply with that order.

Mr. Bauman persisted in his representations on behalf of the regional director Neil Clark that removal could be done safely and expeditiously, and on that basis we forebore taking action to set aside the order.

I believe that there is no impediment to this court's exercise of jurisdiction. There's no bar to successive petitions in the context of a 2241 petition, and fortuitously he's in this district now. I think a different case would be presented if they transferred him to Alaska or to Alabama.

THE COURT: And how am I to know that he's going to

stay put long enough for me to exercise any jurisdiction?

MISS DAHL: I think that the rules of habeas preclude this kind of shuttling around. We have -- I have personally represented about 50 to 60 indefinite detainees in the District of Oregon. ICE has regularly ignored the rules of litigation requiring them to refrain from shuttling people from district to district.

At my clients' request I have complained sometimes and had them brought back to the District of Oregon, and sometimes we have ignored that because ICE has taken the position that when their regional directors are parties respondent they will comply with the order, and they in fact control the physical custodians, so to a certain degree the lack of presence has not been a basis upon which to defeat jurisdiction.

THE COURT: Anything else you'd like to make me aware of?

MISS DAHL: I think that Mr. Garad should be released. He has family members in Oregon. He's ready, willing, and able to comply with all conditions of supervision that might be imposed. He has community support. He's not a danger to the community, he's not a flight risk, and there's no reason he should continue detention.

THE COURT: Mr. Mack.

MR. MACK: Thank you, Your Honor. I do want to be

heard, because I have a feeling an appearance before the district court in Oregon's going to be in my near future.

I think procedurally habeas jurisdiction attached with the Oregon court, so procedurally I think the action for this court to take jurisdiction in Oregon would have to be dismissed. I don't have any evidence that Mr. Garad is in fact detained in this district other than counsel's representation that he's detained in this district and, of course, we have yet to have a petition filed upon the Court with respect to that.

But I think if that's the case, that he is in fact detained in this court's jurisdiction, the habeas jurisdiction attached with the district court in Oregon when it was filed and, if a prisoner or an alien is transferred after he's filed a habeas petition in the District of Oregon, I think the law is is that habeas jurisdiction attaches where it was filed and when it was filed, so Judge Panner and the district court of Oregon still maintains habeas jurisdiction even though the individual's been transferred out of the district.

So I think before this court could enter an order of release over Mr. Garad, because he is in this district, the action in Oregon would have to be dismissed first.

THE COURT: How are you going to comply with his order?

MR. MACK: Your Honor, I have said I don't think we can comply with the order. We have this court's order, a

nationwide injunction saying he cannot be removed from the United States. That order has been affirmed by the Ninth Circuit. And we have a pending rehearing petition on that issue.

But the Ninth Circuit has approved that order of no removal. So for a district court to then order removal puts the government in a perilous position in terms of trying to deal with two competing district court orders.

If the case had not gotten here and if the order had simply stayed with Oregon and there had been no motion to exclude him from the class, I think what the government would have done was appealed Judge Panner's order to the Ninth Circuit because that court had affirmed this court's order of no removal. So I think that's how that would have been played out.

But, given that the parties had seen that Mr. Garad wanted to be removed, the step that we moved through was to have Judge Panner's order issued in the manner that it was. I think previously he had ruled from the bench that Mr. Garad was not part of the class, and that was a problem for the Court, of course. I think that language had been removed and he issued the order that's now before the Court.

Then the next step was to file a motion to exclude Mr. Garad from this class and this class's protection so that all legal impediments to his removal would be removed and

therefore we could then comply with Judge Panner's order.

Now, with respect to whether he can be removed expeditiously and safely to Somalia, I -- after the August 24th hearing before this court I became aware of the transcript of the proceedings before Judge Panner and I had seen the language with respect to expeditiously. Knowing what I know about removal to Somalia, I knew that was problematic language.

And Mr. Bauman and Mr. Clark may not have had consultations with headquarter as to how actual removal to Somalia would take place. I'm not saying that their representations were not true. They were earnest representations in terms of trying to get Mr. Garad removed. But from my experience I know that removals to Somalia are a priority but they do not happen expeditiously or happen within 30 days. They are complex matters, particularly given that we've been in litigation on this issue for the past three years up to two different circuit courts of appeals.

The government did have occasions to remove one individual to Somalia in the midst of all that litigation. That certainly didn't take 30 days, and it almost involved emergency litigation before the district court of Minnesota.

ICE, when it wants to remove an individual to Somalia, wants to know that all legal impediments to that removal are free and clear. For example, with respect to Mr. Keyse Jama, the lead Somali alien who had started this

action in the United States, he was subject to removal after the Eighth Circuit reversed the district court. However, he still had 90 days to file a petition for certiorari.

Within that period there were discussions about whether he could be removed or not. Our position was he had 90 days to file a petition for certiorari and also seek a stay from the Supreme Court of his removal; so within that 90-day period ICE was certainly not going to take steps to remove him, but they did some contingency planning respect to his removal.

Within that 90-day period before he could file certiorari the district court in Minnesota issued an order saying he should be released from detention. Because there was some contingency planning, the next step that ICE and the government took was to file a notice with the district court in Minnesota that he would be removed within two days.

The district court in Minnesota held a Sunday hearing on that removal issue and barred his removal. That was after ICE had engaged in contingency planning with a second government to remove Mr. Jama. That involved consultations with that foreign government which had to be put off because the stay was entered by the district court.

So that's one factor and one concern with trying to take contingency steps with respect to folks who have legal impediments or legal options to block their removal.

But, getting back to the individual that was removed

to Somalia, that occurred privately through Dallo Airlines. Dallo Airlines has routes from Kenya into Somalia with a first stop, as I understand it, at Mogadishu, then on to Hergeysa, then on to Boossasso.

Mr. Mahad Omar, who was the individual that was removed from Minnesota -- he didn't want to go to Mogadishu, as most Somalians do not want to go to Mogadishu, but the plane transitted through Mogadishu on to Hergeysa and then on to Boossasso. Mr. Mahad Omar decided to go on with the flight through Dallo from Kenya into Mogadishu, on into Hergeysa.

However, no U.S. government official's accompanying these individuals into Somalia. That's United States government practice. So there's no way for United States government officials to eyeball the individual on the Tarmac or that they are getting into Somalia on to the destination which they desire.

So that speaks to, I think, the question of whether he would be removed safely to Somalia, because the government can't say yes, he's in Mogadishu or yes, he landed in Mogadishu or yes, he's moved on from Mogadishu on to Hergeysa. This is done after he's put on the flight in Kenya on Dallo Airlines. That's it as far as U.S. government personnel are concerned, and then the plane takes off from Kenya.

And again with respect to expeditiously, if there are legal impediments to removal, legal options for the alien to

pursue with respect to removal, that's not going to be something that ICE is going to want to act on until all those legal impediments are removed or those legal options are exhausted and precluded.

So I became concerned and noted that concern when we were here on August 24th, that we were coming to a head on this issue with respect to the district court in Oregon issuing an order saying that Mr. Garad could be removed and, knowing what I know about removals to Somalia, I had become very concerned. And Miss Dahl and I had a very forthright conversation this week about how that would actually happen, and I walked through those steps with her and that's just based on my experience with one alien's removal to Somalia.

So to say that the removal would be expeditiously done, I knew that expeditious would not be my choice of words. I knew it would be a priority for ICE once the legal impediments and legal options were exhausted, but expeditiously would not have been a word that I used.

THE COURT: Well, Mr. Mack, I have to say I'm confused and, I guess, dismayed how the government can stand in front of a judge in Oregon and say one thing and you come here and stand -- what you've told me is consistent with what I had always understood about the problems of removal. But you're standing here saying one thing and one of your colleagues is standing in front of Oregon saying something quite different.

You know, I can't understand how ICE tells my marshals that somebody has been released when in fact they're sitting in detention within my own district. I can't understand where ICE is getting these documents. We've had the similar problem come up in Alabama with people being approached, told that they have travel documents. I'm looking at something that would lead somebody to believe that this was very official.

Where are these coming from, and who's making them up?

MR. MACK: I don't know where they're coming from. I know that the ICE official in Kenya obtained these passports, but I don't know whom or what in Somalia is issuing these documents.

And if the Court recalls when they came to my attention when, I guess, letters were sent to the Court or -- excuse me -- when ICE had sent that letter to Mr. Iman Iman that there's a government in Somalia and you have a travel document, that's when I said, do not issue that kind of language. And I had that kind of language stricken from the custody decision letter because I knew that the United States government doesn't recognize for the moment a government in Somalia, and I stated before the court that the government, U.S. government is now engaged in a deliberative process over this passport issue.

But I don't know actually whom these documents came from in Somalia, but I do know that an ICE official in Kenya obtained these documents. They have not been used yet, however.

It's my understanding that Dallo Airlines is the party that is interested in a travel document or a passport so that's why the passports are being obtained. But they're not to be used, as far as I know, with any government official, government entity in Somalia for the purposes of transit into Somalia. But it's a Dallo Airlines interest that wants this sort of travel document. But I don't know whom or what in Somalia is issuing this document.

THE COURT: Well, Mr. Mack, as we know, we've got that revolving set of Somalis who are in probably -- is it ten different states? Have you issued a directive to all the places where they are held to tell your people to stop telling people that they have passports? Are we going to go through this one state at a time? We've had it in Alabama. We've now had it in Oregon.

MR. MACK: Well, with respect to Alabama certainly yes, that word has gone down to the ICE officials with respect to those statements on those documents, and what happened to Garad, that was an issue that came up simultaneously and was in litigation, so that word has not gone out. What has gone out since this court issued its injunction last year was there will

be no removals to Somalia, so this shouldn't have been an issue but as these issues percolated and I heard about them, I have certainly said, nobody goes to Somalia, to remind folks about this court's injunction.

THE COURT: Well, don't you think it's time that you issue a directive to everybody in terms of if you've got individual people that are continuing to manufacture these documents and present them to people in custody as something that's legitimate -- shouldn't that go out to everybody, that that is not the case?

MR. MACK: Well, as I said, it's a deliberative process now ongoing with the U.S. government as to what exactly these passports are and whether they should be recognized or not. So that word cannot as yet go down. The word that has gone down is nobody can be removed to Somalia unless they somehow are released from the protection of this court's order. So that word has not gone down.

What has gone down is they can't be removed. In order to remove them pursuant to any document that was obtained from Somalia they would have to come to this court first to be removed or released from this court's protection.

THE COURT: What I'm concerned about is the mental agony that you're putting these people through by telling them that they have documents. It's a tremendous -- you know, look at the expense of everybody coming here today, getting multiple

courts involved, you know, the class representatives have moved to intervene. When you say it's a deliberative process, when do you expect an answer to the question of telling them to stop doing this?

MR. MACK: I don't have a timetable for that. I know that ICE is in consultation with the State Department on that question. I don't have a deadline to when those consultations are going to be completed.

THE COURT: Well, I've got to say it certainly has occupied a fair amount of my time and my concerns, and if -- we can't simply go through this, one jurisdiction at a time, getting these people's hopes up and expending all this legal energy, only to be told that they're -- they have been made up for the purpose of some airline's request. I mean you just can't start issuing things that look like governmental documents because somebody wants a ticket to get on a plane. That makes no sense to me whatsoever.

I don't know what the limits of my authority is but -- in terms of trying to marshal or make sure that the class gets proper information -- but you should know that from my standpoint you've got to stop messing with people's lives in this way. It's cruel.

And I would expect that you're going to get back to me in very short order and tell me what it is that you've done in order to make sure that you don't have these rogue officers

in various detention centers advising people of things that aren't true.

MR. MACK: And I will, Your Honor. As I mentioned, as soon as I heard about the Alabama situation, that was where I said that language should be stricken from that custody decision letter and hold off on any use of these passports.

THE COURT: What's a reasonable time for you to engage in this deliberative process in order to report back to me?

MR. MACK: I would say within 45 days, Your Honor.

THE COURT: How about 30?

MR. MACK: I can try for that date as well, Your Honor.

THE COURT: I mean we all know that the Supreme Court is shortly going to take up the issue. I'm assuming you're going to be there next Monday.

MR. MACK: I will, Your Honor.

THE COURT: So perhaps they will have an answer for us. But in the meantime I think that you've got to take some steps to insure that this doesn't continue to happen.

Now, I take it you don't have a position at this time as to whether -- we've got some jurisdictional problems as to who actually owns the release --

MR. MACK: Who has a --

THE COURT: Who's on first. So I'm assuming that

that's going to be worked out fairly swiftly. I know for a fact today I don't have it. Whether I'm going to get it because of his removal, because a petition was filed here, whether Judge Panner is -- you're going to appeal him, but at this point we're -- he doesn't have a petition in front of me, and he does no longer have a request that he be removed from the class. So as far as I'm concerned he is still in the class. He's not going anywhere.

Is there anything else procedurally, Mr. Mack, that would assist you in trying to clean this up that you would like to have me do?

MR. MACK: Not that I can think of at the moment, Your Honor. I mean we're here because Mr. Garad had purportedly had an interest in being removed from the Court's protection and from the class, so I think what needs to happen is where is Mr. Garad today and then where does he want to next proceed legally. Does he want to take his action back to Judge Panner? Does he want to proceed before this court?

When I get back to Washington I will also try to figure out exactly where he is and get my client's position on what their position is on any sort of administrative release. So I think the next steps are for me to go back to Washington and figure that out.

But I think also Mr. Garad needs to decide which court he wants to proceed in, whether he wants to dismiss his

Oregon action and proceed here or simply live with Judge Panner's order that he be removed from the United States and then have the government deal with that in appellate perspective.

THE COURT: Mr. Mack, who's your client in the sense of who is making the decisions when you consult with your client?

MR. MACK: That is the Immigration and Customs Enforcement Division back in Washington, D.C., Department of Homeland Security.

THE COURT: I actually mean who's the individual.

MR. MACK: Who's the individual? That would be Michael Garcia. And then his delegates under him. I'm actually consulting with the general counsel's office at Immigration and Customs Enforcement, and they are consulting with their client.

THE COURT: Okay. Well, I think that maybe Mr. Garcia in 30 days ought to be telling me what action was taken on these things so that I can see what he's done. I realize that you're the lawyer and not the client, but he's the person who's in charge here.

I'd be looking in 30 days to see his affidavit to tell me how he's dealing with the fact that these documents are circulating to the people who are in his charge.

Thank you.

Counsel, is there anything else you'd like to say?

MISS DAHL: Yes. I'd like to briefly reply to some of the statements that Mr. Mack has made.

Regarding notice --

THE COURT: Counsel, can you come over to the microphone.

MISS DAHL: Regarding notice to the District of Oregon, we went back before Judge Panner on September 14th. Prior to that hearing I gave Ken Bauman, the lawyer for BICE, and Judge Panner a copy of this court's order regarding notice of the classwide injunction that specifically restrains, enjoins the government from making representations about travel documents and about its ability to remove people.

The government is continuing to talk out of both sides of its mouth. They have never said that they thought Judge Panner made an error and in fact induced Mr. Garad to remain in custody and not to take an expedited appeal of that order and not to continue to seek conditional release on the basis that they were ready, willing, and able but for this injunction to safely and expeditiously remove him to Hergeysa.

And I'm flabbergasted. There is no reason that Mr. Garcia, who is a named respondent in the District of Oregon, should have his legal representative go into court and accede to their allowing BICE to do that which this court has prohibited them from doing.

Mr. Garad is sitting on tenterhooks being told that any minute he's going to go back to Hergeysa and instead, every time I have asked the legal representatives for this administrative agency to tell me how they are going to do this, they have said they don't know, they can't tell me, but they will get back to me. And I just think that it is cruel for Mr. Garad to continue to remain in detention and to be given promises that can't be kept and to be shuttled between two district courts and for them to persist in not even being able to take a position about release.

This is a problem that ICE created itself, and there's no reason that this court should allow them to continue to violate this court's orders.

THE COURT: Well, first I need some form of a -- some form of motion.

MISS DAHL: Yes, Your Honor. And as soon as I can plug in my computer it will be filed, because it's already prepared and I was giving Mr. Mack the courtesy of getting his client's position on release.

I have suggested that all of this can be mooted by an administrative decision by his agency to simply release him on conditions. They do that every day. They release people on conditions. And there's no impediment to that except their inability to make a decision.

THE COURT: Well, what I don't have in front of me is

your client's petition.

MISS DAHL: Yes, Your Honor.

THE COURT: I also don't have in front of me any motion for contempt. You know, now Mr. Mack and his client are on notice that -- and by my previous orders -- and you saw the summaries that I put up on the website and are insisting to each individual that they are not to be telling people they have travel documents.

And at this point I think what I can do is require that Mr. Mack have his client respond to what they have done to correct this problem in 30 days, and I'm going to be expecting an affidavit or the presence of Mr. Garcia to explain how it is that he's got people who are claiming to have documents that aren't real, how he's got detention officers who are asking people to sign things that are not supported, and how he can have a lawyer in Oregon tell a judge one thing and Mr. Mack here in Washington tell me something different.

The record of this particular injunction is fairly complete. The reasons why the injunction was ordered are the same issues we're talking about today.

So file your petition. We'll have to sort out whether or not I have jurisdiction.

You may wish to go see Judge Panner. He seemed to be quite insistent that he didn't care about the injunction, at least in his remarks. But I think as long as the Ninth

Circuit's affirmance is in order your client cannot be removed.

MISS DAHL: Thank you, Your Honor.

THE COURT: Okay?

30 days from today would be October the 29th or 30th.

THE CLERK: 29th.

THE COURT: So, Mr. Mack, I don't need to continue to hammer at you. I think you know what I'm looking for. So I'll expect some explanation and steps to be taken as to how we're going to correct this particular problem.

MR. MACK: Yes, Your Honor.

THE COURT: Okay? Then I believe we're at recess.

MISS DAHL: Your Honor, if I may retrieve the documents I will file them separately, but that is my sole file copy.

THE COURT: Okay. I'll give them back to you.

(At 9:49 a.m. proceedings were adjourned.)

--oOo--

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

______________________________

Laurene Kelly

This 30th day of SEPTEMBER, 2004.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

| | |
|---|---|
| YUSUF ALI ALI, *et al*,<br>Petitioners,<br>v.<br>JOHN ASHCROFT, *et al*,<br>Respondents. | No. C 02-2304 P<br><br>Declaration of Leonard Kovensky<br>Deputy Assistant Director, Remvoval Management Division<br>U.S. Immigration and Customs Enforcement |

I, Leonard Kovensky, hereby declare that:

1. I am the Deputy Assistant Director, Removal Management Division with U.S. Immigration and Customs Enforcement (ICE) in Washington, DC. I have been in this position since August 30, 2004. From October 2002 to August 30, 2004, I served as the Deputy Assistant Director, Field Operations Division. I have served in immigration law enforcement positions within the Department of Homeland Security, and prior to March 2003, with the Immigration and Naturalization Service, for 20 years. As part of my duties and responsibilities, I am responsible for formulating all transportation and removal policy, conducting transportation and removal planning, defining and projecting transportation and removal requirements and overseeing and supporting field office execution of transportation and removal funding.

2. I am making this declaration both from facts known personally to me and from facts learned during the performance of official duties.

3. I understand that copies of this declaration may be filed by the U.S. Government in other cases.

4. ICE believes that, without any judicial impediments, it can generally remove an individual to Somalia within 30 to 45 days of a removal. However, various unforeseen operational impediments could slow this process down.

5. For example, ICE removed an individual named Mahad Mohamed Omar earlier this year. Mr. Omar was deemed to be outside the injunction issued by the United States District Court for the Western District of Washington in Ali, et al. v.

**EXHIBIT M**

Ashcroft, et al., No. 02-2304, and requested that ICE remove him to Somalia. Serious discussions began on or about December 17, 2003 to remove Mr. Omar from the United States. On or about January 29, 2004, the government informed the District Court of Minnesota that the government was prepared to remove Mr. Omar to Somalia within 45 days.

6. Mr. Omar left the United States on March 11, 2004. On the morning of March 13, 2004, an ICE official escorted Mr. Omar to a Daallo Airlines flight from Nairobi, Kenya to Mogadishu, Somalia with an onward connection to Galcaio, Somalia. The ICE official did not board the flight to Mogadishu.

7. Prior to removing an individual to Somalia, ICE must first determine whether the alien is a member of the class in Ali, and therefore cannot be removed to Somalia. If the alien is not a member of the class, ICE must then generally obtain any necessary travel documentation, secure an itinerary, and, when ICE agents are escorting individuals, receive the necessary country clearances with the assistance of the Department of State. This can take from several days to several weeks. In general, ICE does not make the latter two arrangements until judicial impediments to removal, if any, are cleared.

8. ICE has practical and diplomatic issues in removing individuals to Somalia as there are limited transit points that ICE can use to stage the final leg of the alien's repatriation.

9. In the past, ICE has issued certificates of identity based on our records to Somalis, which have been used to transport these individual back to Somalia. ICE believes these documents can be used to remove Somalis from the United States and plans to continue issuing these documents for any Somali who is being removed.

10. Subsequent to Mr. Omar's removal, ICE was informed by Daallo Airlines, a commercial carrier that flies from Nairobi into Somalia, that it will no longer board individuals without a passport and that the certificates of identity will no longer suffice. Also, the Department of State has recently requested that ICE utilize the certificate of identity up to the final transit point prior to Somalia, but not to present it for admission into Somalia.

11. ICE recognizes that if Daallo Airlines is the only feasible way that ICE can presently complete the removal process and the Department of State has now requested that ICE should no longer use the certificate of identity for admission to Somalia (although ICE believes that a certificate of identity could be used to seek admission into any country), individuals must generally obtain a passport to enter Somalia.

12. Mr. Garad has sought to be removed on numerous occasions, including by letter from Mr. Garad dated September 4, 2002 while he was still serving time at the Oregon State Penitentiary. This letter indicated that he has two emergency

situations, one that his sister is suffering from epilepsy and needs his assistance. The other is that since September 11, 2001, he has experienced "backlash". Mr. Garad sent another letter dated July 27, 2004 where he states that he intends to sue the government for "imprisoning me instead of allowing me to leave the United States of America."

13. In Mr. Garad's case, a Somali passport was obtained with the assistance of an ICE official at the U.S. Embassy official in Nairobi after an ICE official in Portland, Oregon, requested assistance in obtaining a passport around April 2004. Included in the correspondence sent to the ICE official in Nairobi was a letter from the Branch Director of the Somali Community Services Coalition requesting deportation on behalf of Mr. Garad and a handwritten statement from Mr. Garad stating that he is willing to go back to Somalia (Somaliland). The passport was issued in Mogadishu on May 22, 2004.

14. To my knowledge, this is the only passport that ICE has assisted a Somali in obtaining since the Western District of Washington issued its injunction in January 2003. The Department of State has advised us that while they would not recognize the passport in question, some countries may recognize these passports.

15. Mr. Garad has requested, and the District Court for Oregon has ordered, that Mr. Garad be removed to Hargeysa, Somalia. Hargeysa is a city located in a region that is referred to by that region's local officials as the independent nation of Somaliland. Somaliland is not recognized by the United States Government as a separate country. Mogadishu is not part of the region known as Somaliland.

16. The Department of State has advised us that Somalis regularly commute between Somalia and Somaliland using their own travel documents. In relation to Mr. Garad's case, the Department of State opined that Mr. Garad should not be expected to be denied entry to Hargeysa with a passport issued in Mogadishu.

17. Although ICE generally does not believe it must send, absent a court order, individuals to specific locations within a country of removal, the agency realizes the unique circumstances surrounding removals to Somalia and will make efforts to accommodate these requests.

18. In Mr. Garad's case, ICE understands that the District Court of Oregon has ordered that Mr. Garad be removed to Hargeysa. Apparently, Mr. Garad has also stated that he is afraid to transit through Mogadishu. We have located a commercial flight on Daallo Airlines to Hargeysa that does not stop/transfer in Mogadishu. This flight, D3-189, departs Djibouti on Mondays and Thursdays at 8:30 AM and arrives in Hargeysa at 9:45 AM. We have contacted the United States Embassy in Djibouti and it was indicated that the Djibouti government would provide transit clearance as long as advance notice was provided. In the event that the Daallo flight does not prove feasible, we have also sought and

received three bids for charter flights that would fly Mr. Garad from Nairobi nonstop to Hargeysa.

19. It should be noted that ICE does not believe it makes sense to secure any specific flights nor work on country clearances for its officers until all judicial impediments are lifted since there are still too many variables (e.g., date of departure, availability of officers to escort, availability of Embassy personnel in transit countries (if needed) to be available, etc.) that are subject to change. It should also be noted that unforeseen circumstances may alter ICE's plans regarding removal before or after an itinerary is set, although we would keep the court appraised of our progress. ICE believes it is currently precluded from removing Mr. Garad due to the Western District of Washington's injunction issued on January 17, 2003.

20. ICE will do everything in its capacity to provide Mr. Garad with safe transit to Somalia. ICE agents, however, do not enter Somalia as our officers would not have any Embassy support if they encountered any problems on the ground. If Mr. Garad is refused entry into Somalia, ICE agents will escort him back to the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Date: Oct 12, 2004.

Leonard Kovensky

U.S. Department of Justice

Civil Division

DJK:GDM:gdm
39-39-4?6

Telephone: (202) 616-4858

Kevin Magnuson
Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Re: Mahad Mohamed Omar (A-43-074-621)

Dear Mr. Magnuson:

On June 5, 2003, pursuant to Jama v. INS, 329 F.3d 630 (8th Cir. 630 (8th Cir. 2003), pet. cert. pending, 72 U.S.L.W. 3348 (Nov. 4, 2003) (No. 03-674), the district court rejected Mr. Omar's petition for a writ of habeas corpus. Mr. Omar did not appeal the district court's decision. Therefore, there are no legal impediments to Mr. Omar's removal to Somalia. Accordingly, I have been informed that Immigration and Customs Enforcement ("ICE") will endeavor to remove Mr. Omar within 30 days of this letter.

Sincerely,

GREG D. MACK
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

cc: David Suna
Office of the Principal Legal Advisor
Immigration and Customs Enforcement
Department of Homeland Security
425 I Street, N.W., Room 6100
Washington, D.C. 20536

**EXHIBIT N**

From: Greg.Mack@usdoj.gov [mailto:Greg.Mack@usdoj.gov]
Sent: Thursday, February 12, 2004 3:16 PM
To: Magnuson, Kevin
Subject: RE: Mahad Omar

PDF file containing signed letter on Mahad's removal. Hardcopy is being sent via regular mail.

Greg D. Mack
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
U.S. Mail: P.O. Box 878, Ben Franklin Station,
Washington, D.C. 20044
Federal Express, Delivery, Courier: Room 7025S,
1331 Pennsylvania Avenue, N.W.,
Washington, D.C. 20004
Ph: 202-616-4858
Fax: 202-616-9366

U.S. Department of Justice

Civil Division

DJK:GDM:gdm
39-39-468

Telephone:
(202) 616-4858

March 9, 2004

**VIA FACSIMILE AND FEDERAL EXPRESS**

Kevin Magnuson
Briggs & Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Re: Mahad Mohamed Omar (A43-074-621)

Dear Mr. Magnuson:

I am writing to inform you that on Thursday, March 11, the Bureau of Immigration and Customs Enforcement will rem Mahad Mohamed Omar to Somalia, specifically Hargeysa, Soma

Sincerely,

GREG D. MACK
Senior Litigation Counsel
Office of Immigration Litiga
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin S
Washington, D.C. 20044

EXHIBIT O


YEMEN
ERITREA
DJIBOUTI
Djibouti
ETHIOPIA
KENYA
SOMALIA
SOMALILAND
PUNTLAND
INDIAN OCEAN
GULF OF ADEN
Ogaden
BOUNDARY UNDEMARCATED AND IN DISPUTE
Berbera
Burco
Boosaaso
Garoowe
Galkacyo
Beledweyne
Baydhabo
Mogadishu
Marka
Kismaayo
Kaamboni
Jamaame
Baraawe
Afgooye
Jawhar
Hobyo
Eyl
EQUATOR
The government of Somalia collapsed to clan militias in 1991. Somaliland claims independence and governs some three million people in the north. Puntland administers a region in Somalia's northeast but does not claim independence.
Water shortages, lack of pasture
Successive rain failures, food shortages, lack of pasture
Unevenly distributed rainfall, poor crop production
Conflict (Jan. 2001-Mar. 2002)
Land mine area
Microwave station
Political leader
Refugee camp
Vulnerable population group (March 2002)
Agro-pastoral
Pastoral
EGAL
SHATIGADUD
MORGAN
ABDIKASSIM
AIDEED
ATTO
YALAHOW
YUSUF
Population density (people per square km)
More than 25
16 to 25
Less than 16
Clan families
ISAAQ
DAROD
HAWIYE
RAHANWIIN
DIGIL
© 2002 National Geographic Society All rights reserved.

EXHIBIT P