U.S. District Court for the District of Minnesota
Civil No. 01-1172 JRT/AJB

Keyse G. Jama,
Petitioner,

v.

Immigration and Customs Enforcement,
Respondent.

I, John Tsoukaris, hereby declare that:

1. I am the Acting Deputy Assistant Director, Removal Management Division, Office of Detention and Removal Operations, Immigration and Customs Enforcement (ICE), United States Department of Homeland Security, in Washington, DC. I have been in this and other management positions at ICE Headquarters since 2002 and have been in various law enforcement positions within ICE (and the former Immigration and Naturalization Service) for 13 years. My present duties and responsibilities include formulating transportation and removal policy, conducting transportation and removal planning, defining and projecting transportation and removal requirements, and supporting field office execution of transportation and removal operations.

2. I am making this declaration both from facts known personally to me and from facts learned during the performance of official duties.

3. I have been involved in the efforts to remove Keyse Jama. It is anticipated that Jama will be removed from the United States within the next 5 weeks, barring any unforeseen operational obstacles.

4. Current efforts to arrange for Jama's removal involve a combination of commercial airlines and a contract charter. It is anticipated that Jama will be flown to Nairobi, Kenya via commercial airline, then via contract charter from Nairobi, Kenya to Somalia.

5. Preliminary efforts to remove Jama focused on commercial airlines or his return via the land border between Djibouti and Somalia. However, it is our understanding that Jama has expressed a strong desire to be removed only to Bossaso, to the exclusion of any other place within Somalia. This has strictly limited the options for removal, as only one commercial airline, Daallo Air, flies regularly into Bossaso. The flight is not direct, and transits through Mogadishu,

Hargeysa, or both. This also has also excluded the possibility of returning Jama via the land border with Djibouti as we understand that Jama has expressed concern about having to traverse non-Puntland territory of Somalia.

6. Daallo Air requires that any individual seeking to enter Somalia have a passport. In the past, Daallo Airlines had accepted for transport aliens with only a Certificate of Identity. However, the airline has since informed us that authorities in Somalia now require a Somali passport for Somali passengers arriving in Somalia; therefore Daallo Air now requires a passport for any Somali traveling to Somalia.

7. The United States does not have diplomatic relations with and does not recognize a Somali government. Likewise, the United States does not recognize travel documents issued by Somalia for purposes of admission or identification. However, other countries do accept Somali travel documents for these purposes.

8. As Daallo Airlines requires a travel document, and other countries do indeed recognize Somali passports, obtaining a passport is the most expeditious means to remove Jama to Somalia. Therefore, ICE forwarded to U.S Department of Justice Senior Litigation Counsel Greg Mack a list of possible points of contact for information on issuance of a Somali passport. ICE understood that this list would be forwarded to Jama and/or his counsel.

9. Since that time, ICE has learned that Jama and/or his counsel declined to pursue issuance of a Somali travel document. This refusal, in addition to his strong desire to avoid removal to any part of Somalia outside Bossaso, has ended ICE efforts to effectuate Jama's removal via Daallo Airlines.

10. In the absence of other feasible alternatives, ICE is attempting to coordinate Jama's removal via charter aircraft. This would entail Jama traveling via commercial air to Nairobi, Kenya, then traveling via private charter into Somalia.

11. The ICE Attache in Nairobi is in negotiations with RMI Security, a private security agency, to provide for Jama's transit into Somalia. RMI Security has agreed to explore the possibility of returning Jama to Bossasso and is making preliminary arrangements to ascertain if it is practicable to enter into a contract with ICE for this purpose.

12. RMI Security advises that it needs to contact persons within Puntland to arrange for the arrival of the flight at a landing strip in Puntland. ICE expects to hear from RMI Security as to the arrangements within a week.

13. RMI Security has not yet entered into a contract with ICE for this charter flight, but indicates that it will be willing to contract once the arrangements are made with its Puntland contacts.

14. Assuming that RMI Security makes the necessary arrangements within the week, it is anticipated that the charter flight will be scheduled within 4 weeks thereafter, barring any unforeseen operational obstacles.

15. Jama is detained as his removal will be effectuated in the reasonably foreseeable future. In light of his foreseeable removal, risk of flight is a significant concern. Furthermore, his criminal conduct and behavior while detained demonstrate that he may be a danger to the community or to the safety of other persons if released.

I declare under penalty of perjury that the foregoing is true and correct. Dated March 7, 2005.

John Tsoukaris