2200 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MINNESOTA 55402
TELEPHONE (612) 977-8400
FACSIMILE (612) 977-8650

BRIGGS AND MORGAN

PROFESSIONAL ASSOCIATION

WRITER'S DIRECT DIAL
(612) 977-8438

WRITER'S E-MAIL
kmagnuson@briggs.com

March 28, 2005

The Honorable John R. Tunheim
U.S. District Court Judge
202 US Courthouse
300 South Fourth Street
Minneapolis MN 55415

**Re: Keyse E. Jama vs. John Ashcroft, et al.**
**Civil No. 01-1172 (JRT/AJB)**

Dear Judge Tunheim:

The Court authorized on Monday, March 28, 2005, the filing of this letter in response to the Declaration of Lisa Hoechst, filed on Friday, March 25, 2005. The purpose of the Hoechst declaration is to appraise the Court of the progress the Bureau of Immigration and Customs Enforcement ("ICE") has made in its negotiations with RMI Security since oral argument on March 9, 19 days ago. However, the Hoechst declaration raises more questions about the deportation arrangements and the fate of Mr. Jama upon arrival in Somalia than it purports to answer.

In the March 9 hearing and in supporting papers, counsel for ICE, Greg Mack, represented that ICE "is in negotiations with RMI Security, a private security agency, to provide Jama's transit into Somalia." (*See* Tsoukaris Decl. at ¶ 11.) At the hearing, Mr. Mack and ICE attorney Lisa Hoechst, described RMI Security as a Kenyan charter company. However, it appears from RMI Security's website, that RMI Security is a "risk management company" based in Ireland. (*See* http://www.rmi.ie/rmisecurity/index.html.) The Hoechst declaration did not provide more information about the company, although the Court had directed several questions about this company to both counsel at the hearing. The Court also directed several questions to Mr. Mack about the identity of the persons in control of the landing strip in Boossasso, which Mr. Mack was not able to answer and which the Hoechst declaration does not address.

The Hoechst declaration states that RMI Security has received "preliminary approval to remove Jama to Puntland." (*See* Hoechst Decl. at ¶ 10.) Presumably, this "preliminary approval" is from "persons in Puntland" in control of a "landing strip in Boossasso." I discussed the declaration with Mr. Mack in a Friday telephone conversation and asked for more details about the "preliminary approval" and other logistical arrangements ICE contemplates that RMI Security would be making with respect to Mr. Jama's deportation. Mr. Mack declined to address those questions, stating that his client would be willing to expand on the declaration if the Court

so desired. Given the limited information provided by the government, we believe that the best course would be for us to take the deposition testimony of a senior level ICE official who is responsible for the removal of Mr. Jama. The District Court in *Ali v. Ashcroft*, No. 02-2304P, authorized petitioners to depose a senior INS Official. The subject matter of the deposition would be the status and details of Mr. Jama's planned deportation to Somalia.

In the alternative, Respondent should be directed to respond in a timely manner in writing to the following questions and any other questions the Court may have:

1. What is RMI Security?

2. What is the identity and nature of the entity in control of the landing strip in Boosssasso with whom RMI Security is negotiating for Mr. Jama's flight into Somalia? By virtue of what authority does this group control the landing strip?

3. Who is or are the persons with whom RMI Security primarily is negotiating? Provide names and contact information.

4. What is the status of the negotiation between RMI Security and these persons? Provide copies of the "response from those persons" which consists of a number of questions as mentioned in paragraph 9 of the Hoechst Declaration. If the response did not come in writing, provide a detailed summary of the response. Provide copies of RMI Security's response to the persons in control of the landing strip. If the response was not in writing, provide a detailed summary of ICE's response.

5. What constitutes "preliminary approval"? Provide a copy of the "preliminary approval" ICE received by RMI Security from the persons in control of the landing strip in Boossasso. If the "preliminary approval" did not come in writing, provide a detailed summary of the response.

6. What arrangements must RMI Security make in order to accomplish deportation for Mr. Jama to Somalia referred to in paragraph 11 of the declaration? What is the status of such arrangements? Has RMI Security received landing authorization? If not, when will RMI Security receive such authorization?

7. What will happen to Mr. Jama once he arrives at the landing strip? What arrangements have been made for Mr. Jama following his arrival at the landing strip? Has RMI Security and/or ICE received any guarantees regarding the safety of Mr. Jama? How does ICE know that the persons in control of the landing strip will not rob and/or harm Mr. Jama? What have the persons in control of the landing strip been told about Mr. Jama?

Very truly yours,

s/ Kevin M. Magnuson

KMM/krw

cc: Michelle Garnett McKenzie
Keyse G. Jama