U.S. District Court for the District of Minnesota
Civil No. 01-1172 JRT/AJB

Keyse G. Jama,
Petitioner,

v.

Immigration and Customs Enforcement,
Respondent.

# REDACTED DECLARATION

I, Lisa Hoechst, hereby declare that:

1) I am Chief for the Travel Document Unit of the Office of Detention and Removal Operations (DRO), Removal Management Division, U.S. Immigration and Customs Enforcement (ICE), within the Department of Homeland Security in Washington, D.C.

2) My present duties and responsibilities include conducting transportation and removal planning, defining and projecting transportation and removal requirements, and supporting field office execution of transportation and removal operations. In my current position, I am personally familiar with inter- and intra-governmental procedures for the repatriation of persons to Somalia.

3) I have been involved in the efforts to remove Keyse Jama. I am making this declaration both from facts known personally to me and from facts learned during the performance of official duties.

4) This declaration is intended to comply with the Court's order of April 13th.

5) The removal of Keyse Jama is planned as follows:

    a) Jama will be removed from Saint Paul, MN on or before April 25th .

        i) A private charter aircraft contract solicitation has been announced and that contract is being drafted and will be finalized within the next 48 hours. However, ICE is considering commercial flight options should the charter option become unavailable or impractical.

        ii) In either scenario, ICE deportation officers will accompany Jama on the flight from the United States and to Nairobi, Kenya. In accordance with ICE escort

policy, a minimum of two ICE officers will escort Jama on that flight(s). The escorting officers have been selected from the available officers at the Saint Paul field office.

iii) Flight departure time and date are not yet known as this may be by commercial or charter aircraft.

b) Jama and the ICE escorts will disembark the aircraft in Nairobi, Kenya no later than April 25th. Jama, the ICE escorts, and the ICE Attaché in Nairobi, Mike Webster, will remain in Nairobi overnight. The ICE escorts will stay in a hotel, and Jama will be held overnight by Kenyan immigration officials as he is a transiting alien and to ensure his safe passage.

c) The RMI charter flight containing Jama and RMI Security escorts will depart Nairobi for Boosasso, Puntland on the following day. The ICE officers will remain in Nairobi until they receive word from RMI that Jama has been successfully repatriated to Somalia.[1]

d) The landing is scheduled to occur the following day following Jama's arrival in Nairobi because some African airstrips do not have landing lights, thereby necessitating all flights to arrive during daylight hours.

6) This removal operation has taken longer than ICE anticipated for several reasons.

a) After the Supreme Court's decision on April 12, 2005, ICE began investigating the use of a commercial airline to transport Jama into Somalia. Several airlines fly to cities within Somalia.

i) Jama has expressed a strong desire, which we are attempting to accommodate at significant cost, to arrive in Boosasso, to the exclusion of all other Somali cities. Only Daallo Airlines offers the option of a direct flight to Boosasso, but Daallo Airlines requires that any Somali being removed to Somalia possess a Somali passport.

ii) Jama does not currently possess a Somali passport, but expressed through his counsel a desire to be removed from the United States expeditiously following the Supreme Court's ruling in his case. The Daallo Airlines flight would best satisfy Jama's requests (Boosasso destination, no transiting within Somalia, ICE's ability to book travel in the near future). Due to Daallo Airlines' requirement, ICE informed Jama that such an option requires a Somali passport (per airline directive). Understanding that Somali passports are issued by some Somali self-proclaimed "governments," and that such

[1] It is beyond the authority of the U.S. Government to control the specifics of what happens to an alien immediately after removal or anytime thereafter. As in every removal, the receiving entity has been informed of the bases underlying the alien's removal. It should be noted that Jama is being removed to Boosasso at his own request.

passports may be recognized as valid in Somalia (as they are in some other countries, but not the United States), ICE offered to Jama through his counsel, a list of contacts who may have some recognized authority to issue a Somali passport. Jama's counsel indicated that he contacted those on the list, but declined to pursue issuance of a Somali passport.

b) After learning this, non-commercial flight alternatives were considered.

i) The ICE Attaché in Nairobi approached several private charter companies to ascertain the possibility of transporting Jama to Boosasso via air. RMI Security[2] responded that it would be able to provide a private charter and security escorts, but that it would not enter a formal contract with ICE until it had worked out the arrangements with the Somalis.

ii) RMI contacted Puntland officials (identities unknown to ICE) to request permission to land the charter aircraft in Boosasso. The Puntland officials indicated that it would consider RMI's proposal and would respond in approximately one week.

iii) Unfortunately, Puntland's response was in the form of further queries as to Jama's clan and subclan membership. RMI asked ICE Attaché Webster for this information, which he did not possess. He immediately transmitted that request to ICE DRO via email. ICE DRO forwarded that request to ICE counsel and to the local ICE office with jurisdiction over Jama's detention location and consequently his A file. While the local office was attempting to ascertain this information from its records, ICE counsel advised the Department of Justice (DOJ) of the clan query. The DOJ attorney asked Jama's counsel for this information, and was it supplied to ICE that same day. ICE counsel relayed the data to ICE DRO, which advised the ICE Attaché, who told RMI, who then responded to Puntland's query.

iv) It took Puntland several days to respond to RMI and indicate that it had preliminarily authorized the landing of the charter aircraft and return of Jama. Thereafter, Puntland offered to RMI the date(s) on which it could receive Jama.

c) RMI relayed the date(s) to the ICE Attaché. He then communicated with ICE DRO and the Kenyan government to ascertain when Jama's transit through Kenya would be satisfactory.

i) ICE DRO researched commercial flight options for arrival in Nairobi.

---

2 RMI is a private security firm that provides strategic and operational security support to private and governmental entities.

ii) The Kenyan government determined that it was prepared to accept Jama for transit. ICE then advised the Court that removal was imminent and that it would be accomplished by April 25, 2005.

iii) It is this arrangement with the Kenyan government that prevents Jama's immediate removal. ICE can easily transport Jama to Nairobi, but Kenya is permitting Jama only to transit Nairobi. Kenya has set a specific time and date at which they will permit Jama to transit. At no time has Kenya offered to permit Jama to extend his transit to a duration of a week or more. Further, Puntland has determined the window during which it will authorize the charter landing and Jama's return. Therefore, the timeline for Jama's removal has not been arranged at the pleasure of the U.S. Government, but is the result of international negotiations and contract terms, the request to transit directly to Boosasso, and the diligent efforts of ICE Attaché Webster.

d) Once RMI had worked out all the details with the Puntland contacts, it was then prepared to enter a contract with ICE. That occurred very recently, but the contract is now finalized.

7) ICE has recently determined that it would be most appropriate to utilize a private charter aircraft for Jama's transit out of the United States and to Nairobi.

a) ICE originally planned to use commercial aircraft to transport Jama to a staging city outside of Somalia until chartered to Somalia.[3] Several neighboring countries were considered by ICE, and talks were undertaken with several of those countries to receive Jama for transport and allow use of a private charter aircraft. ICE concluded that Kenya provided the most viable option for Jama's transit to Somalia.

b) In order to ensure Jama's successful removal from the United States, ICE DRO undertook solicitation of private charter aircraft to transport Jama from the United States to Nairobi. Federal procurement obligations dictate that the contract be posted for bids. The bidding closed on April 12, 2005, and the procurement office is finalizing the contract. That should be finalized at any moment.

8) It is ICE's policy not to provide details concerning a removal plan so as to ensure the safety of all parties involved and integrity of removal operations.

a) In order to minimize potential threats to officer and public safety, as well as attempts to foil U.S. Government efforts to execute lawful orders of removal, it is long-standing ICE practice to not disclose specific travel details such as aircraft routes, carrier, and departure time to aliens scheduled to be removed.

[3] There are commercial airlines that could transport Jama from the United States without a Somali passport. Therefore, the Daallo obstacle is not at issue for this leg of the flight.

b) Disclosure of further operational detail regarding Jama's removal would pose a threat to officer and public safety and could conceivably aid or otherwise enable someone to attempt to frustrate those plans.

c) In addition, diplomatic relations with foreign entities is a critical component of any removal, and disclosure of specific operational details could result in irreparable harm to those relations.

d) Safety and the integrity of removal operations are paramount to ICE's mission, and any threat to those would defeat ICE's ability to carry out its mission of protecting public safety and national security by ensuring the safe and orderly departure of aliens ordered removed from the United States.

I declare under penalty of perjury that the foregoing is true and correct. Dated April 14, 2005.

Lisa Hoechst
Chief
Travel Document Unit