**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Civil No. 01-1172 JRT/AJB**

---

KEYSE E. JAMA,

Petitioner,

vs.

IMMIGRATION AND CUSTOMS ENFORCEMENT,

Respondent.

**DECLARATION OF KEYSE JAMA**

INS No. A71 689 585

---

I, Keyse Jama, through an interpreter, hereby declare that:

1. I am currently being held in the Ramsey County jail. I respectfully request that I be released from jail immediately. When released, I will follow any and all conditions of supervision. I do not oppose ICE's efforts to remove me to Boosaaso and will cooperate in any way I can in making arrangements for my removal to Boosaaso. When ICE is ready to deport me again to Boosasso, I will report to ICE officials when it is time to leave. Although at the time of my previous departure I did not know how I would be received at the airport in Boosaaso, I know now after having been there that the government of Puntland is in control of the airport and I do not fear for my personal safety at the time of arrival.

2. Prior to my departure, my attorneys shared with me public court documents entitled "Redacted Declarations" which explained how my deportation will occur. I did not know the exact time and date of my departure but I knew that I would be removed sometime before April 25, 2005. I took comfort in understanding what the American government was

doing to me and was especially glad to see the statement from the Puntland officials that I would be free to live and work in Puntland.

3. On Wednesday, April 20, 2005, at approximately 9 am, ICE officers came to the Washington County jail and told me to collect my belongings. I was very happy to be leaving the jail after being held for so long. As I left, many of the prison officers and workers said goodbye to me. They told me good luck. They said that they were happy for me that I was finally getting out of jail because I was a detainee and that I had been in there longer than any other inmate.

4. ICE officers drove me to the Bloomington ICE District Office. I was treated very respectfully while being processed for deportation. I was happy to cooperate. I knew that it was inevitable that I would be sent to Boosaaso. I was glad finally to be leaving prison and looked forward to getting on with my life.

5. At the airport in Minneapolis, I was put on a private medium-sized jet waiting for us there. It was a very luxurious airplane. Two ICE officers, Mr. Paul LeBrasseur and Ms. Denise Gearey, escorted me on the trip. First, we stopped in Iceland for a little bit and then in Rome to refuel before going to Nairobi. The ICE agents and I had easy and pleasant conversations during the flight.

6. I arrived in Nairobi, Kenya on Thursday, April 21 and was held in an immigration jail at the airport. Mr. Mike Webster, the ICE official in Nairobi, stated that he appreciated my cooperation and hoped that once in Somalia, I would assist ICE in resettling other Somalis ICE would like to deport. He gave me his contact information.

7. The next day, Friday, April 22 the ICE officials turned me over to RMI Security. There were two pilots and two other men escorted me. One of the two was Irish with an Irish

passport and the other was a white African with a Kenyan passport. We boarded a small jet plane and flew to Boosaaso. The two escorts stated that they would be returning lots of deported Somalis to Puntland and we discussed the possibility that I might work with them if that happens. They gave me their full names, phone numbers and email addresses. I have been asked not to use their names here.

8. We landed on a gravel landing strip in Boosaaso. Two officials from the Puntland police approached the airplane first. They were closely followed by two immigration officials. None of these men had guns. There were some security forces at the airport but none ever close to the plane. The police men first asked us where the plane was from. The Irish man said that they had a man to hand over to them and that the Irish man had an email from an official accepting me. The Puntland officials asked to see my passport. When it became apparent that I did not have one, we went to an office near the landing strip and they called the Deputy Chief of Police of Puntland.

9. I had been given a couple of telephone numbers by members of the Somali community in the Twin Cities of people who might be able to help me once I arrive. The Irish man allowed me to use his cell phone but I was not able to get through to them.

10. Half an hour later, the Deputy Chief of Police of Puntland arrived and interviewed the RMI men. The Irish man did all the talking. It became apparent that the Puntland immigration officials and Deputy Chief of Police had no notice of our arrival and were not inclined to accept me. As the conversation between the Puntland officials and the Irish man became heated, I was asked several questions directly. I responded in English but each time the Irish man nudged me to shut up. The Deputy Chief of Police became very angry and directed me to respond to his questions and speak Somali. I said that I did not want to disrespect the English

speakers but he told be to answer his questions. The questions were limited to my identity and the reason I was being deported, which I answered. I asked that I be allowed to stay in Puntland because I had come all this way and I did not want to be returned to jail in the United States.

11. The Irish man had become very angry and said that the Vice-President of Puntland had agreed that I could be returned there. The Deputy Chief of Police phoned the Vice-President who apparently agreed on the phone that he had given his consent. The Deputy Chief of Police then called the President of Puntland, and perhaps the Chief of Police, and a heated discussion in Somali occurred. Eventually, Puntland officials said that Puntland had to be respected as a proper government and that the Americans should deal directly with them, not through a contractor such as RMI. They also stated that while in the past Somalis from abroad had been dumped in Somalia without passports, Puntland is now a regional government that is part of a central government with a system and that they would not allow people to be dumped there without proper arrangements between the central government and the United States government. The officials said that they could not accept me without proper identity documents and an explanation of why I was being deported. They gave me a letter stating that they refused to accept me because I lacked "lawful documents."

12. The Irish man, at some point in the discussion, asked if the issue was a matter of money. This statement upset the Deputy Chief of Police very much and he accused the Irish man of treating Puntland as if it was a corrupt and unsafe place.

13. The Irish man kept arguing with the Puntland officials after the decision not to accept me was made. Finally, the Deputy Chief of Police told us that we had fifteen minutes to leave. He then asked me for telephone numbers of people he could contact to tell them what had happened. He said that he was worried about what would happen to me after I left and wanted to

make sure someone knew that I had not been allowed to remain in Puntland. I gave him the telephone number of members of my family and of my lawyer, Kevin Magnuson. He gave me his telephone number and the number of another Puntland official.

14. After we took off, I became very nervous. The Irish man was furious. He stated that he wanted to go to Garoowe, which is also in Puntland. I responded that I thought the orders of the Puntland officials probably applied to the other cities in the region as well and that it was not a good idea. He then stated that he wanted to fly me to Mogadishu me but I do not think he was serious because the risk to the plane and RMI personnel is too great. It crossed my mind that they might just land and leave me somewhere. While these discussions were going on, the telephone was ringing constantly with calls from ICE officials in Nairobi and possibly in Washington, D.C.

15. When we arrived in Nairobi, we were immediately met by a large group of people. The ICE officials were extremely upset. They interviewed the RMI men apart from me. Paul LeBrasseur told me that, like Mahad Omar, who unsuccessfully sought asylum in Sweden while in transit, they were taking me back to the States and that I would be locked up and never let out until they removed me again to Somalia. I begged to be allowed to remain in Kenya but they refused.

16. In a very short time, the ICE officers bought a commercial ticket back to the States for me. I was not restrained on the flight and sat between the two officers. At the airport in London, I asked the British immigration officials to allow me to stay there or to send me to Kenya but not to allow me to go back to the United States where I again would be put in jail. They stated that they could not accept me and that I had to continue in transit with the American officers.

17. We flew from the UK to Chicago and then to Minneapolis. I was put in a car and three police cars escorted us to the Ramsey County jail were I was put in solitary confinement and not allowed to contact anyone. However, I was able to signal to another inmate from my cell to call Shirley Holdahl and she called my lawyer, Kevin Magnuson.

18. I understand that the government claims that I said disparaging things about Boosaaso. That is not true. The city is on the coast of the Indian ocean and is very beautiful. I was surprised to see how many nice new buildings had been constructed there.

19. I will fully cooperate with the United States government in arranging my deportation to Boosaaso. Until then, I respectfully request that I be released under any conditions of supervision ICE may impose until the deportation can be arranged.

Executed in St. Paul, Minnesota on the 28th day of April, 2005.

s/ Keyse Jama
Keyse Jama