**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

JAMA, Keyse E. (A71 689 585)

Petitioner,

vs.

IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Respondents.

**AFFIDAVIT OF**
**<u>KEVIN M. MAGNUSON</u>**
**Civil No. 01-1172 (JRT/AJB)**

---

STATE OF MINNESOTA )
)
COUNTY OF HENNEPIN )

I, Kevin M. Magnuson, being first duly sworn under oath, states and alleges as follows:

1. I am an attorney at the law firm of Briggs & Morgan P.A.

2. Mr. Keyse Jama was deported on Wednesday, April 20, 2005. Prior to his deportation, I had shared with him the details of the removal operation which were in the public record. As the plan became more fully known, he became comfortable with the operation. His only concern was that he was being sent to Somalia without any identity documents. I requested that ICE provide him with an official U.S. identity card, or at the very least, allow him to keep the Certificate of Identity (Form I-269) that ICE uses to document the identity of deportees in transit through third countries. Counsel for ICE informed me that the United States government could not allow a deportee to have U.S. identity documents because those documents might fall into the wrong hands and be used against the United States. After conferring with Mr. Jama, we decided not to challenge the removal operation on that ground and deferred to the government's

expertise in concluding that the operation likely would succeed. Mr. Jama was eager not to interfere in any way with the removal plan as he preferred to "take his chances" rather than remain in jail.

3. On Friday, April 22, I received a call from Puntland's Director of Planning for Civil Aviation. He called me from Boosaaso. He spoke very good English and informed me that the Puntland Authorities had declined to accept Mr. Jama into the country. He stated that the Puntland officials had requested and received my telephone number from Mr. Jama. He said that he called me because he wanted me to know that Mr. Jama had left Boosaaso but he could not say to where and that he was concerned about Mr. Jama's safety.

4. He also stated that Mr. Jama arrived at the airport in Boosaaso in the custody of a man with an Irish passport and a man with a Kenyan passport, both of whom who worked for RMI Security. He stated that they had not had any contact with the American government. Their decision had been made not to admit Mr. Jama because of this fact and because he did not have proper identity documents. He stated that although some minister may have communicated to RMI that Mr. Jama would be accepted upon his arrival, that minister was not above the law. He stated that he did not know where Mr. Jama would be flown.

5. The Director of Planning for Civil Aviation stated that I should contact the person who made the decision not to accept Mr. Jama, the Deputy Chief of Police of Puntland, who would be waiting for my call. He gave me the number in Somalia.

6. I got Jeffrey Keyes, another lawyer at Briggs and Morgan, conferenced in a Somali translator and called the Deputy Chief of Police. He also spoke very good English but we utilized the translator for most of the conversation. The Deputy Chief of Police stated Mr.

Jama landed in the Boosaaso airport at 11 am local time that day accompanied by two men of Kenyan and Irish Nationalities. The police questioned them regarding their reason for being in Boosaaso. The men stated that Mr. Jama was being deported because he had been convicted of assault in the United States and that his action did not result in serious injury or death. He said that the Puntland officials demanded identification from Mr. Jama but he was unable to produce any form of identification. Consequently, the Puntland authorities refused to admit Mr. Jama into Puntland without proper identification. The authorities gave Mr. Jama a letter documenting their decision. The plane then departed from Boosaaso. He presumed it was going to Nairobi but was not certain.

7. The Deputy Chief of Police stated that "it is the responsibility of the U.S. government to protect the human rights of Mr. Jama."

8. Later that afternoon, I received calls from Somalis in the Twin Cities who had heard the Puntland officials describing their refusal to accept Mr. Jama on the Somali language broadcast of the BBC. The audio is available in Somali on a number of Somali websites. True and correct copies of stories reporting the BBC interview in the Minneapolis Star and Tribute, at http://www.startribune.com/stories/484/5364965.html, and in the St. Paul Pioneer Press, at http://www.twincities.com/mld/pioneerpress/news/local/11467848.htm, are attached hereto as **Exhibit A**.

9. On Saturday, April 23, I received a telephone call from Shirley Holdahl at approximately 7:45 pm. She stated that Mr. Jama was being held in solitary confinement in the Ramsey County jail. She stated that Mr. Jama had somehow got word to another inmate to call her. I went to the jail but Sergeant Sontoya informed me that the immigration officials who had

brought him there instructed him not to let Mr. Jama talk to anyone including his lawyer. He further stated that Mr. Jama had been brought to the jail at approximately 3 pm earlier that day. I informed the Sergeant that Judge Tunheim had ordered that Mr. Jama have immediate access to counsel. The Sergeant agreed to try to call his contact at ICE. I then called Greg Mack, counsel for ICE, and informed him that ICE had violated the judge's order and attempted to prevent my client from contacting me. If it had not been for the phone call of another inmate, it likely would have been have been considerably longer before I was able to meet with him to ascertain his condition and to provide counsel. About half an hour, at about 9:30 pm, I was able to see Mr. Jama.

10. Mr. Jama obtained the names and contact information of the RMI Security personnel who took Mr. Jama from Nairobi to Boosaaso and back as well as the contact information of Mr. Mike Webster, the ICE agent in Nairobi. The government has requested that we not reveal this information and we have agreed. However, this voluntary withholding of information should not be construed as a waiver of our right to use this information in pleadings or other public documents or to depose or subpoena these individuals if the need arises.

**FURTHER AFFIANT SAYETH NOT.**

s/ Kevin M. Magnuson
Kevin M. Magnuson

Subscribed and sworn to before me
this 28th day of April, 2005.

s/ Cynthia L. Fjelstad – 1/31/10
Notary Public