**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

JAMA, Keyse G. (A71 689 585)

Petitioner,

vs.

IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Respondents.

**PETITIONER'S REPLY TO RESPONDENT'S SUPPLEMENTAL REPORT CONCERNING PETITIONER'S REMOVAL**

**Civil No. 01-1172 (JRT/AJB)**

---

The issue before the Court in Petitioner Keyse Jama's pending motion for release is whether ICE has met its evidentiary burden by showing that it can and will deport Jama in the near future. If the ability to do so is in doubt, the remaining issue is whether the government's interests may be protected by conditions of supervision, which ICE devises, rather than continued administrative incarceration. Respondent's most recent supplemental report on the status of its efforts to remove Jama fails to establish ICE's capacity to deport Jama any time soon and fails to established any reason why Jama cannot wait for a viable deportation arrangement on supervised release. Instead, the latest declarations merely repeat ICE's intention to attempt to devise a plan. This showing is not sufficient to establish that the government can remove Jama in the foreseeable future but merely provides more details about the government's hope to formulate a plan. The government's latest status report is plainly inadequate and raises a number of concerns.

1. The Hoechst declaration provides fourth-hand hearsay that is undependable and misleading. It is based on the statements allegedly made to ICE by unidentified employees of

the private security firm RMI Security to whom ICE has outsourced the deportation. It states that a "contact" told RMI that the office of the President of Puntland is "prepared to inform RMI that Puntland will accept Jama's return." (Hoechst Decl. at ¶ 7.) Respondent has not provided Petitioner with any information that would indicate that this "contact" is any more capable now of guaranteeing acceptance than it was before. The declaration provides no evidence that ICE has overcome the obstacles that doomed the previous operation. Just as they did before the last failed deportation attempt, the unidentified RMI employees claim that they have assurances from Puntland that Jama will be accepted. This fourth-hand hearsay evidence, even if it were to represent that the President of Puntland actually had consented, is too tenuous to support a factual finding. The only direct evidence before the Court at this point is contained in Jama's declaration regarding what transpired during the failed removal operation and the Magnuson affidavit regarding the statements of the Puntland officials to Jama's counsel. That evidence demonstrates that ICE is unlikely to be able to meet Puntland's deportation requirements. ICE must overcome that showing with a showing that it has indeed overcome these obstacles.

2. Even if these latest declarations are accepted at face value, they do not deal with the pressing issue of whether Jama should be released under ICE supervised conditions while ICE works out the deportation plans. The government presents no evidence that Jama is a flight risk or any other evidence to compel continued detention. These failures are particularly significant after being detained for over four years. To justify continued detention, ICE now faces a high burden to show that deportation is not merely possible but is in fact imminent and necessary. *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) ("as the period of postremoval

confinement grows, what counts as the 'reasonable foreseeable future' conversely would have to shrink.")

3. The Hoechst declaration on its face demonstrates that the acceptance of the Puntland government promised to RMI by the "contact" is unlikely and, even if present, may not be sufficient to guarantee a successful deportation. Despite stating that the President, presumably on behalf of the Puntland government, will accept Jama's return, the declaration undercuts that representation by stating that the "contact" wants Jama flown someplace other than the largest city in Puntland: Boosaaso. (*See* Hoechst Decl. at ¶ 8.) If the Puntland government really were to officially consent to Jama's deportation, RMI would not need avoid flying to Boosaaso

4. The declaration of Leonard Kovensky insinuates that the removal operation failed because elements of the plan were a part of the public record in this proceeding rather than because of circumstances beyond ICE's control or their ineptitude. (*See* Kovensky Decl. at ¶ 6(a).) Kovensky provides no support for this insinuation, which Jama strenuously contests, nor for the conclusion that ICE should not be required to meet its evidentiary burden under *Zadvydas* that it can and will deport Jama in the next few weeks. As the Court noted in its April 13 Order, it, in light of the government's lack of candor, "has a particular duty to ensure the government's chosen method of effecting Mr. Jama's deportation is legal and humane." (*Id*. at 2.) The Court's review is needed now more than ever precisely because ICE has demonstrated that it will go to extraordinary and unsuccessful lengths to attempt a rapid deportation in order to avoid its obligation to release Jama under appropriate conditions until it can devise a sound removal plan. Indeed, the Court's April 22 Order requiring ICE not to deviate from the approved removal plan

without this Court's review proved to be necessary in light of RMI's desire to improvise on Jama's deportation plan after it failed in Boosaaso. The failed removal attempt and the unsubstantiated insinuation by ICE and RMI that Jama or his counsel were somehow responsible for the botched removal attempt, raises added concerns regarding Jama's treatment by ICE field officers and RMI Security personnel in any future operation. Jama continues to be concerned about the possibility that ICE officials or its contractor will resort to illegal means of deporting him in the near future to avoid a decision of this Court releasing him, for example by holding him at some undisclosed off-shore location while "deporting" him or utilizing other illegal methods of deportation. The Court should have the opportunity to review any planned deportation to ensure that ICE and RMI operate according to American law and that Jama does not suffer illegal or inhumane treatment during any renewed attempt to deport him to Somalia. The Court's review should be subject to the opportunity for Jama's counsel to vet the government's claims.

The government's latest declarations are an attempt to muddy the waters — to create an impression that ICE may be able to remove Jama in the next two months — in order to avoid a finding by this Court that deportation is not foreseeable. Given the failed removal operation just a couple of weeks ago and the controversy within the Puntland government as to whether they will allow another operation, Jama's removal in the foreseeable future is at best in doubt. The government's showing falls far short of a justification for continuing to subject Jama to extremely harmful detention in a county jail when far less drastic but effective supervisory release conditions are available to increase ICE's comfort level with respect to any perceived risk of flight.

**CONCLUSION**

Jama should not continue to be held in detention while ICE, through an outsourcing contractor with a "contact," researches whether another removal operation is feasible. Every day that Jama remains in jail is a day too long. Release under supervised conditions safeguards the interests of both parties. For the foregoing reasons, Jama should be released immediately.

DATED: Tuesday, May 8, 2005.

BRIGGS AND MORGAN, P.A.

By: /s/ Kevin M. Magnuson
Jeffrey J. Keyes (#55505)
Kevin M. Magnuson (#306599)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 334-8400

**AND**

Michelle Garnett McKenzie
Minnesota Advocates for Human Rights
650 Third Avenue South #550
Minneapolis, MN 55402
(612) 341-3302

**ATTORNEYS FOR PETITIONER**