**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

KEYSE G. JAMA,

Petitioner,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT,

Respondents.

Civil No. 01-1172 (JRT/AJB)

**ORDER ON MOTION FOR RELEASE**

---

Jeffrey J. Keyes and Kevin M. Magnuson, **BRIGGS AND MORGAN**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN, 55402 and Michele Garnett McKenzie, **MINNESOTA ADVOCATES FOR HUMAN RIGHTS**, 650 Third Avenue South, Suite 550, Minneapolis, MN 55402, for petitioner.

Greg D. Mack, Office of Immigration Litigation, **UNITED STATES DEPARTMENT OF JUSTICE**, Civil Division, 1331 Pennsylvania Avenue, NW, Room 700S, Washington, D.C., 20530; Lonnie F. Bryan, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for respondents.

Keyse Jama's Petition for a Writ of Habeas Corpus has been pending in this Court for four years. Throughout, Mr. Jama has been civilly incarcerated in prisons and jails in Minnesota while his legal battle has been fought, ultimately in the United States Supreme Court. As a result of the Court's decision, it is now clear that Mr. Jama is deportable to Somalia as are many other American residents from Somalia who have committed crimes, even those who have committed minor crimes such as Mr. Jama. Yet, few of

these deportable aliens, perhaps none, are currently incarcerated as Mr. Jama is. The government has consistently refused to release Mr. Jama despite a prior Supreme Court decision that limits the time a deportable alien can be held to roughly six months. The Court has been patient with the government as it has been devising plans to deport Mr. Jama. Mr. Jama himself has cooperated fully with the government's efforts.

The government's attempt to deport Mr. Jama to Puntland in the unstable Somali territory on April 22, 2005 failed badly and he was returned to jail in Minnesota. Fortunately, the episode was only an embarrassment and not something more deadly. As this Memorandum and Order notes in much more detail, the Court finds nothing in the factual record of this case to suggest that the government's next attempt, if it even occurs, will be more successful. Indeed, a safe and proper deportation to Somalia may be impossible at this time. In the view of the Court, the myriad of problems associated with deportation to this territory are not fixable in the immediate future and the government's unsupported claims to the contrary are simply not credible. Because the law does not permit Mr. Jama to be held indefinitely, and because the Court finds that he is neither a flight risk nor a potential danger to the community, the Court will order Mr. Jama's release and suggest that the government slow down its rush to act and take time to carefully and thoroughly plan a lawful and safe deportation for all Somali nationals subject to deportation. Forming such a plan will be a difficult task, and is one that deserves careful and deliberate attention. When the time for deportation arrives, the Court is confident that Keyse Jama will willingly obey the laws of this land.

## BACKGROUND

Respondent ICE[1] entered a final removal order against petitioner Keyse Jama in May 2001. Jama did not challenge the determination that he was removable, but filed a petition for a writ of habeas corpus seeking an order barring the government from deporting him to Somalia because the territory has no functioning central government. The United States Supreme Court denied Jama's petition on January 12, 2005.[2] *Jama v. ICE*, 125 S. Ct. 694 (2005).

On March 4, 2005, Jama renewed his motion to compel removal or release pursuant to *Zadvydas v. Davis*, 533 U.S. 678 (2001). (*See* Pet'r's Emergency Mot. to Compel Removal or Release of Mar. 4, 2005; Pet'r's Mem. in Supp. of Emergency Motion to Compel Removal or Release of Mar. 4, 2005.) In an Order dated April 7, 2005, this Court denied the motion, finding that the government was entitled to 90 days from the date of the Supreme Court's opinion to assemble and carry out a removal plan. *Jama v. ICE*, No. 01-1172 (D. Minn. April 7, 2005). On April 12, exactly 90 days from the date of the Supreme Court's opinion, in response to this Court's Order, the government submitted to the Court an affidavit representing that a plan had been finalized and would be carried out by April 25, 2005. (Hoechst Decl. of April 12, 2005 [hereinafter "First Hoechst Decl."]. The affidavit was plainly insufficient, as it disclosed

[1] In previous orders, the Court has referred to the organization formerly known as the Immigration and Naturalization Service ("INS"), now known as Immigration and Customs Enforcement ("ICE") as "INS (n/k/a ICE)." The Court does not foresee any continuing confusion as to the name of the organization and will now refer to the respondents as "ICE."

[2] Jama later amended his petition to assert a claim for release pursuant to *Zadvydas v. Davis*, 533 U.S. 678 (2001). The Supreme Court did not address this question.

nothing to the Court except the date by which ICE planned to carry out the deportation. Following another Order of the Court, the government submitted a sealed affidavit describing the plan in more detail. *See Jama v. ICE*, No. 01-1172 (D. Minn. April 13, 2005); Hoechst Decls. of April 14, 2005 [hereinafter "Second Hoechst Decl." and "Third Hoechst Decl,"]; Hoechst Decl. of April 18, 2005 [hereinafter "Fourth Hoechst Decl."]. Based on the apparently concrete and detailed nature of the plan, and accepting ICE's representations as accurate, the Court determined that Jama's deportation would indeed take place in the reasonably foreseeable future and thus permitted the plan to proceed. The Court permitted Jama's lawyers to know the day Jama would be deported, but only disclosed that information one day in advance and agreed with ICE's demand to keep secret for security reasons the rest of the details of the deportation plan.

On Wednesday, April 20, 2005, the United States government attempted to deport petitioner Jama from the United States to Puntland, an autonomous region in Somalia, pursuant to the deportation plan that this Court had previously approved. On the morning of Friday, April 22, the Court was informed that the deportation had been unsuccessful. Jama was accompanied back to the United States and returned to detention. Since learning of the failed removal effort, the Court has held three telephone conferences in an attempt to ascertain what happened, to determine whether the approved plan can be resurrected and, if so, when, and also to learn whether any alternative plans are being formulated. Throughout, the Court has focused on the need to ensure Jama's safety during this process. The following factual determination is what the Court has learned.

On Friday April 22, 2005 at approximately 10:00 a.m., the Director of Planning for Civil Aviation of Puntland telephoned Jama's counsel and informed them that Jama

had been denied entry to Puntland because he did not have appropriate identification and documentation of his circumstances. Further, the director indicated that Jama had been sent away from the area in the company of the private contractors that the government hired to accomplish the final step of the deportation. (Magnuson Aff. of Apr. 28, 2005.) This official asked Jama's counsel to call the Deputy Chief of Police of Puntland, and provided a telephone number where he could be reached. *Id.* Jama's counsel, with the assistance of a Somali translator, spoke to the Deputy Chief of Police, who confirmed the information the Director of Planning had previously provided. *Id.* Jama's counsel then informed the Court and the government of this development.

The first telephone conference was held that afternoon, at which point the government, despite its agents having been involved in the operation and despite having had at least four hours and possibly longer to investigate the situation, was unable to offer even the barest amount of information about the situation. A second telephone conference was held the next morning, Saturday, at which point the government offered only that Jama was being returned to the United States.[3]

Jama arrived at the Ramsey County jail on Saturday afternoon, having been accompanied back to the United States by ICE agents. (*Id.*; Jama Decl. of Apr. 28, 2005.) Jama was inexplicably placed in solitary confinement and permitted to speak to no one, including his attorneys. *Id.* ICE is unable to explain why Jama was improperly

[3] The Court notes its growing concern that ICE may be deliberately not informing its counsel of record of what is going on so that he will be, consequently, unable to offer any information in response to the Court's questions. Counsel has been less forthcoming during each successive teleconference. Such a situation is untenable since the Court is obligated to make a determination as to whether deportation is even possible. If there is a need for additional hearings in this case, the Court orders ICE to ensure that its attorney is fully informed.

placed in such a severe restricted status. Another inmate at the jail was able to get word of Jama's location to Jama's attorneys. *Id.* After nearly an hour of being denied access to his client, Jama's counsel was permitted to see Jama on Saturday night. *Id.* Jama's counsel visited him again on Sunday.

A third telephone conference was held the afternoon of Monday, April 25. The government again offered no information regarding what had happened to the seemingly complete plan that had been presented to the Court, whether the plan could be resurrected and if so, when, or any efforts to assemble and carry out an alternative plan. As a result, Jama's counsel moved for his immediate release.

On April 26, the government advised the Court that Jama had been moved from solitary confinement into the general jail population and that it intends to remove Jama again within six weeks. (Status Report of Apr. 26, 2005.) The government reiterated this intention, but provided no information as to any plan for deportation, in a declaration filed on April 27. (Hoechst Decl. and Redacted Decl. of Apr. 27, 2005 [hereinafter "Fifth Hoechst Decl."].) On May 6, the government filed a declaration providing a modicum of additional information about the failed deportation attempt, and again reiterating its intention to remove Jama. (Hoechst Decl. of May 6, 2005 [hereinafter "Sixth Hoechst Decl."].)

The government's April 27 and May 6 declarations and Jama's April 28 declaration provided further detail regarding the unsuccessful deportation attempt. According to both accounts, upon landing in Puntland, the private plane carrying Jama

and the private contractors[4] accompanying him was met by Puntland officials, including immigration officials,[5] who asked for Jama's identification documents. (Fifth Hoechst Decl.; Jama Decl. of Apr. 28, 2005.) When none could be provided, Jama and his escorts were taken to an office, where the Deputy Chief of Police[6] was called. *Id.* One of the contractors asserted that Jama's acceptance had been approved by a high-level Puntland official.[7] *Id.* This official was reached by telephone and confirmed this statement. *Id.* However, a higher level official, the Deputy Chief of Police, and possibly other officials determined that Jama should not be accepted without proper documentation and without official communication between the United States and Puntland governments. *Id.* Jama

---

[4] As the United States does not have either diplomatic ties with or presence in Somalia, ICE agents were unable to or declined to accompany Jama on the last leg of the trip. Rather, the government contracted with a private "security company" specializing in global risk management to arrange and manage Jama's travel from Nairobi, Kenya to Boosaaso, Puntland, Somalia, undoubtedly exacerbating the difficulty of the deportation effort.

[5] The private contractors accompanying Jama apparently reported to the government that approximately twenty armed men surrounded the plane, some of which identified themselves as immigration officials. According to Jama, four unarmed men approached the plane. The Court finds this discrepancy immaterial to the current motion, but notes that Jama's version is more consistent with the government's position that Puntland, Somalia is sufficiently stable and functional to be considered an appropriate, humane destination for deportable persons while the contractors' version supports the view that Puntland remains so lawless and dangerous as to make deportation to the area impossible to accomplish.

[6] The private contractors apparently understood this person to be the Puntland Police Commissioner. The Court will refer to him as the Deputy Chief of Police because this is the title under which he identified himself to Jama's counsel. Again, however, this distinction is immaterial.

[7] Jama understood this person to be the Vice President of Puntland. The government's declaration does not identify this person, but makes clear that he was not the Vice President. This discrepancy is, as with the others, unimportant. The important fact is that the assurances made by one high-level official were contradicted and overruled by others, including another of higher rank. These facts support the reality that Puntland and Somalia are territories that lack a recognizable reliable governing structure.

and the contractors returned to Nairobi, where they were immediately interviewed by ICE officials. *Id.* Jama and two ICE agents then returned to the United States via commercial flights. *Id.*

## ANALYSIS

In *Zadvydas*, the Supreme Court held that if, after **six months** of post-removal detention, an alien provides good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing or release the alien subject, of course, to appropriate conditions. *Zadvydas*, 533 U.S. at 699-700. There is no fixed time that constitutes the "reasonably foreseeable future;" but, as the period of post-removal-period confinement grows, the amount of time considered the "reasonably foreseeable future" shrinks. *Id.*, at 701. It is the Court's duty to determine the contours of the "reasonably foreseeable future" and whether the alien is likely to be removed within that period of time. *Id*. at 699-700. Nothing about *Zadvydas* is unclear. *Zadvydas* is the law of this land and its mandate must be followed by this Court and the executive branch of the United States government.

This Court has determined, and repeatedly noted, that the six-month *Zadvydas* detention period, which incorporates a ninety-day statutory detention period, has long since passed. *See Jama v. Ashcroft*, 2003 WL 22427839, at *2-3 (D. Minn. Oct. 24, 2003).[8] Thus, unless Jama's deportation will be accomplished in the reasonably

[8] The government did not challenge this determination in its appeal of the October 24 Order to the Eighth Circuit Court of Appeals.

foreseeable future, he must be granted supervised release until plans for his deportation are finalized. Jama has been in detention since his order for removal became final some forty-nine months ago. The Court notes again that deportation to Somalia is neither easily arranged nor easily executed and may well be impossible. This has been more than amply demonstrated by the government's several unsuccessful attempts to piece together a deportation plan over the years and by the recent failed and dangerous attempt. In their haste to deport Jama, ICE and its agents surely mishandled the attempt and caused a situation which could easily have turned deadly. ICE's repeated glib assurances to the Court that "everything was in order for the deportation" turned out to be nothing more than boastful assertions without much factual basis. The unwillingness of the United States to deal directly with Puntland officials suggests that fruitful negotiations are not likely to occur any time soon. This is further indicated by the spectre of many other deportations to Somali territory which will undoubtedly cause Puntland officials to require more extensive negotiations regarding any deportation attempt.[9] In fact, even ICE has acknowledged that it may well be impossible to successfully deport Jama or any of the other Somalis subject to deportation.[10] This alone is enough for the Court to conclude that petitioner is not likely to be deported in the reasonably foreseeable future.

Several other facts found by the Court supports the Court's conclusion that petitioner is not likely to be deported in the reasonably foreseeable future. Initially, the government will likely require at least another ninety days to develop another concrete,

---

[9] *See* note 12, *infra*.

[10] Counsel for the government acknowledged that removal to Somalia may be impossible during the telephone conference held April 25, 2005.

workable plan for Jama's removal. The government represented to the Court that it began planning Jama's removal upon learning of the Supreme Court's opinion on January 12 but, nevertheless, was not able to attempt the operation until April 20. (*See* Third Hoechst Decl.)

The period of time required to ensure Jama's acceptance may, in fact, be much longer than ninety days. According to the private security company that the government hired to handle the last leg of the removal, they received assurances from an official, who in turn had received assurances from other officials, that Jama would be accepted. (Fourth Hoechst Decl.) The parties agree that although the official contacted by the contractors continued to support Jama's acceptance, several apparently higher-level officials agreed that he should not be admitted. (Fifth Hoechst Decl.; Jama Decl. of Apr. 28, 2005.) The government's most recent declaration to the Court indicates that the security company has received renewed assurances of Jama's acceptance from the same official from whom they received assurances the first time. (Sixth Hoechst Decl.) This official has apparently agreed to meet Jama's plane personally. *Id.* However, the government gives no indication of why this official's authority will extend farther in a future deportation attempt than it did in the last failed attempt and does not explain how his physical presence can accomplish more than his verbal instruction that Jama be accepted did last time.

This indicates to the Court that there was a significant miscommunication between ICE's private contractors and their Puntland contacts as to who had the authority to authorize Jama's admission. It also indicates to the Court that the contractors do not have access to the Puntland officials necessary to carry out a deportation plan and that decision

making channels in the region remain so ill-defined that the assurances of any one official mean little to nothing. Although the government need not secure affirmative acceptance from a recognized government before attempting a deportation, as a practical matter, it seems essential for the United States government to ensure that the people in physical control of the area will not oppose the action. At best, such opposition will enable local officials to physically prevent the deportation, as happened in this instance. At worst, such opposition will place the deportee and his escorts in physical danger.

Additionally, Jama was refused entry, at least in part, because he did not have adequate identification. (Fifth Hoechst Decl.; Jama Decl. of Apr. 28, 2005.) The importance of Jama being provided with adequate identification was noted both by this Court in its April 11, 2005 Order and by Jama's counsel. Although alerted to the potential problems a lack of identification could occasion, the government apparently refused to provide Jama with any identification other than the warrant and order for his removal. (Fourth Hoechst Decl.; Magnuson Aff. of Apr. 28, 2005.) The government's May 6 declaration indicates that the government still intends to provide Jama with only these documents.[11] (Sixth Hoechst Decl.) It has also been reported to the Court that the Puntland officials were concerned that Jama could not establish that he was a citizen of Puntland or, indeed, of Somalia. As Jama does not have any identification or documentation dating from before his family fled Somalia, it appears that it may be impossible to allay this particular concern, at least in the immediate future. The

[11] The security company's statement, relayed in the May 6 declaration, that these documents will be sufficient does little to allay the Court's concern as, presumably, the security company took the common sense step of confirming that they would be acceptable before the last attempt.

Government's earlier suggestion that Jama's counsel provide him with a fake Somali passport, *see Jama v. ICE*, No. 01-1172, at *2-3 n.2 (D. Minn. Apr. 7, 2005)), a scheme fortunately rejected, would have likely made the situation on the ground in Puntland even worse.

Finally, in addition to the obvious difficulties related to effecting a removal to a still unstable, relatively primitive and lawless locale, the Court is concerned that the government may have jeopardized what ability it had to accomplish removal to Puntland, Somalia by rushing to carry out a plan that was not as fully or carefully considered as was represented to the Court simply in order to avoid a temporary release of Jama. The Puntland officials who denied Jama's entry expressed concern that the United States had not negotiated directly with them or provided adequate and complete documentation with respect to Jama, and voiced displeasure that the United States might consider Puntland and Somalia a "dumping ground" for people the United States deemed undesirable.[12] (Fifth Hoechst Decl.; Jama Decl. of Apr. 28, 2005; Magnuson Aff. of April 28, 2005.) The task of repairing this breach is complicated by the government's unwillingness to negotiate directly with Puntland officials, whom the United States do not recognize as a legitimate government.

The government has done nothing to address any of these issues. Indeed, the government has refused to share virtually any information whatsoever with the Court, and what information it has shared has been significantly delayed and only provided in

---

[12] This corresponds to anecdotal accounts that the Court has received that the Somali language BBC radio station has reported that officials in Puntland are extremely concerned about the possibility that the United States may be attempting to remove some 4,000 more deportable aliens to Somalia.

response to a specific order of the Court. The government's unwillingness to be forthcoming is again demonstrated by its reliance on the bare statement that "ICE is developing alternate plans to accomplish Jama's removal from the United States … [and] anticipate[s] that Jama's removal will be successfully executed within the next six weeks" as grounds for continuing Jama's detention. (Fifth Hoechst Decl.) As noted above, the government's most recent declaration indicates that the security company has received renewed assurances from the same Puntland official. (Sixth Hoechst Decl.) That official once again apparently says that he and higher level officials he had spoken to have approved Jama's acceptance. *Id.* The Court notes the obvious fact that these assurances from this official previously proved to be wholly inadequate. The government goes on to state that "ICE is developing an itinerary to accomplish Jama's removal from the United States to Puntland. It is anticipated that Jama's removal will be successfully executed within the next few weeks."[13] *Id.*

The Court has taken substantial additional time to consider the government's latest submissions and to permit the government time to further advise the Court of the steps it has taken to ensure that the next deportation attempt will succeed where the last one

[13] The declaration asserts that the security company has received renewed assurances from their "official" contact that Jama will be accepted and that this official will be present to accept Jama on behalf of the Puntland government. According to the security company, this official has spoken to the President of Puntland, who was unhappy that the first attempt was not successful, and that the office of the President "is prepared to inform RMI that Puntland will accept Jama's return, and that an ICE-issued certificate of identity is sufficient to permit his entry to Puntland," and that such a statement could be expected by May 14. (Sixth Hoeschst Decl.) The Court has not been provided with any such statement. Additionally, the Court notes that this "official" claimed to have obtained the approval, such as that allegedly now offered by the President, from very high ranking officials prior to the first attempt. (Sealed Fourth Hoechst Decl..)

failed. However, despite the Court's April 13, 2005 Order detailing the type of information required by the Court in order to determine whether any deportation plan is sufficiently concrete to ensure that it will be accomplished in the reasonably foreseeable future, the government has provided plainly inadequate and incomplete information indicating only that it plans to reattempt exactly the plan which collapsed so disastrously the first time. The Court appreciates the government's desire not to mislead the Court with inaccurate or incomplete information. However, the Court is well aware of the fluid and developing nature of the current situation and is well able to take that into account in making the necessary determinations in this case. The government's refusal to provide the Court with any concrete information regarding a removal plan leaves the Court no choice but to conclude that no viable plan exists and that plaintiff cannot and will not be removed in the reasonably foreseeable future, as required by law.

Continued detention in a civil matter is impermissible and indeed, unjust, except in "certain special and narrow nonpunitive circumstances" where a special justification, such as severe mental illness or extreme dangerousness, is demonstrated. *Zadvydas*, 533 U.S. at 690 (internal quotations and citations omitted). Neither ensuring an alien's availability for deportation at some unidentified, remote time in the future, nor an ordinary concern that the alien may, because of past behavior, present a danger to the community provides the requisite special justification. *Id*. at 690-91.

The government continues to insist that Jama presents a serious flight risk and may be dangerous. The evidence in the record of this case, however, is completely to the contrary. In fact, at this point, the Court specifically finds that there is not even a shred of evidence in the record of this case that Jama is a flight risk or a dangerous person. It

cannot be seriously disputed that neither Jama's criminal history nor his mental history even begin to approach the levels of dangerousness or illness contemplated by the Supreme Court in *Zadvydas* as possibly providing justification for ongoing civil detention, particularly when Jama has been detained for so many years. Jama has been a model prisoner for a significant period of time, even developing a friendly, mentor-like relationship with other inmates. (*See* Hohldahl Decl. of Apr. 28, 2005); *see also Jama v. Ashcroft*, 2004 WL 67658, at *2 (D. Minn. Jan. 12, 2004). The Court observes that Jama's long legal battle with the United States has afforded him recognition and respect among Somalis and indeed in the wider community.[14] Jama cooperated with each step of the recent deportation attempt, including attempting to contact people in Boosaaso who might have been able to help him gain admission.[15] (Jama Decl. of Apr. 28, 2005.) On

[14] The Court has examined carefully Jama's earlier conduct while incarcerated and finds that it was a product of extreme frustration and a youthful reliance on other inmates who gave him poor advice. The Court finds that such immature activity is long in Jama's past and not likely to be repeated. *See Jama v. Ashcroft*, 2004 WL 67658, at *4.

[15] In its conversations with and submissions to the Court, the government has seemed to suggest that Jama somehow orchestrated the denial of admission, perhaps hinting at the Government's possible appellate strategy. Initially, the Court notes the virtual impossibility that Jama could have accomplished such a feat from the Washington County Jail. Additionally, given the public attention that has been given this case, it surely is not surprising that Jama's family and members of the Somali community were alerted to Jama's imminent departure by other inmates immediately after ICE agents removed him from jail. If indeed anyone interfered in the deportation by informing the officials in Puntland of Jama's arrival, the Court finds it much more likely that this was accomplished by some well-intentioned member of the large Somali community in the United States which has followed Jama's long legal battle with great interest. If that interference did occur, and the Court believes there is no evidence demonstrating that it did, it seems likely that such communications would continue to hamper any deportation process to Somalia. For their part, Jama and his lawyers have repeatedly and consistently favored deportation rather than continued detention and, absent a threat to Jama's safety, would not have interfered. The Court finds absolutely no evidence to support any theory that Jama and his legal team did anything to thwart the deportation and in fact, finds that they tried to assist in effectuating a successful removal. In fact, the Court believes that Jama's lawyers could have

(Footnote continued on next page.)

the commercial flight back to the United States, ICE agents felt no need to restrain Jama, and the multi-leg journey was completed without incident.[16] *Id.* Further, as this Court has previously noted, ICE's often-stated concern that Jama would flee to Canada, which was once a legitimate concern, is no longer a viable option in light of the Agreement Between the Government of Canada and the Government of the United States of America for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries. *Jama v. ICE*, No. 01-1172 slip op. at 12, n.6 (D. Minn. Apr. 7, 2005). Under this Agreement, even if Jama were to flee to Canada and seek asylum, he would not be permitted entry. The Court finds that Jama satisfies any acceptable standard for release and will not interfere in any way with a future deportation.[17]

(Footnote continued.)

been helpful in the deportation if they would have had access to the specific plans for the operation, plans that ICE refused to share. The Court also notes that it would have been prudent for the government to ensure that all of the relevant officials had been informed of, and were amenable to, Jama's impending arrival rather than risk surprising anyone necessary to the success of the operation.

[16] Jama states that, before leaving Nairobi and again while transiting through London, he asked to be permitted to remain in either of those places because the ICE agents told him that he would be returned to jail in the United States indefinitely. His requests were denied, and he continued to cooperate with the agents.

[17] The Court has repeatedly suggested to ICE that if the agency is worried about Jama being a flight risk or a danger to the community, a concern not shared by the Court, conditions can be imposed on his release that would help allay those worries. ICE has apparently rejected these suggestions and strangely appears to seriously misunderstand the concept of a conditional release. (*See* Fifth Hoechst Decl.) The ICE official suggests that if released, Jama would have little incentive to comply with any conditions. Conditional releases, which are successfully accomplished every day, do not give the person released a choice as to whether to comply. They either comply with the conditions of release, or they are arrested and detained. There is no choice. Contrary to ICE's representation, Jama would have every incentive to comply with the conditions because if he did not, he would go back to jail.

In light of the above, the Court finds that Jama is not likely to be removed in the reasonably foreseeable future and must therefore be released, subject, of course, to any appropriate conditions. The Court fully appreciates that Jama is a deportable individual and desires, along with all parties to this case, that his removal be accomplished as quickly as possible. The Court also appreciates the government's immigration-related and foreign policy expertise. *See Zadvydas*, 533 U.S. at 700. Indeed, it was the Court's respect for this expertise that led it to defer to the government's previous removal plan, despite the Court's apparently accurate concerns that certain details, such as proper identification papers, had not been resolved. Nevertheless, Jama's removal, like the removal of any other alien, must be accomplished within the bounds of the law. The government is entitled to continue to develop a successful removal plan, but it may not simply keep trying to get it right while Jama remains incarcerated into a fifth year. The Supreme Court clearly rejected the argument that detention is lawful as long as good faith efforts to effectuate deportation continue. *Id.* at 702. Jama's temporary release will afford the government the time to investigate the situation, either repair the intended plan or build another, and accomplish Jama's removal and the removal of other deportable aliens safely and smoothly. Plainly, it makes good sense that the ICE take the time that is needed to carefully develop a safe deportation plan that is workable and effective rather than rushing a complex and difficult operation.

Keyse Jama has been living in limbo for over forty-nine months, has been civilly incarcerated for years beyond the length of his short criminal sentence, and has just endured a harrowing and frightful experience. Mr. Jama, perhaps more than anyone, has expressed a firm desire to have this situation conclusively and finally resolved – even

through deportation to a country in which he has not lived since childhood, to an area and people he does not know, and to a land that has changed beyond recognition. (*See* Jama Decls. of Apr. 15, 2005 and Apr. 28, 2005.) Releasing Keyse Jama subject to conditions and with the possibility of a looming deportation is not the concrete resolution desired by all parties. But the desired resolution is not available at this time and will not be in the near future, so release is the only appropriate, just and humane response to these very unique circumstances.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Petitioner's Motion for Release is **GRANTED**.

**IT IS FURTHER ORDERED** that:

2. Petitioner be released no later than 10:00 A.M. CDT on Monday, May 23, 2005.

DATED: May 20, 2005
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge