**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

JAMA, Keyse G. (A71 689 585)

Petitioner,

vs.

IMMIGRATION AND CUSTOMS ENFORCEMENT,

Respondents.

**PETITIONER'S RESPONSE TO RESPONDENT'S MOTION TO VACATE INJUNCTION AND DISMISS HABEAS PETITION AND REPLY TO RESPONDENT'S OPPOSITION TO MOTION TO COMPEL PRODUCTION OF EVIDENCE**

**Civil No. 01-1172 (JRT/AJB)**

## I. The Purported Letter of Acceptance from the President of Puntland Should Be Produced.

The Respondent argues that the purported letter from the President of Puntland should not be produced because there is no general right to discovery in habeas proceedings and the Petitioner has allegedly not shown good cause for the discovery of the letter. However, the Petitioner is not seeking the letter as part of a pre-hearing discovery effort. Rather, Petitioner is responding to Respondent's assertion that the letter constitutes new evidence to support its position that the deportation will be successfully implemented within the next few weeks and that, as a result, Jama should not be released from custody as required by this Court's Order of May 20, 2005. The letter constitutes the sole justification for Respondent's position that the deportation is now "reasonably foreseeable," and Jama's counsel should be able to review and confront that evidence

because Jama's constitutional liberty interest is at stake. *Zadvydas*, 533 U.S. at 701 (". . [O]nce the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.")

Here, the necessity for review of the letter is established by the history of the lack of reliability in the government's assertions about the dealings with the government of Puntland. Just as in the past, it is not the United States government which has dealt directly with the self-proclaimed government of Puntland in this recent effort. It is RMI. The U.S. government officials submitting declarations in this matter never state that they have actually seen or authenticated the letter. In its opposition to Petitioner's motion to lift the stay of the release order in the Eighth Circuit, the Respondent stated that: "Indeed, Jama's removal is reasonably foreseeable because ICE, *through its contractor*, has secured the approval of Jama's repatriation from the President of Puntland . . .." (Op. to Mot. to Lift Stay, at 4 (emphasis added).) Indeed, the United States government has consistently taken the position that it cannot deal directly with the self-proclaimed autonomous region of Puntland because of foreign policy and diplomatic considerations. The Respondent has made no showing as to why it can now rely upon RMI's dealings with the government of Puntland when, just two months ago, RMI proved to be a wholly unreliable agent to obtain acceptance by the government officials in Puntland. Given the track record of unreliability of the Respondent's assertions about the commitments of the state of Puntland to RMI, the Petitioner should be entitled to confront the evidence which is claimed as a basis for his continued incarceration. Respondent also makes the

unsubstantiated claim that disclosure of the letter from the President of Puntland will somehow impair the deportation process. In light of the fact that the Respondent is relying upon the public disclosure of acceptance from the President of Puntland as part of its attempt to keep Mr. Jama in jail, it is hard to see how the disclosure of the letter which sets forth this acceptance will jeopardize the removal process. Jama's continued detention should not rest on an out-of-record hearsay statement from a proven unreliable source. Respondent must meet its burden of proving that the deportation will occur as represented by producing this key letter. An easy solution for any such concerns, however, would be to limit the disclosure of the letter to Jama's counsel and to *in camera* review by the Court.

## II. Respondent's Motion to Dismiss the Habeas Petition Should Be Denied Because, at a Minimum, It Ignores Petitioner's Zadvydas Claim.

In seeking dismissal of this habeas petition, the Respondent ignores the fact that this petition includes Petitioner's *Zadvydas* claim that he must be released from custody because deportation is not reasonably foreseeable. There is a pending order from this Court requiring release from which the Respondent has appealed. Dismissal of the habeas petition, thus, would require this Court to interfere with appellate review. The Respondent does not make any argument as to why Petitioner's *Zadvydas* claim should be dismissed on grounds of lack of habeas jurisdiction. *Zadvydas* squarely held that there was habeas jurisdiction over an alien's challenge to ongoing detention. *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ("We conclude that § 2241 Habeas Corpus proceedings

remain available as a forum for statutory and constitutional challenges to post-removal-period detention.") Respondent's motion to dismiss the habeas petition should be denied.

## III. <u>8 U.S.C. § 1252 Does Not Divest this Court's Habeas Jurisdiction to Restrain Unlawful Conduct by the Respondent in the Deportation Process</u>.

In order to place in proper context the Respondent's claim that this Court has no power to deal in any way with the deportation process, it is important to review the scope of Petitioner's rights, the source of authority for those rights and the legal limitations on Respondent's exercise of power in the deportation process. The existence of Petitioner's rights, and this Court's authority to protect them, may best be demonstrated by examining extreme forms of government conduct to determine whether a deportee ever has rights which would place a limit on government conduct. Assume, for example, a case where the government inflects extreme physical pain upon a detainee during his transport to the country of removal through the use of physical restraints or drugs, or one where the deportee is thrown off an airplane into an isolated or war-torn territory where he will be in extreme danger or is forced across a border into a life-threatening environment. Does the alien have any rights at all which can be asserted to place some limitation on the government's conduct and its claim of unfettered discretion in such matters? Is there some point at which the government's conduct in such matters becomes unlawful? If so, then there must be habeas jurisdiction available to restrain the Executive's unlawful exercise of power.

Such limits on the government's conduct clearly exist. *Zadvydas* made clear that aliens like Mr. Jama who have been admitted into the United States and are in custody of

the United States are entitled to constitutional protection, such as the Fifth Amendment's Due Process Clause protection which forbids the government from depriving any person of "life, liberty, or property, without due process of law." The Court noted that freedom from imprisonment "or other forms of physical restraint" lies at the heart of the liberty that the Fifth Amendment Due Process Clause protects. 533 U.S. at 690. It drew upon the tradition of constitutional protection of aliens who are already subject to a final order of deportation. *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). In *Wong Wing,* the Court held unconstitutional a statute that imposed a year of hard labor upon aliens subject to a final deportation order. As *Zadvydas* noted: "That case [*Wong Wing*] concerned substantive protections for aliens who had been ordered removed, not procedural protections for aliens whose removability was being determined." 533 U.S. at 694. *See e.g. Ly v. Hansen*, 351 F.3d 263, 269 (6th Cir. 2003) ("*Zadvydas* establishes that deportable aliens, even those who had already been ordered removed, possess a substantial Fifth Amendment Liberty interest.")

Another source of the petitioner's right to be free from cruel, inhumane, and life-threatening treatment by the government while in its custody in the deportation process is international law. International law, as embodied in both treaty and customary law, is part of the law of the United States. Under the Constitution, international treaties are the supreme law of the land. U.S. Const. art. VI, cl. 2 ("all Treaties, made or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land"). Customary international law is also part of the law of this nation. *See The Paquete Habana*, 175 U.S. 677, 700 (1900); Restatement (Third) of the Foreign Relations Law of

the United States § 1211 cmt. E (1987) ("Restatement (Third)") ("Cases arising under treaties to which the United States is a party, as well as cases arising under customary international law . . . [are] within the Judicial Power of the United States under Article III, Section 2 of the Constitution.").

The basic protections codified in international human rights law depend primarily on states for their implementation and enforcement. These protections, as codified in the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, Dec. 16 1966, include the right to life (art. VI) and the right to be free from torture or cruel, inhumane, or degrading treatment or punishment (art. VII)[1] customary international law also obligates states to prohibit and protect human rights abuses, such as cruel, inhumane, or degrading treatment or punishment as well as slavery, genocide, and torture. *See e.g.*, Restatement (Third), supra, § 702 ("state violates international law if, a matter of state policy, it practices, encourages or condones, *inter alia*, genocide, slavery, murder, torture, cruel, inhumane, or degrading treatment or punishment, and apartheid"); *Filartiga v.*

[1] In ratifying the ICCPR, the United States declared articles 1-27 non-self-executing. U.S. Sen. Exec. Rep. 102-23 (102d Cong., 2d Sess. 1992), *reprinted in* 31 I.L.M. 645, 657 ("U.S. Sen. Exec. Rep.") (ICCPR does "not create a private cause of action" under the treaty). This declaration appears to be inconsistent with the purposes of the ICCPR and the Supremacy Clause. U.S. Const. art. VI, cl. 2; *see United States v. Duarte-Acero,* 208 F.3d 1282, 1284 (11th Cir. 2000). Moreover, whether or not the ICCPR is self-executing is not involved here since it is being invoked defensively and not to create a private cause of action. *Cf. United States v. Duarte-Acero,* 132 F. Supp. 2d 1036, 1040 n.8 (S.D. Fla. 2001) (declaration does not apply when raising "ICCPR claims defensively").

*Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) (recognizing prohibition against torture as customary international law).[2]

The primary federal habeas statute, 28 U.S.C. § 2241, confers jurisdiction upon this Court to halt violations of such rights. See § 2241(c)(3) (authorizing any person to claim in Federal Court that he or she is being held 'in custody in violation of the Constitution or laws . . . of the United States'). None of the recent amendment to 8 U.S.C. § 1252 strip the Court of such habeas jurisdiction. What § 1252 does do is channel and limit the way in which an alien can contest a final order of removal. For example, a petition for review can only be filed in the Court of Appeals, must be filed not later than 30-days after the date of the final order of removal, and there is to be no other jurisdiction to review claims contesting the final order of removal. 8 U.S.C. § 1252(a)(1), (a)(5), b(1), b(9).

In this proceeding, however, Petitioner has never contested the final order of removal to Somalia. Thus, § 1252(a)(5) and § 1252(b)(9) do not have any applicability to the claims concerning the government's mistreatment of Jama after the final order of removal. Moreover, there is no way in which Petitioner could have brought his claims about the current unlawful treatment by the government within 30 days of the final order

[2] The Supreme Court of the United States recently emphasized the importance of examining principles of international law as instructive for interpretation of the Eighth Amendment's prohibition of cruel and unusual punishment in the juvenile death penalty case. *Roper v. Simmons*, 543 U.S. ____ (2005) (slip opinion at 21).

of removal in May 2001 because the unlawful conduct did not take place until long after that period of time expired.

The habeas jurisdiction of this court was not stripped by the catch-all provision at the end of the statute, § 1252(g) entitled "Exclusive Jurisdiction," which provides that except as provided in the final order review process through the court of appeals, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Petitioner is not contesting the fact that the removal order will be executed. Rather, he is invoking the court's traditional habeas protection to prevent the government's unlawful conduct against him while he is in custody of the United States. The Eighth Circuit has already ruled on the inapplicability of § 1252(g) to such claims in its initial decision upholding this court's conclusion that it had jurisdiction under 28 U.S.C. § 2241 to consider Mr. Jama's habeas petition. *Jama v. INS*, 329 F.3d 630 (8th Cir. 2003). ("Mr. Jama, however, is not objecting to an unfavorable discretionary decision or action to execute the removal order.")

The government's interpretation of § 1252, as amended, would lead to an absurd result. It would mean that the government could act with complete impunity in any action that it took against the alien after the final order of removal and during the deportation process. It would strip the courts of any ability to restrain government mistreatment of the alien, no matter how severe or outrageous the conduct might be. If

this is in fact the meaning of the recent amendments to § 1252, then § 1252 violates the Suspension Clause, Art. I, § 9, cl.2, because it constitutes an evisceration of the Great Writ power of the courts to serve a check on the unlawful conduct of the Executive Branch. However, statutes should, if possible, be interpreted to avoid such constitutional problems. *INS v. St. Cyr*, 533 U.S. 289, 300 (2001). This Court is properly exercising its habeas jurisdiction to evaluate whether the Respondent is operating in an unlawful manner in violation of Petitioner's constitutional rights.

**IV. <u>This Court's April 22, 2005 Injunction Should Not Be Vacated</u>.**

The Respondent argues that even if this Court continues to assert habeas jurisdiction, it should vacate the injunction of April 22, 2005. It argues that it has received recent assurance from the President of Puntland regarding Jama's repatriation to Puntland and that Jama will be transported via charter aircraft to Bossasso in the "Puntland state of Somalia" on or before July 28, 2005. (Clark Decl., Ex. 3, Resp't Mot.) Thus, the Respondent argues that the "new plan should obviate the concerns that lead the Court to issue its April 22, 2005 injunction." (Resp't Mot. at 7.)

At first glance, it appears that the Respondent's Motion to vacate the April 22, 2005 Order is unnecessary because the Respondent declares under oath to the Court that it is going to once again arrange Jama's deportation to Bossasso in the custody of a private contractor, and this would appear to be the same deportation procedure previously presented to this court before April 22, 2005. However, the reason why the Respondent brings this motion is shown by Respondent's statement about what will happen in Puntland if Jama is once again rejected in Bossasso: "In the event that his repatriation to

Bossasso is not feasible or successful, Jama will immediately be taken by the same charter aircraft and contract escorts *to another location* within the state of Puntland." Clark Decl., Ex. 3, Resp't Mot. If this Court's Order of April 22 is vacated, the outside contractor would have unfettered discretion to take Jama to "another location within the state of Puntland" without any regard for Jama's safety.

Jama's concern that he will be subject to inhumane treatment by the Respondent and its agents during the next deportation effort is borne out by what occurred during the failed deportation effort in late April. Despite prior assurances by the private contracting firm RMI that it had arranged for Jama's acceptance in Bossasso, Jama was met with a chaotic situation upon arrival in Bossasso where approximately 20 armed men surrounded the plane, according to the private contractor. (Dist. Ct. Order May 20, 2005, at 7.) Ultimately, Puntland officials determined that Jama should not be accepted without proper documentation and without official communication between the United States and Puntland government. *Id.* Upon leaving Bossasso, the security agents for the private contractor threatened to leave Jama someplace else in Puntland or take him to Mogadishu because they were furious about their failure. (Jama Decl., April 28, 2005.

This history proves that the concerns that lead this Court to issue its April 22, 2005 injunction are not obviated by the government's "new plan" which is no more than the government's continued reliance upon RMI's trustworthiness in dealing with the government of Puntland and carrying out the duties of the U.S. government.

The Respondent argues, in the alternative, that this Court should not involve itself in any manner with the "removal operations" because it should defer to the Executive

Branch in matters relating to "foreign policy." It implies that the Supreme Court's decision in *Jama* calls for such abstinence. The Supreme Court's decision in *Jama*, however, was limited to the specific issue of whether the federal removal statute required prior acceptance by the government of the country of removal before deportation could occur. It did not deal in any way with the issue of constitutionally prohibited treatment of the deportee during the deportation process while the deportee is in the custody of the United States and its agents. The general principle that the courts should defer to the Executive Branch in matters where foreign policy expertise and diplomacy may be involved does not trump the alien's right to seek habeas protection from a federal court when the government mistreats the alien in violation of the alien's constitutional rights during the deportation process itself. Moreover, this Court has already shown substantial deference and patience towards the government's control of the deportation process in relying upon the government's earlier profession of its ability to successfully carry out a deportation effort before the bungled attempt at the end of April, 2005. The Court's Order of April 22 simply requires the government to report any new deportation plans to the Court so that the Court can properly balance the need to protect the Petitioner's constitutional and human rights with the duty of the Executive Branch to carry out the removal order in a lawful manner. It is clear that ICE has some contingency plan in mind. The Government should detail that plan in addition to its primary plan.

DATED: July 7, 2005

**BRIGGS AND MORGAN, P.A.**

By: s/ Jeffrey J. Keyes
Jeffrey J. Keyes (#55505)
Kevin M. Magnuson (#306599)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 334-8400

**AND**

Michelle Garnett McKenzie
Minnesota Advocates for Human Rights
650 Third Avenue South #550
Minneapolis, MN 55402
(612) 341-3302

**ATTORNEYS FOR PETITIONER**